**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
AT KANSAS CITY**

| | |
|---|---|
| **ALBERT OGLES,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) |
| | ) **Case No. 2:18-cv-02265** |
| **SECURITY BENEFIT LIFE** | ) |
| **INSURANCE COMPANY;** | ) **CLASS ACTION COMPLAINT FOR:** |
| **SECURITY BENEFIT** | ) |
| **CORPORATION; GUGGENHEIM** | )  1. **BREACH OF CONTRACT** |
| **PARTNERS, LLC; ROYAL BANK** | )  2. **FEDERAL RICO** |
| **OF SCOTLAND plc, and** | )     **VIOLATIONS** |
| **GUGGENHEIM INVESTMENTS,** | )  3. **UNJUST ENRICHMENT** |
| **A/K/A GUGGENHEIM PARTNERS** | ) |
| **INVESTMENT MANAGEMENT,** | ) |
| **LLC** | ) |
| | ) |
| **Defendants.** | |

---

### AMENDED COMPLAINT

---

Plaintiff Albert Ogles, by and through his attorneys, brings this Complaint against Defendants Security Benefit Life Insurance Company ("Security Benefit Life"), Security Benefit Corporation ("SBC"), Guggenheim Partners, LLC ("Guggenheim"), the Royal Bank of Scotland plc ("RBS"), and Guggenheim Investments, also known as Guggenheim Partners Investment Management, LLC (collectively, "Defendants"), on behalf of himself and all other similarly situated persons who purchased annuity products issued by Security Benefit Life, on or after July 2012. Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and as to all other matters upon information

and belief, based upon the investigation made by and through his attorneys and expert consultants.

## INTRODUCTION

1.      Plaintiff's claims arise out of his investment in Security Benefit Life's "Total Value Annuity," commonly known as a "fixed indexed annuity."

2.      In 2010, fixed indexed annuity sales totaled over $30 billion and were projected to grow substantially in the coming years. Prior to 2010, Security Benefit Life had not issued any indexed annuities. The company had also been weakened by the recession. Guggenheim Partners was attracted to the indexed annuity market and saw opportunity in the financially distressed Security Benefit Life. Although Security Benefit Life had never offered indexed annuities, it was a ready-made platform from which Guggenheim could launch indexed annuity products. Thus, in 2010, Security Benefit Life became a "Guggenheim Partners Company."

3.      Guggenheim was attracted to the indexed annuity market because fixed indexed annuities provide an ideal vehicle for companies who issue them to gain access to large amounts of cash in the form of up-front premium deposits, many of which are one-time payments in the hundreds of thousands of dollars per each annuity. Once deposited with the company, the company can then invest the money and earn returns on the investments. This arrangement is made more attractive to the annuity issuer by the fact the actual returns on the investments are not paid to the annuity purchasers because fixed indexed annuities are designed to not actually participate in equity, bond, other security, or commodities investments. Instead, any interest credited to the annuity is done so according to changes in an external index chosen by the insurance company

2

in designing the product. In other words, the earnings performance of the annuity is not based on the insurance company's asset management and investment successes, but instead is passively linked (purportedly) to an external reference over which the insurance company should have no control. As for the actual returns created by the asset management and investment successes of the insurance company using the annuity purchasers' cash, those are kept by the insurance company and a substantial portion are ultimately paid as dividends to its parent company(ies). With the acquisition of Security Benefit Life in 2010, the parent company ultimately receiving such dividends would become Guggenheim.

4.      Under its new ownership, Security Benefit Life's focus immediately shifted to indexed annuities and the company went from being unranked in indexed annuity sales on January 1, 2011 to number four as of December 31, 2011. In just two short years of being under Guggenheim's control, Security Benefit Life would rise to become the industry leader in fixed annuities and the second largest in the United States in indexed annuity sales.

5.      Security Benefit Life's success in the indexed annuity market was driven by an aggressive marketing campaign aimed at both the sales force who would distribute the products and the consumers who would buy them. On both fronts, the primary pillar of the marketing efforts was the longevity and then current financial condition of Security Benefit Life now coupled with the investing power of the Guggenheim Partners. But, as explained below, the financial strength of Security Benefit Life was illusory and the investing power of Guggenheim Partners was not to be used for the benefit of the annuity purchasers, but instead only to promote Guggenheim's self-interests.

6.   The phenomenal success of Security Benefit Life was also driven largely by the "Total Value Annuity" and its "5-Year Annuity Linked TVI Index Account," both of which were developed by the Guggenheim Partners Companies in conjunction with the Royal Bank of Scotland. The product was touted by its creators as an innovation in the fixed indexed marketplace because it was linked to the Trader Vic Index Excess Return ("TVI Index") which tracks the prices of 24 highly liquid future contracts across physical commodities, global currencies and U.S. interest rates, and does so in a manner that purportedly takes advantage of both rising and falling market trends. In other words, the Total Value Annuity was purportedly built on an interest crediting strategy that was not equities oriented, but instead was more diversified and commodities-based and, if it lived up to its creators' hype, would provide higher interest credits at a time when historically low interest rates were not allowing other equity-indexed annuities to provide much "upside potential."  The Total Value Annuity's upside potential was also hyped as being greater than its competitors' because, when the annuity purchaser allocated premium payments to the "5-Year Annuity Linked TVI Index Account," there would be no "cap" imposed on the interest crediting and there would be a 100% participation rate (at least initially). In addition to these features, the "5-Year Annuity Linked TVI Index Account" also had a "volatility control overlay" that would purportedly provide more stable returns even if the underlying Trader Vic Excess Return Index failed to perform as anticipated.

7.   Along with these features, the original design of the Total Value Annuity made the "5-Year Annuity Linked TVI Index Account" the most, if not only, attractive interest crediting option available in the product because the only other options were the fixed account interest crediting option that provided only a 1.00% guarantee and the "S&P

Annual Point to Point" account option that was capped at 2.75%. When presented with these options, most purchasers of the Total Value Annuity opted to allocate most of their purchase payment dollars to the "5-Year Annuity Linked TVI Index Account" and its promise of greater upside potential.

8.      A trade-off for being allowed to allocate premium dollars to the "5-Year Annuity Linked TVI Index Account" was the fact that once the allocation was made, no re-allocation could be made for a period of five years. And, any interest credits would only be determined at the five-year mark, meaning that the annuity purchaser would not know how much interest they would receive until five years after the initial investment because the interest was calculated based on the difference between the ALTVI Index as it was reported at the time of the initial investment and then as it was reported on the fifth anniversary from the initial investment. An attempt to re-allocate or withdraw from "5-Year Annuity Linked TVI Index Account" carried substantial penalties.

9.      Five years after the Total Value Annuity's roll-out, the trade-off of the "5-Year Annuity Linked TVI Index Account" proved to not be worth it as the account failed to deliver. Purchasers who allocated their life savings to the account have seen little if any interest credited to their account. Meanwhile, the Guggenheim Partners companies and RBS have generated substantial profits all of which were derived from the premium dollars investors used to purchase the Total Value Annuity.

10.      With the Total Value Annuity and its "5-Year Annuity Linked TVI Index Account," the Defendants in this action created a vehicle that would effectively lock thousands of annuity purchasers' life savings into a product that was both designed and expected by the Defendants to perform far below, and in stark contrast to the promotional

sales and marketing messaging. The true nature of the product's design and the Defendants' expectations for its underperformance were fraudulently concealed from the thousands of purchasers of the Total Value Annuity. The Defendants' actions have locked the Plaintiff and proposed Class members into an unsuitable and non-performing investment, all while the Defendants have enjoyed reaping substantial profits from other investments made with the Plaintiff's funds.

11.     The investment dollars of the Plaintiff and proposed Class were obtained through a common course of deceptive conduct involving a centralized sales scheme orchestrated by Security Benefit Life, SBC and Guggenheim. The sales scheme employed uniform misrepresentations and omissions of material facts including that the annuities were worth substantially less than the purchase prices paid for them, and that the annuities are fundamentally inferior to comparable products. The Defendants also fraudulently omitted facts about the severe conflicts of interest created between Security Benefit Life, Guggenheim, the advisors selling the annuities, and the Royal Bank of Scotland who purportedly created, sponsored and administered the "external" index that was being used to manipulate and determine the interest credits (or lack thereof) for a substantial amount of the dollars invested in the Total Value Annuities.

## II – PARTIES & RELATED ENTITIES

### Plaintiff:

12.     Plaintiff Albert Ogles is, and at all times mentioned herein was, a resident and citizen of the State of Alabama. As discussed in greater detail below, in July 2012, Plaintiff purchased a Security Benefit Life Total Value Annuity with the reasonable

expectation that Security Benefit Life, SBC, Guggenheim and RBS would administer the annuity in such a way that it would perform consistent with the uniform representations made in the standardized marketing materials and contract documents provided by the Defendants.

**Defendants:**

13.     Defendant Security Benefit Life Insurance Company ("Security Benefit Life") is a Kansas corporation with its principal place of business in Topeka, Kansas. Security Benefit Life issued, administered and managed its annuities, as well as its relationships with its co-Defendants and related entities in this District and elsewhere during the Class Period.  The alleged misconduct set out herein occurred substantially in this district and such misconduct emanated, at least for Defendant Security Benefit Life, from its home office in Topeka, Kansas.  Security Benefit Life is liable for its own acts and the acts and omissions of its related entities, producers, agents, employees, co-conspirators, and co-members of the RICO enterprise described herein including, but not limited to SBC, Guggenheim, Royal Bank of Scotland, Creative Marketing, Advisors Excel, Impact Partnership and Gradient Financial. Security Benefit Life can be served at One Security Benefit Place, Topeka, Kansas 66636.

14.     Defendant Security Benefit Corporation ("SBC") is a Kansas corporation with its principal place of business in Topeka, Kansas. SBC, at all relevant times, was doing business in this District. SBC is Security Benefit Life's parent company and is controlled by Guggenheim. SBC is liable for its own acts and the acts and omissions of its related entities, affiliates, agents, employees, co-conspirators, and co-members of the RICO enterprise described herein including, but not limited to, Security Benefit Life,

Guggenheim, Royal Bank of Scotland, Creative Marketing, Advisors Excel, Impact Partnership and Gradient Financial. SBC can be served at Security Benefit Corporation, One Security Benefit Place, Topeka, Kansas, 66636.

15.     Defendant Guggenheim Partners, LLC ("Guggenheim") is a New York limited liability corporation, with its headquarters in Chicago, Illinois and New York, New York. Guggenheim owns and controls Guggenheim Investments, SBC and Security Benefit Life. Guggenheim is liable for its own acts and the acts and omissions of its related entities, affiliates, agents, employees, co-conspirators, and co-members of the RICO enterprise described herein including, but not limited to, Guggenheim Investments, Security Benefit Life, SBC, Royal Bank of Scotland, Creative Marketing, Advisors Excel, Impact Partnership and Gradient Financial. Guggenheim can be served at through its registered agent, Richard E. Michaels, at 311 South Wacker Drive, Suite 4400, Chicago, Illinois, 60606.

16.     Defendant Guggenheim Investments is also known as Guggenheim Partners Investment Management, LLC which is registered with the Security & Exchange Commission as an investment advisor and lists its principal place of business as 100 Wilshire Boulevard, Suite 500, Santa Monica, California, 90401, and maintains other offices at 227 West Monroe Street, Suite 4900, Chicago, Illinois, 60606; and at 330 Madison Avenue, New York, New York, 10017; and at 500 Boylston Street, Suite 1300, Boston, Massachusetts, 02116. It notes on its form ADV that it does business in all United States jurisdictions with the exception of Guam and Wyoming. Guggenheim Investments is liable for its own acts and the acts and omissions of its related entities, affiliates, agents, employees, co-conspirators, and co-members of the RICO enterprise described herein

including, but not limited to, Security Benefit Life, SBC, Guggenheim, Royal Bank of Scotland, Creative Marketing, Advisors Excel, Impact Partnership and Gradient Financial. Guggenheim Investments can be served at its principal place of business at 100 Wilshire Boulevard, Suite 500, Santa Monica, California, 90401.

17.     The Royal Bank of Scotland, plc ("RBS") is a United Kingdom-based banking and financial services company headquartered in Edinburgh, Scotland. Its filings with the Kansas Secretary of State notes that its principal office in the United States is at 600 Washington Boulevard, Stamford, Connecticut 06901. At all relevant times, RBS and its affiliates created, sponsored and administered the "Annuity Linked TVI Index." RBS is liable for its own acts and the acts and omissions of its related entities, affiliates, agents, employees, co-conspirators, and co-members of the RICO enterprise described herein including, but not limited to, Security Benefit Life, SBC, Guggenheim, Creative Marketing, Advisors Excel, Impact Partnership and Gradient Financial. RBS's resident agent is the Corporation Service Company and may be served at 2900 SW Wanamaker Drive, Suite 204, Topeka, Kansas 66614.

**Defendants' Related Entities:**

18.     Creative Marketing International Corporation ("Creative Marketing") is a Kansas corporation with its principal place of business in Leawood, Kansas. In 2014, Creative Marketing changed its name to "Creative One Marketing Corporation." Creative Marketing is an "independent marketing organization" ("IMO") and is one of the four IMOs Security Benefit Life released its Total Value Annuity exclusively through.

19.     Advisors Excel, LLC ("Advisors Excel") is a Kansas corporation with its principal place of business in Topeka, Kansas. Advisors Excel is an "independent marketing organization" ("IMO") and is one of the four IMOs Security Benefit Life released its Total Value Annuity exclusively through.

20.     The Impact Partnership, LLC ("Impact Partnership") is a Georgia corporation with its principal place of business in Kennesaw, Georgia. Impact Partnership is an "independent marketing organization" ("IMO") and is one of the four IMOs Security Benefit Life released its Total Value Annuity exclusively through.

21.     Gradient Financial Group, LLC and/or Gradient Annuity Brokerage and/or Gradient Insurance Brokerage, Inc. ("Gradient Financial") is a Minnesota corporation and/or a Kansas corporation with principal places of business in Topeka, Kansas. Gradient Financial is an "independent marketing organization" ("IMO") and is one of the four IMOs Security Benefit Life released its Total Value Annuity exclusively through.

22.     Mark Walter ("Walter") was at all relevant times Guggenheim's CEO. Walter is currently Chairman and controlling owner of the Los Angeles Dodgers. Walter is also a trustee or director of several organizations including the parent holding companies for Security Benefit Life.

23.     Todd Boehly ("Boehly") was at all relevant times Guggenheim's President.

24.     Robert "Bobby" Patton Jr. ("Patton") was at all relevant times a Guggenheim client and associate of Walter and Boehly. Patton is part of the group that formed Guggenheim Baseball Management, LLC with Walter and Boehly, the private partnership Guggenheim formed in 2011 to acquire the Los Angeles Dodgers.

25.     Guggenheim Life and Annuity Company ("Guggenheim Life") is a Delaware company domiciled in Delaware, with its "Main Administrative Office" reportedly at 401 Pennsylvania Parkway, Suite 300, Indianapolis, Indiana. Guggenheim Life was first organized in 1985 as Kansas City Variable Life Company. Following a change in ownership, that company was renamed Wellmark Community Insurance Inc., which Guggenheim through its subsidiaries acquired in the fall of 2009 and renamed Guggenheim Life. Walter and other employees of Guggenheim and Guggenheim's parent, Guggenheim Capital, LLC, were made members of Guggenheim Life's board of directors. In 2012, Security Benefit Life ceded $502,384,360 to Guggenheim Life.

26.     Heritage Life Insurance Company (AZ) ("Heritage") is an Arizona company domiciled in Arizona, with its "Main Administrative Office" reportedly at 401 Pennsylvania Parkway, Suite 300, Indianapolis, Indiana. Heritage is not a subsidiary of Guggenheim. Heritage sold no annuity products during the Class Period; it has instead purportedly assumed approximately $1.69 billion in current liabilities through reinsurance agreements with Security Benefit Life. As shown below, despite Heritage's separate ownership, Guggenheim is affiliated not only with Security Benefit Life and Guggenheim Life, but also with Heritage; by the same token, despite Heritage's separate ownership, Security Benefit Life and Guggenheim Life, are likewise affiliated with Guggenheim and Heritage.

## III - JURISDICTION AND VENUE

27.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

28.     This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965(a), (b) and (d). Security Benefit Life and SBC reside in, are found in, have agents and related entities in and transact their affairs in Kansas.

29.     Moreover, all Defendants are associates in and have participated in a fraudulent enterprise designed to market, promote, distribute, sell, administer and manage Security Benefit Life's annuity products in and from Kansas during the Class Period, such that the "ends of justice" support the exercise of personal jurisdiction over them by this Court.

30.     Defendants' contacts with this District and the United States as a whole satisfy the "minimum contacts" test, such that the exercise of jurisdiction over them is consistent with constitutional due process protections.

31.     Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and (b), as Security Benefit Life and SBC reside in, are found in, have agents in and transact their affairs in Kansas.

32.     Venue in this District is alternatively appropriate under 28 U.S.C. § 1391, because Guggenheim, Security Benefit Life, SBC and RBS, as corporations, are deemed to reside in any judicial district in which they are subject to personal jurisdiction, and because a substantial part of the events or omissions giving rise to the claim occurred in this District.

## IV - FACTUAL ALLEGATIONS

### The Fixed Indexed Annuity Market

33.     Security Benefit Life's Total Value Annuity is a fixed index annuity ("FIA"). FIAs are retirement investments sold by life insurance companies and are like all other

annuities in that by accepting the premium deposit and issuing the FIA an insurance company promises to pay income on a regular basis for an agreed period of time. FIAs are "deferred" annuities and have two phases. The first, called the "accumulation" or "deferral" phase, occurs when the contract accrues value through the purchaser's payment of premiums and credited interest. The second, called the "payout" phase, occurs when the insurance company pays the purchaser a stream of payments based on a designated payment option.

34.      An FIA earns credited interest based on positive changes in a market index; typical examples are the Dow Jones Industrial Average, Nasdaq 100 Index, or Standard & Poor's 500 Index. The purchaser's annuity premiums are not invested in index funds, however. Instead, the market index's performance is used simply as a reference to determine the amount of credited interest under the specified index crediting method. So, depending on the performance of the specific market index, a FIA may produce much higher or lower returns than the guaranteed rate of return offered by a declared rate annuity. But, the crediting rate is guaranteed never to fall below zero, even if the market goes down and the index is net negative for the crediting period. Thus, the principal should be protected from market downturns. Both declared rate annuities and FIAs are governed by state insurance laws, and they are exempt from federal securities laws. *See Mkt. Synergy Grp., Inc. v. U.S. Dep't of Labor*, No. 16-CV-4083-DDC-KGS, 2016 WL 6948061, at **2–3 (D. Kan. 2016).

35.      The United States Department of Labor ("DOL") has described the differences it perceives between FIAs and other types of fixed annuities (such as declared rate annuities). The DOL explained that other types of fixed annuities "provide payments

13

that are the subject of insurance companies' contractual guarantees and that are predictable." The DOL concluded that the non-FIA deferred annuity contracts have important lifetime income guarantees and terms that are more understandable to consumers. But, with regard to FIAs the DOL concluded that "[t]hese investments typically require the customer to shoulder significant investment risk and do not offer the same predictability of payments as Fixed Rate Annuity Contracts." The DOL explained that FIAs are "often quite complex and subject to significant conflicts of interest at the point of sale" and, thus, as the DOL determined, should be sold under more stringent conditions designed to protect customers. *See Mkt. Synergy Grp.,* 2016 WL 6948061, at *7 (citing Amendment to and Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies, and Investment Company Principal Underwriters, 81 Fed. Reg. 21, 147-01. at 21,152-53 (Apr. 8, 2016)).

36.     Viewed in the larger context of overall annuity sales (including all fixed and variable annuities sold), FIA sales were as follows: 2012 FIA sales amounted to approximately $34.1 billion, or approximately 15.5% of all fixed and variable annuities sold). 2013 FIA sales amounted to approximately $38.7 billion, or approximately 16.8% of all fixed and variable annuities sold). 2014 FIA sales were approximately $46.9 billion, or approximately 19.7% of all fixed and variable annuities sold). 2015 FIA sales were approximately $53.1 billion, or approximately 22.5% of all fixed and variable annuities sold). And, in 2016, FIA sales amounted to approximately $58.2 billion or approximately 26.2% of all fixed and variable annuities sold).

**Guggenheim Acquires Security Benefit Life and Prepares to Enter the Fixed Indexed Annuity Market**

37.     Security Benefit Life was founded in 1892 and with its parent company, SBC, provided retirement plan services throughout the nation, primarily in the education marketplace. However, prior to 2010, Security Benefit Life did not offer a fixed-indexed annuity in its product portfolio and instead had written substantial (non-FIA) annuity business that had put stress on the company's surplus. Security Benefit Life also suffered substantial losses from the financial crisis of 2008. Nonetheless, although Security Benefit Life was financially vulnerable, it  operated conservatively in its investments in keeping with its long-term obligations.

38.     In July, 2010, Security Benefit Life and SBC were purchased by an investor group led by Guggenheim and became "Guggenheim Partners Companies." Upon information and belief, Guggenheim targeted Security Benefit Life for acquisition due, in part, to the company's financial vulnerability and also because it provided an existing avenue for Guggenheim to enter the fixed-indexed annuity market. The fact that Security Benefit Life had no established track record or reputational baggage attached to equity indexed annuities also made the company an attractive option to become a new player in the fixed index annuity market.

39.     Immediately after the acquisition, Guggenheim demutualized Security Benefit Life, so that its dividends would be paid to Guggenheim rather than its policyholders.

40.     As discussed in great detail below, also immediately after Guggenheim acquired SBC and Security Benefit Life, Guggenheim, SBC and Security Benefit Life employed a deceptive and fraudulent accounting strategy to make Security Benefit Life appear financially stronger than it really was. The strategy involved a number of

reinsurance transactions that had the effect of shifting liabilities off Security Benefit Life's books while appearing to bolster the company's assets. Security Benefit Life continued to market its annuity products based upon express representations of its financial stability, emphasizing that Security Benefit Life is well-capitalized with sufficient assets to perform its long-term contractual commitments to its annuity purchasers. These representations were untrue. Instead, Guggenheim, SBC and Security Benefit Life had implemented fraudulent accounting schemes to siphon cash out of Security Benefit Life. The schemes included misrepresenting Security Benefit Life's surplus, misstating the company's financial strength by falsely claiming reserve credits for liabilities it was not entitled to claim, and misstating and concealing a substantial debt load that required substantial payments of interest and which undermined the company's ability to perform its long-term obligations to annuity holders. The schemes also included misstating Security Benefit Life's surplus by concealing massive amounts of toxic assets in the form of mortgage backed securities.

41.     While the true financial condition of Security Benefit Life has had a negative impact on the value of the Total Value Annuities sold to unsuspecting investors like the Plaintiff and members of the proposed Class, Guggenheim has profited from the fraudulent scheme. It extracted dividends from Security Benefit Life when Security Benefit Life did not have the requisite surplus and profits to support paying dividends. Guggenheim and RBS also extracted exorbitant management fees and investment fees from Security Benefit Life without providing corresponding value through services rendered for the company and its policyholders. Guggenheim also extracted cash from

Security Benefit Life through the use of improper loans and promissory notes, including financing the highly leveraged and speculative purchase of the Los Angeles Dodgers.

42.     While it re-worked Security Benefit Life's books, Guggenheim, Security Benefit Life, SBC and RBS collectively embarked on a unified campaign to generate maximum short-term cash by selling ever-increasing massive amounts of fixed-indexed annuities. According to a ranking from AnnuitySpecs.com's Indexed Sales and Market Report, 4Q2011, of all the Indexed Annuity products sold, Security Benefit Life went from unranked on January 1, 2011 to number 4 in Indexed Annuity Sales as of December 31, 2011. In just two short years of being under Guggenheim's control, Security Benefit Life would rise to become the industry leader in fixed annuities and the second largest in the United States in indexed annuity sales. Sales of annuities for Security Benefit Life increased from $321,254,569 in 2010 to $4,112,610,163 in 2012 of annuity considerations, a 1,180% increase.

43.     In April 2012, following the 2011 meteoric rise to becoming an industry sales leader, Security Benefit Life announced the launch of the "innovative" Total Value Annuity and with it, Guggenheim, Security Benefit Life, SBC and RBS would ultimately capture billions more retirement investment dollars. They did so through the deceptive design of the product, an over-incentivized sales force, and by continuing to misrepresent Security Benefit Life's financial strength.

**The "Innovative" Design of the Total Value Annuity and its 5 Year Annuity Linked TVI Index Account Interest Crediting Option**

44.     Fixed-indexed annuities are complex financial instruments and the crediting methods they use are extremely complicated.  The Total Value Annuity and its crediting

methodology has been described by one expert as the "poster child" of the complicated fixed-indexed annuity. The complexity of the product is beyond the comprehension of the average investor and any meaningful understanding of the product is dependent on full disclosure and comprehensive explanations of how the product is designed and is intended to function. Without full disclosures, the annuity purchaser is at the mercy of the company who designed and issued the product, as well as the advisors selling the product. By design, Security Benefit Life, SBC, Guggenheim and RBS failed to provide the necessary disclosures and likewise failed to adequately train the sales force who convinced Plaintiff and others to invest their life savings in the product.

45.     Among the information not provided by the Defendants to the Plaintiff and members of the proposed Class was the fact that the Total Value Annuity's extremely complex formulas, calculation methods and features provided Security Benefit Life, SBC, Guggenheim and/or RBS either the ability to manipulate the performance of the investment to the disadvantage of the annuity owner and to the advantage of the Defendants, or by design to minimize the interest to be credited to the annuity holders. Also not included during the marketing and sale of the product was any explanation of what the present intentions of the Security Benefit Life, SBC, Guggenheim and/or RBS were with respect to their own projections of the performance of the underlying indexes and their plans for future manipulation of the complex formulas, calculation methods and features of the product.

46.     The Total Value Annuity's original design was built around the "5 Year Annuity Linked TVI Index Account." This feature is unique in the world of the fixed-indexed annuities and is found only in the Total Value Annuity. It is the primary index crediting

option account for allocation of principal and the sales people who were appointed to sell the Total Value Annuity were trained and incentivized to direct Total Value Annuity owners to allocate most if not all of their principal investment to it, rather than one of the more standard index accounts such as the S&P 500 Index Account. It was uniformly touted as the best investment option available in the Total Value Annuity as well as the primary feature that purportedly made the Total Value Annuity superior to other annuities and investments.

47.    The "5 Year Annuity Linked TVI Index Account" is deceptive by design and works to the disadvantage of the annuity owner while allowing Security Benefit Life, SBC, Guggenheim, RBS and their sales force to reap profits at the expense of the annuity purchasers. It does this by locking the investor's money into a five-year period in which the investor has no option to reallocate his or her funds to another account within the Total Value Annuity. This is in addition to the fact that the annuity has a surrender charge penalty in effect for ten years from the date the annuity is purchased and this penalty prevents the annuity owner from moving funds to another product or outside investment. In more typical equity-indexed annuities with similar surrender charge penalties, the annuity owner would still have the ability to reallocate funds within the annuity to different accounts if the chosen account was failing to perform.  The "5 Year Annuity Linked TVI Index Account" does not allow such reallocation and once funds are allocated to the account those funds remain locked in for five years and the annuity owner has no choice or control over his or her savings.  It is only at the end of the five-year period that the annuity owner will even know if the "5 Year Annuity Linked TVI Index Account" has yielded a positive return at all because part of the complex crediting formula is built upon a five

year point-to-point crediting methodology. This means the performance of the index account is determined in part by comparing the Annuity Linked TVI Index on the day the annuity is issued with Annuity Linked TVI Index on the five-year anniversary of the issue date. In other words, the annuity owner will not and cannot know if he or she has earned any return on their investment until the end of year five.

48.     Although Security Benefit Life, SBC, Guggenheim and/or RBS represent that the "5 Year Annuity Linked TVI Index Account" provides the annuity owner with "the opportunity to receive index credits in times when an index crediting option based on equity or bond markets would not," the Defendants do not disclose that by being locked into the five-year point-to-point method, the annuity owner has increased odds of being affected by bad times. Since the launch of the Total Value Annuity, the "Annuity Linked TVI Index" has declined in value and being locked into the "5 Year Annuity Linked TVI Index Account" has amplified the negative effect of these bad times experienced by the Plaintiff and members of the proposed Class. The features of the TVA combine to make the annuity worth substantially less than the annuity purchasers paid for it.

49.     Any meaningful understanding of the "5 Year Annuity Linked TVI Index Account" is also complicated by the fact that repeated reference is made to the "TVI Index" or the "Trader Vic Index$^{TM}$ Excess Return Index." Like the S&P 500 Index, the Trader Vic Index was created prior to the launch of the Total Value Annuity and was not created solely for the purpose of providing a reference to equity-indexed annuities. The Trader Vic Index is an index that measures movements in prices of futures contracts on physical commodities, global currencies and U.S. interest rates that are publicly traded. Security Benefit Life, SBC, Guggenheim and/or RBS marketed the Total Value Annuity with an

emphasis on the Trader Vic Index because it is not based on the stock market. By highlighting the Trader Vic Index, Security Benefit Life, SBC, Guggenheim and/or RBS provided their sales force with a tool they could use to further differentiate the Total Value Annuity from other equity-based annuities (that were typically linked to the S&P 500) that were already in the marketplace and were "underperforming," and to play on the anti-stock market sentiment that grew out of the financial crisis and recession.

50.    Despite the emphasis placed on the Trader Vic Index in the Defendants' marketing scheme, the Total Value Annuity and its "5 Year Annuity Linked TVI Index Account" does not directly track the Trader Vic Index. Instead, the annuity uses the "Annuity Linked TVI Index." Unlike the Trader Vic Index (or the S&P 500 Index), the "Annuity Linked TVI Index" was created specifically for the Total Value Annuity and is operated exclusively for purposes related to the annuity. Rather than being an "external market index", as it is represented to be by the Defendants, the "Annuity Linked TVI Index" provides Security Benefit Life, SBC, Guggenheim and/or RBS a reference point they both designed and control and have the discretion to manipulate while using it to determine the amount of interest annuity owners will be credited. Because it was designed and is controlled internally, Security Benefit Life, SBC, Guggenheim and/or RBS either designed and created it in a manner to minimize interest credits to be paid to the annuity owners, or can use it to manipulate the outcomes to their advantage and to the detriment of annuity owners—either or both of which was done without disclosure to the Plaintiff and the members of the prospective Class.

51.    The true nature of RBS's involvement with Security Benefit Life and Guggenheim was also misrepresented. Security Benefit Life's direct and on-going

relationship with RBS is in contravention of the uniform terms of the "5 Year Annuity Linked TVI Index Account Rider" which state that "RBS's only relationship to Security Benefit Life Insurance Company is as licensor of certain trademarks and trade names of RBS and of the Annuity Linked TVI Index." The direct and ongoing relationship includes, but is not limited to, RBS being a direct counterparty to call options and warrants purchased by Security Benefit Life for hedging purposes related to the Total Value Annuities and "5 Year Annuity Linked TVI Index Account Rider," as well as Security Benefit Life making substantial other payments of fees and costs to RBS in relation to RBS's management and computation of the Annuity Linked TVI Index which diminish the value and performance of the Plaintiff's and putative Class members' annuities and riders.

52.     Similarly, Security Benefit Life, SBC, Guggenheim and/or RBS added a volatility control overlay feature to the Total Value Annuity and falsely represented that with it, Security Benefit Life and purchasers of the Total Value Annuity could obtain more upside potential. Creative One, one of the three IMOs tapped to distribute the Total Value Annuity, parroted what the Defendants told it and explained to its producers that "[t]his volatility feature, or 'dynamic allocation' is expected to dampen the daily volatility in the returns of the Annuity Linked  TVI Index . . . [a]nd [b]y adding this dynamic allocation, Security Benefit can obtain more upside potential from its option budget and offer clients the more compelling values of no interest cap, 100% index participation and no annual spread." Contrary to the stated expectations, the volatility overlay has proven to be of little to no value to the annuity purchasers. This is because either the feature was designed to minimize interest credits, was faulty by design, or is being improperly managed by

Security Benefit Life, SBC, Guggenheim and/or RBS. The Defendants have fraudulently concealed these facts from the Plaintiff and members of the proposed Class.

53.    The flaws of the Total Value Annuity and its Annuity Linked TVI Index are evidenced by the fact that in the years following the Plaintiff's purchase of the annuity, the Defendants created the "True Value Blended Index" in recognition of the shortcomings of the Annuity Linked TVI Index. Yet, the True Value Blended Index has not been made available to annuity owners like the Plaintiff who was already locked in to the "5 Year Annuity Linked TVI Index Account."

54.    In the meantime, Security Benefit Life, SBC, and/or Guggenheim have the benefit of 100% of the annuity owner's funds, which they invested at their discretion and kept all earnings and profits that are in excess of the costs they incur for issuing the annuity. The annuity owner's funds are not invested in the Annuity Linked TVI Index and none of the earnings derived from investing the annuity owner's funds are shared with the annuity owners.

55.    With respect to the Total Value Annuity's associated costs incurred by Security Benefit Life, it is important to note that a substantial amount is paid to Guggenheim and its other subsidiaries for managing Security Benefit Life's general account assets. As mentioned previously, these management fees are inflated and reduce the investment value of the Total Value Annuity for the Plaintiff and members of the proposed Class. Guggenheim, Security Benefit Life and SBC misrepresented and/or concealed this fact, in part, by stating in their standardized marketing materials that the asset management expertise of Guggenheim (and its subsidiary, Guggenheim Investments) "helps us set competitive credited rates for our annuity products."

56.     To the extent Guggenheim's asset management has any effect on the "credited rates for [their] annuity products," the actual effect has been non-existent interest credits for purchasers of the Total Value Annuity with purchase payments allocated to the "5 Year Annuity Linked TVI Index Account." This occurred while Guggenheim essentially paid itself to manage the investments of the general accounts for its own benefit.

57.     Indexed investment products, including fixed indexed annuities, are designed as passive investments, meaning that the performance of the investments are to be determined by reference to an external index that is measuring the performance of other investments that are being actively and externally managed.

58.     Security Benefit Life, SBC and Guggenheim Partners either chose the "TVI Index" and developed the "Annuity Linked TVI Index" and "5 Year Annuity Linked TVI Index Account" based on their undisclosed belief that the index would decline in value from the point at which the Total Value Annuity would be sold, or they were grossly negligent in failing to project the decline in value that would necessarily impact the Total Value Annuity's performance and to then adequately inform the annuity purchasers. In either case, Security Benefit Life, SBC and Guggenheim gained an advantage from the index's poor performance because no funds were invested directly in the index.  If there is no increase in value, nothing is owed by the companies to the annuity purchasers. Correspondingly, any projections of the Total Value Annuity's performance based on positive performance of the index were illusory.  Defendants developed the "Annuity Linked TVI Index" and "5 Year Annuity Linked TVI Index Account" to further their fraud as both were shams.

**How the Total Value Annuities were Sold**

59.     With the launch of the Total Value Annuity and with an eye toward carrying out its marketing and sales scheme, Security Benefit Life announced that the Total Value Annuity would be offered exclusively through "four elite independent marketing organizations (IMOs)." Its CEO explained, "[w]e're building on the success of our recent efforts to put unique and competitive products into the hands of respected national distribution organizations . . ." and ". . . are eager to again partner with Advisors Excel, together with three other elite marketing organizations, Creative Marketing, Gradient Financial and Impact Partnership."

60.     In the same announcement, Security Benefit Life explained that its parent company, SBC, "is a leading provider of savings and income solutions for America's pre- and post-retirees . . . [and] targets multiple wealth segments and channels of distribution through an independent, merit-based distribution structure."

61.     Security Benefit Life's "independent, merit-based distribution structure" is a watered-down description of its marketing and sales scheme that is built largely on a compensation system that includes exorbitant commissions and other perks offered to agents and IMOs in exchange for pushing the company's equity-indexed annuities. Indeed, the only plausible explanation for Security Benefit Life going from being unranked to number four in the industry in only a year is that it incentivized its sales force by offering higher commissions and more attractive sales perks than its competitors were offering.

62.     Another key component to Security Benefit Life's and SBC's "independent, merit-based distribution structure" is the fact that it "focuses on the retirement savings

market" and looks to "broker/dealers, IMOs and other financial services providers" to market and sell its equity-indexed annuities. In other words, inherent to Security Benefit Life's marketing and sales scheme is the fact that the products are not being sold as life insurance products (as they are technically categorized), but instead as investments and retirement plans by "financial services providers" who hold themselves out as investment advisors and retirement planning experts. Thus, by design, Security Benefit Life's and SBC's "independent, merit-based distribution structure" for its equity-indexed annuities is built on advisory relationships created by a sales force operating as investment advisors and retirement planning experts (rather than merely life insurance sales agents) and who are promoting investments in exchange for exorbitant undisclosed commissions and other compensation.

63.    Security Benefit Life's and SBC's compensation system creates conflicts of interest between those selling the equity-indexed annuities and the customers who invest their life savings. On the one hand, those who are selling the annuities are doing so in the context of an advisory relationship that requires the advisors to act in the customer's best interest. But on the other hand, the advisors are overly incentivized by the exorbitant commissions and perks to sell SBC and Security Benefit Life's annuities and to do so to the exclusion of other more suitable investments, and to the detriment of the customer.

64.    On a uniform and consistent basis, the full extent of these conflicts of interests and the Defendants' compensation system and its detrimental impact on the Plaintiff's and proposed Class members' investments were not disclosed and were fraudulently concealed. Consistent with the uniform training, Plaintiff's advisor either never mentioned the compensation he was to receive or created the impression and belief

that the compensation he received came from Security Benefit Life and not from the Plaintiff's funds. Likewise, Security Benefit Life's sales and marketing materials distributed in connection with the sale of Total Value Annuities, under the heading "Charges" on a page titled "Important Information About Security Benefit Total Value Annuity," states that "[w]hen you purchase your Total Value Annuity contract, no product-related expenses are deducted from your Purchase Payments at the time the application is received at Security Benefit . . . ." This is a deceptive half-truth. The commissions and perks paid to every producer who sold a Total Value Annuity were funded, directly or indirectly, by the Plaintiff's and proposed Class members' investments. The amount of this compensation factors directly into the amount of earnings the Plaintiff and proposed Class members are to receive because, while Security Benefit Life initially bears the cost of the compensation, it ultimately recoups the cost by reducing the amount of earnings that would otherwise inure to the benefit of the Plaintiff and proposed Class members. This was not disclosed to the Plaintiff and proposed Class members, but should have been because it would have revealed the conflicts of interest and would have also allowed the Plaintiff and Class members the opportunity to make informed investment decisions. The Defendants owed a duty to make these disclosures, in part, because they voluntarily offered some information about other factors that could affect the performance of the Plaintiff's and proposed Class members' investments, but failed to tell the whole story of how the annuity was designed and how the agent compensation undercut the value and performance of the Plaintiff's and proposed Class members' investments.

65.    As noted above, the Defendants' marketing and sales scheme of the Total Value Annuity was to be carried out through "four elite independent marketing

organizations (IMOs) . . .  building on the success of our recent efforts to put unique and competitive products into the hands of respected national distribution organization." The advisors who sold the Plaintiff their annuities were contracted with Creative Marketing, one of the "four elite independent marketing organizations" referred to above.

66.     The primary role of the IMO is to serve as a conduit between companies who issue annuities and the field agents who sell them. As a marketing organization, Creative Marketing, like the other three IMOs, was actively involved and provided direct support to the advisor who sold the Total Value Annuity to the Plaintiff. That support came in the form of funding for sales events such as seminars and ad campaigns, as well as agent training and supervision. For every annuity Plaintiff's advisor sold, Creative Marketing also received compensation from Security Benefit Life. Creative Marketing's arrangement with Security Benefit Life was substantially the same as the other IMOs' arrangement with Security Benefit Life.

**<u>Security Benefit's Financial Condition</u>**

67.     The Defendants' fraudulent marketing and sales scheme also emphasized the financial strength of Security Benefit Life. Advisors selling the Total Value Annuity were trained to represent Security Benefit Life as financially stable, having been in existence for over 100 years, and as a company that would provide safety and security for the annuity owners' retirement savings. Indeed, the financial strength and stability of a company issuing annuities are primary factors in any decision to invest one's life savings in the purchase of an annuity. This is because the annuity purchaser's life savings is only as safe and secure as the company with which they are entrusting it.

68.     But, the financial stability and strength of Security Benefit Life was misrepresented and its true condition was concealed from the Plaintiff and other purchasers of the Total Value Annuities.

69.     As mentioned above, Guggenheim acquired Security Benefit Life at a time when the company was financially distressed. In fact, the acquisition of Security Benefit Life was only one component of a larger scheme designed and carried out by Guggenheim in which two other life insurance companies were also acquired. Between 2009 and 2012 Guggenheim purchased the three insurance companies—Guggenheim Life (which operated in 2009 as Wellmark Community Insurance Inc. ("Wellmark") and was relatively dormant for the several years preceding the Guggenheim purchase in 2009), EquiTrust Life and Security Benefit Life. In short, Guggenheim's plan was to acquire insurance companies weakened by the recession and use them to sell seemingly safe and secure annuity products (particularly annuities with large, upfront premiums) while funneling cash out to Guggenheim and its affiliates, friends and associates rather than holding or reserving it to satisfy their long-term obligations to the annuity holders.

70.     For a combined 246 years, Security Benefit Life, EquiTrust Life and Guggenheim Life operated conservatively. They survived numerous economic downturns, wars, and periods of hardship by following the "tried and true" fundamentals of operating life and annuity insurance companies. They stored up policyholder premiums and annuity payments as reserves and surplus for the long haul so that when claims, annuity payments or requests for withdrawals or surrenders came due, adequate assets were readily available to make those payments. When they purchased reinsurance, it was mostly with outside, unaffiliated reinsurance companies that had their own capital and

surplus to be used to actually spread the risk — which is the legitimate reason for reinsurance in the first place.

71.     This all changed when Guggenheim — a private equity firm — swooped in to exploit the insurance company model, acquiring insurance companies, raiding their cash and leaving the long-term obligations of the policyholders and annuity holders unprotected. In the mere two years after taking control of Security Benefit Life, EquiTrust Life and Guggenheim Life, Guggenheim ignored the fundamentals of operating an insurance company for the long-term security of the policyholders and annuity holders by extracting hundreds-of-millions of dollars from these companies, not only depleting their surplus but eroding their reserves, leaving them in *a negative* surplus condition — meaning assets are less than required reserves.

72.     This was because the consequence of dramatically increased sales of annuity products dramatically increased long-term liabilities for the life insurance company who issues the annuities. However, to access and deplete Security Benefit Life's and the other insurance companies' surplus while maintaining the illusion of adequate capitalization, Guggenheim operated its group of wholly-owned insurers as excessively interdependent and incestuous affiliates, reinsuring virtually all of their risks with one another rather than spreading the risks to legitimate reinsurance companies through arm's-length reinsurance treaties. At the same time, instead of retaining premium revenue in reserve for future claims and annuity payments, the Guggenheim Insurers used the annuity holder funds to pay stockholder dividends to their Guggenheim parent and to loan billions of dollars more to a slew of Guggenheim affiliated companies.

73.     In addition to saddling the Guggenheim Insurers with the highly illiquid affiliated promissory notes and billions of dollars of highly illiquid mortgage and other risky asset-backed securities, Guggenheim Chief Executive Officer Mark R. Walter ("Walter"), Guggenheim President Todd L. Boehly ("Boehly") and Guggenheim business associate Robert "Bobby" Patton Jr. ("Patton") used the Guggenheim Insurers as a cash machine to buy the most expensive sports franchise in world history, the Los Angeles Dodgers ("the Dodgers"), with over a billion dollars in policyholders' funds.

74.     To gain access to the large sums of money generated by annuity sales and to keep selling these products and generating more cash, Defendants concealed the true financial impact of the increased liabilities that went along with those sales and the true financial condition of the Guggenheim Insurers. Defendants simultaneously concealed the Guggenheim Insurers' liabilities and inflated the companies' assets to falsely report adequate surplus so they could distribute cash to Guggenheim and its affiliates and business associates.

75.     To accomplish their illicit goals, Defendants took a page out of the Enron playbook, creating a fraudulent scheme through complicated accounting machinations that gave the false appearance of financial strength and stability to Security Benefit Life, Guggenheim Life and EquiTrust Life by: (1) moving liabilities off their books to affiliated and secretly affiliated entities (primarily through non-economic "reinsurance" transactions with affiliated entities), (2) inflating their assets by counting already encumbered assets as though they were available to make annuity holder payments, (3) executing billions of dollars of what appear to be essentially uncollateralized loans to affiliated entities or associates and portraying the related-party unsecured paper as assets, and (4) hiding

their non-performing assets. None of this was disclosed to the Plaintiff and other purchasers of the Total Value Annuities.

76.     At the center of this scheme was a shell game that Defendants hoped no one could follow, where money and liabilities were continuously shifted between companies with whom the Guggenheim Insurers acknowledged an affiliation (Security Benefit Life, Guggenheim Life, EquiTrust Life and Paragon Life Insurance Company of Indiana ("Paragon") and with a separate, secretly affiliated company that Defendants acquired and corrupted to facilitate the fraudulent scheme, Heritage Life Insurance Company (AZ) ("Heritage").

77.     Defendants used Paragon (formed by Guggenheim in 2011) and Heritage (bought in 2012 by Patton) as vehicles to remove massive liabilities from the books of Security Benefit Life, Guggenheim Life and EquiTrust Life, through illegitimate, non-arm's length "reinsurance" transactions among affiliates.

78.     Paragon and Heritage were both essentially shell entities, selling no life or annuity products of their own. Instead, they both were improperly used by Defendants to bury massive liabilities transferred from Security Benefit Life, Guggenheim Life, and EquiTrust Life in order to give them the false appearance of financial strength and stability.

79.     At the same time Defendants were hiding Security Benefit's liabilities, Defendants were also inflating their assets by additional fraudulent accounting machinations.   For example, collectively the three Guggenheim Insurers improperly counted as "admitted assets" over $2.59 billion of collateral that was already pledged to repay loans to the Federal Home Loan Banks.

80.     The Guggenheim Insurers also reported at the full value (i.e., at their original cost) huge amounts of toxic assets (mostly mortgage backed securities) rather than at their realizable value, thus grossly overstating the worth of these assets.

81.     Even worse, however, the Guggenheim Insurers spent over $5.1 billion to acquire affiliated debt instruments from holding companies in the Guggenheim family of companies, often appearing to receive no collateral beyond a written promise by the affiliated holding companies to pay back those billions. The Guggenheim Insurers nevertheless booked these uncollateralized IOUs as true assets at par value on their financial statements, again fraudulently misrepresenting their solvency to enable them to channel money to their Guggenheim parent companies.

82.     Indeed, between the years 2010 and 2012, the affiliated transactions of Security Benefit Life and the other Guggenheim Insurers with Paragon alone amounted to over $10.319 billion — dwarfing the reported surplus of these companies each year and demonstrating their deceptive misrepresentation of a stable financial condition.

83.     In sum, after their acquisition by Guggenheim, Security Benefit Life and the other Guggenheim Insurers were in short order rendered financially impaired, each having an essentially negative surplus (which means annuity holder funds were consequently impaired).

84.     Defendants' fraudulent scheme meanwhile allowed Guggenheim to generate and take cash out of the insurance companies, leaving behind companies in hazardous financial condition and putting their annuity holders at risk. Indeed, while the true surplus of each of these companies plunged further and further, Defendants

continued to funnel the cash extracted from its scheme to Guggenheim, its affiliates and its associates.

85.     For example, flush with their annuity holders' cash, Security Benefit Life and EquiTrust Life paid over $445 million in dividends to their respective Guggenheim parents, over $217 million in management fees to Guggenheim affiliates, and over $55 million in investment fees to Guggenheim affiliates. Additionally, beyond the $5.1 billion the Guggenheim Insurers paid to various affiliates within the Guggenheim family of companies in what appears to be largely unsecured promissory notes, they loaned almost $1 billion to Guggenheim business associates. In that regard, Guggenheim has essentially used Security Benefit Life as a line of credit for Guggenheim projects. As of December 31, 2012, Security Benefit Life had loaned nearly $1 billion to Guggenheim affiliates, through loans classified as either short-term or long-term investments.

86.     Perhaps the most perverse aspect of Defendants' fraudulent scheme, however, is the acquisition of the Dodgers by Guggenheim, Walter, Boehly and Patton for $2.15 billion — $1.2 billion of which was financed by policyholder and annuity holder money from the Guggenheim Insurers.

87.     In addition to the management and investment fees paid to Guggenheim, additional inflated and undisclosed amounts were also paid to RBS from annuity owners' funds through side transactions related to the Annuity Linked TVI Index.

88.     Given Security Benefit Life's true financial condition, none of the cash distributed to Guggenheim, its affiliates or its associates should have left the insurance company. The cash raid on Security Benefit Life has left the annuity holders with annuities worth far less than the premium dollars they paid and has exposed them to wholly

undisclosed and ever-increasing risks as Defendants continue to sell overpriced annuities to unwitting purchasers, particularly to the elderly who make up some 50% of all annuity purchasers and are least able to tolerate the risk of losing their life and retirement savings.

89.    Plaintiff and the other members of the proposed Class suffered concrete damages when they purchased their annuities from Security Benefit Life. As a direct result of the unlawful practices alleged herein, Plaintiff and the members of the proposed Class purchased one or more annuities that were worth far less than the premiums paid; each of them incurred an immediate, albeit fraudulently concealed, measurable financial loss on the purchase date equal to the difference between the premiums paid and the diminished value attributable to Security Benefit Life's undisclosed adverse financial condition and default risk of Security Benefit Life. Plaintiff and members of the proposed Class also suffered concrete damages when, on the five-year anniversary of their annuity purchase, the 5 Year Annuity Linked TVI Index Account realized little or no interest credits. In addition, to the extent that Plaintiff and other members of the proposed Class surrender their annuities before expiration of the pertinent surrender charge period, they have sustained additional concrete damages in the form of surrender charges.

90.    Defendants have thus, through a scheme that began as early as January 1, 2012, and continues through the present day ("the Class Period"), fraudulently duped Plaintiff and members of the proposed Class into buying annuity products based on false assurances of safety and financial strength, and through the fraudulent concealment of the truth about the design of the Total Value Annuity and the 5 Year Annuity Linked TVI Index Account. Plaintiff and the members of the proposed Class would not have purchased their annuities had they known the true financial condition of Security Benefit

Life and that the Total Value Annuity was designed to provide profit to the Defendants at the expense of and to the detriment of the annuity purchasers, and that purchasing annuity products that are far riskier and thus worth far less than comparable products issued by financially sound issuers.

91.     Defendants' fraudulent scheme constitutes a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d). Plaintiff and the Class have been damaged by Defendants' pattern of racketeering activity because they were misled into purchasing annuities based on material misrepresentations of the financial strength of the issuing companies, and omissions of the fact the Total Value Annuity and its 5 Year Annuity Linked TVI Index Account were designed and managed to minimize interest credits to the annuity products that no reasonable person would purchase if not deceived. This suit is necessary to remedy the injury caused by Defendants' racketeering activity. Additionally, the Defendants Security Benefit Life, Guggenheim and RBS have breached both expressed and implied contracts with Plaintiff and members of the proposed Class by failing to manage and administer the Total Value Annuities and the 5 Year Annuity Linked TVI Index Account consistent with the terms of the contracts and the reasonable expectations of the annuity owners.

**RICO Allegations**

**Standing, Injury, and Proximate Cause**

92.     Plaintiff and the members of the putative Class are each "persons" within the meaning of 18 U.S.C. § 1961(3).

93.     Defendants are "persons" within the meaning of 18 U.S.C. § 1961(3).

36

94.     Plaintiff and each member of the putative Class have sustained injury to his or her business or property by reason of the acts and conduct of Defendants alleged in this Complaint, including their loss of money due to their overpayment at the time of sale for the annuity products and/or losses realized after reaching the five-year anniversary of the annuity sold to them during the Class Period by Security Benefit Life.

95.     But for the conduct of Defendants alleged in this Complaint, Plaintiff and the putative Class would not have been injured.  The injury suffered by Plaintiff and each member of the Class herein was "a foreseeable and natural consequence of [Defendants'] scheme" to continue selling annuity products based on the misrepresentation of Security Benefit Life's financial condition and uniform nondisclosure and fraudulent concealment of the manner in which the 5 Year Annuity Linked TVI Index that was created and/or managed to minimize earnings potential. Moreover, there are no victims beyond Plaintiff and the putative Class more directly injured by Defendants' scheme and enterprise who can be counted on to seek remedies under RICO.

96.     The loss suffered by Plaintiff and each member of the Class was proximately caused by Defendants, as the alleged fraudulent scheme and enterprise was a direct and substantial factor in causing their injury.

97.     The harm suffered by Plaintiff and each member of the Class amounts to compensable injury caused by Defendants' conduct of an enterprise through a pattern of racketeering.

98.     Plaintiff and members of the proposed Class were the targets of the RICO scheme. They purchased annuities issued by Security Benefit Life based on false express and implied representations of Security Benefit Life's financial stability. Plaintiff and

members of the proposed Class would not have purchased the annuities had they known the true financial condition of Security Benefit Life.

99.     In addition, Plaintiff and each member of the Class were injured by the overt acts taken by the Defendants in furtherance of their conspiracy to violate 18 U.S.C. § 1962(c) which are themselves predicate acts, including hiding and/or understating liabilities through a series of fraudulent transactions among Security Benefit Life and the other Guggenheim Insurers, and Paragon and Heritage, and concealing the true nature of RBS's relationship with Security Benefit Life and Guggenheim.

**The Alleged Associated-in-Fact RICO Enterprise**

100.    The following group of individuals and companies associated-in-fact as an "enterprise" within the meaning of 18 U.S.C. § 1961(4) to market and sell Security Benefit Life's annuity products during the Class Period while concealing Security Benefit Life's true financial condition and the truth of how the 5 Year Annuity Linked TVI Index Account was created and/or managed to minimize interest credits:

        a.  Guggenheim;

        b.  Guggenheim Investments;

        c.  RBS;

        d.  SBC;

        e.  Walter and Boehly;

        f.  Security Benefit Life;

        g.  Guggenheim Life;

        h.  EquiTrust Life;

  i. Paragon;

  j. Patton;

  k. Heritage;

  l. Creative Marketing;

  m. Impact Partnership;

  n. Advisors Excel; and

  o. Gradient Financial.

101. This association-in-fact is referred to herein as the "RICO Enterprise."

102. As set forth herein, the RICO Enterprise has an ascertainable structure that is separate and distinct from the persons that constitute the enterprise and it is separate and apart from the pattern of racketeering activity alleged herein.

103. As alleged more fully below, Defendants conducted affairs of the RICO Enterprise through a pattern of racketeering activity. Defendants fraudulently concealed and conspired to fraudulently conceal (1) the true financial condition and financial instability of Security Benefit Life, (2) the true value of Security Benefit Life's annuity products, (3) the conflicts of interest created by the sales and marketing scheme of the Total Value Annuities, and (4) the siphoning of Security Benefit Life's cash for the use and benefit of individual enterprise members.

104. As a direct result of this fraudulent scheme, Defendants were able to and did charge Plaintiff and members of the proposed Class excessive prices for Security Benefit Life's annuity products and deprived them of interest credits on their annuities. As a direct result of this fraudulent scheme, Defendants were able to raid Security Benefit Life's coffers of billions of dollars. Defendants left the annuity holders with products they

never would have purchased had they known the true financial condition of Security Benefit Life, or the manner in which the 5 Year Annuity Linked Index Account Rider had been designed and managed to provide profit to the RICO Enterprise at the expense of and to the detriment of the Plaintiff and members of the proposed Class.

105.   The alleged RICO Enterprise has a sufficiently ascertainable structure in that it has (1) a purpose, (2) relationships among the associates, and (3) longevity sufficient to achieve its purpose.

**Purpose**

106.   The RICO Enterprise is an ongoing and continuing organization of companies associated for the common or shared purpose of continuing to market and sell the annuity products of Security Benefit Life and the other Guggenheim Insurers as a source of funds for Guggenheim, Walter, Boehly and Patton while concealing the financial instability of the Guggenheim Insurers through Heritage and Paragon.

107.   The RICO Enterprise functions partly through its deception of prospective annuity purchasers, in part, by deceiving prospective annuity purchasers regarding the value of Security Benefit Life's annuity products sold to them during the Class Period, as well as the true manner in which the 5 Year Annuity Linked Index Account Rider had been designed and managed to provide profit to the RICO Enterprise at the expense of and to the detriment of the Plaintiff and members of the proposed Class. If truly objective and disinterested, and if not used as a ruse to promote and effectuate the sale of these annuity products, many of these services and products could be legitimate and non-fraudulent. However, Defendants have, through the RICO Enterprise, engaged in a pattern of

racketeering activity which involves a fraudulent scheme to increase revenues for Guggenheim through the sale of Security Benefit Life's annuities by concealing its true financial condition and the manner in which the 5 Year Annuity Linked Index Account Rider had been designed and managed to provide profit to the RICO Enterprise at the expense of and to the detriment of the Plaintiff and members of the proposed Class.

**Relationships among Separate and Distinct Associates**

108.   Each associate of the RICO Enterprise has an existence separate and distinct from its participation in the racketeering activities of the RICO Enterprise. Guggenheim, Security Benefit Life, EquiTrust Life, Guggenheim Life, Heritage, Paragon, Creative Marketing, Advisors Excel, Gradient Financial and Impact Partners are all organized as separate companies, with separate boards, separate books and records, separate accounts and separate existences for legal and regulatory purposes. Security Benefit Life, EquiTrust Life and Guggenheim Life facilitated and knowingly participated in the fraudulent scheme orchestrated by Guggenheim. So too did Heritage, which is separately indirectly owned by Patton and was corrupted as part of the scheme.

109.   The RICO Enterprise also has an existence and structure that is separate and distinct from other affairs of its members. Members of the RICO Enterprise engage in business operations separate and apart from their activities on behalf of the RICO Enterprise. Guggenheim, for example, is a privately held global financial services firm with more than $295 billion in assets under management. Guggenheim provides asset management, investment banking and capital markets services, insurance services, institutional finance and investment advisory solutions to institutions, governments and agencies, corporations, investment advisors, family offices, and individuals.

110.    Defendants nevertheless became associated with the RICO Enterprise and conducted or participated in the affairs of the RICO Enterprise in addition to their own affairs. The activities engaged in by the associates of the RICO Enterprise facilitating the racketeering activities are not, however, ordinary legitimate business activities and, in fact, were unlawful.

111.    Each member of the RICO Enterprise has a clearly defined role and relationship in the conduct of the affairs of the RICO Enterprise, and as alleged above all of the associates took some part in directing the RICO Enterprise's affairs:

- Guggenheim, Walter, Boehly and Patton engaged in the siphoning of funds from Security Benefit Life.

- Guggenheim, Walter, Boehly and Patton coordinated the transfer of current liabilities off the books of Security Benefit Life at the expense of and to the detriment of the Plaintiff and members of the proposed Class, and created the false impression of positive surplus and financial stability to permit the illicit siphoning of cash from Security Benefit Life.

- Guggenheim and/or Guggenheim Investments took control of Security Benefit Life's general account and, in addition to siphoning cash through investments, loans and fraudulent reinsurance transactions, also charged Security Benefit Life excessive management and investment fees.

- Walter, Boehly and Patton used a substantial amount of the siphoned funds for personal purposes or purposes not in the interests of Security Benefit Life, including for the speculative Dodgers purchase.

- Security Benefit Life designed and sold annuity products promising to perform obligations for which it had no intention to perform and lacked the assets to support, and collected the proceeds for the RICO Enterprise.

- Heritage served as a corrupt and purportedly unaffiliated entity that accepted ceded liabilities from Security Benefit Life to allow it to falsely represent its financial condition.

- Paragon served as a corrupt and affiliated entity that accepted ceded liabilities from Security Benefit Life so that Security Benefit Life could falsely represent its financial condition.

- Officials from each company involved themselves in the affairs of the others. For example, as more particularly alleged above, as the primary conductors and beneficiaries of the fraudulent scheme, Guggenheim's Walter and Boehly assumed positions of control within Security Benefit Life and Patton acquired control over Heritage. As an additional example, on December 31, 2012, major officer and director positions of Heritage were held by people who worked at Guggenheim and the Guggenheim Insurers.

- Guggenheim, Security Benefit Life and RBS together designed and developed the Total Value Annuity and 5 Year Annuity Linked TVI Index Account and Annuity Linked TVI Index.

- RBS and Security Benefit Life entered into side transactions where RBS served as and profited from being the counterparty to call options purchased by Security Benefit Life related to the Total Value Annuity and 5 Year Annuity Linked TVI Index Account.

- Security Benefit Life, Creative Marketing, Advisors Excel, Impact Partnership and Gradient Financial developed the distribution system for the Total Value Annuity that was rife with conflicts of interest detrimental to the annuity purchasers.

112.   In these ways and others, each of the Defendants directly or indirectly participated in, or managed aspects of, facilitated or otherwise took some part in directing the unlawful activities comprising the RICO Enterprises' affairs.

43

113.   The cooperation exhibited by the members of the RICO Enterprise fell outside the bounds of the parties' normal commercial relationships and was undertaken to advance the corrupt purposes of the RICO Enterprise.

114.   Guggenheim has taken over and manipulated Security Benefit Life. Guggenheim's acquisition and use of Security Benefit Life made it easier to commit and conceal the fraud, allowing circular, non-economic reinsurance transactions among Security Benefit Life and the other Guggenheim-controlled entities, as well as transactions with Guggenheim Investments and RBS in which Security Benefit Life paid excessive fees and costs.

115.   Guggenheim and Patton also infiltrated and manipulated Heritage, which agreed to and did falsely report itself as not affiliated with Security Benefit Life. Guggenheim and Patton thus involved themselves in the affairs of Heritage for an illicit purpose, arranging for it to assume billions of dollars in liabilities so as to generate phony reserve credits for Security Benefit Life while hundreds of millions of dollars have been siphoned off to members of the RICO Enterprise.

116.   The RICO Enterprise's decision to operate through Security Benefit Life and the other Guggenheim Insurers, and Paragon and Heritage thus facilitated its unlawful activity. Defendants consciously used the separate corporate forms of Security Benefit Life and the other Guggenheim Insurers and Paragon in order to make the fraudulent scheme harder to detect and to better conceal the nature and extent of their misrepresentations and wrongdoing. Indeed, the success of the RICO Enterprise depended upon the appearance of distinctness between Guggenheim, Security Benefit Life and the other the Guggenheim Insurers, Paragon and Heritage.

117.   Moreover, Security Benefit Life took actions harmful to its own self interest (and its annuity holders), such as transferring billions of dollars of their funds to Guggenheim affiliates and to highly illiquid, speculative ventures like the Dodgers that would otherwise be available to make payments to its annuity holders.

**Continuous Existence**

118.   The RICO Enterprise has had an ongoing and continuous existence before and during the Class Period sufficient to permit the Defendants to pursue the RICO Enterprise's purpose. Throughout the Class Period, the members of the RICO Enterprise associated in fact to market and sell Security Benefit Life's annuity products while concealing its true financial condition, the severe conflicts of interest at play, and the true nature of the design of the Total Value Annuity and its 5 Year Annuity Linked TVI Index Account, on an ongoing rather than *ad hoc* basis. None of the Defendants acted independently or in competition with one another, or otherwise in a manner contrary to the RICO Enterprise's purpose.

119.   The fraudulent financial condition of Security Benefit Life was not generated independently and without coordination. The fundamental circularity of the non-economic reinsurance transactions could only have been accomplished with the coordination and cooperation of each member of the RICO Enterprise, including in particular, the allegedly non-affiliated Heritage. No associate of the RICO Enterprise could have accomplished the goals of the liability-dumping scheme on its own initiative. Likewise, the distribution of the Total Value Annuity in the marketplace could not have been accomplished without the concerted effort of the RICO Enterprise to conceal the conflicts of interest that were detrimental to the annuity purchasers.

120.     The RICO Enterprise has displayed a continuity of membership during the Class Period exceeding two years, during which time Defendants acted continuously in their respective roles in the RICO Enterprise. And, there is a very real threat of continued misconduct.

121.     During the Class Period, each associate in the RICO Enterprise was aware of the scheme to misstate Security Benefit Life's true financial condition, to conceal the substantial conflicts of interest inherent to the sale of the annuities, and to conceal the true manner in which the 5 Year Annuity Linked Index Account Rider had been designed and managed to provide profit to the RICO Enterprise at the expense and to the detriment of the Plaintiff and putative Class, and thus, was a knowing and willing participant in that scheme.

**Interstate Commerce**

122.     The RICO Enterprise engages in and affects interstate commerce because it involves activities across state boundaries, such as the fraudulent marketing, promotion advertisement, and sale of Security Benefit Life's annuity products, the receipt of inflated annuity payments from such fraudulent sales, and the payment of excessive fees and charges within the RICO Enterprise.

**Pattern of Racketeering Activity**

123.     As alleged above, Defendants have consistently and fraudulently misrepresented the financial condition of Security Benefit Life; concealed the conflicts of interest inherent in the sale of the annuities; fraudulently misrepresented and concealed

the true design of the Total Value Annuity; and misrepresented RBS's status as unaffiliated and external to the operation of the Five Year Annuity Linked TVI Index Account.

124.    Defendants have engaged in a "pattern of racketeering activity", as defined by 18 U.S.C. § 1961(5), by committing or aiding and abetting in the commission of at least two acts of racketeering activity, i.e., indictable violations of 18 U.S.C. § 1341(mail fraud) and 18 U.S.C. § 1343 (wire fraud) as described above, within the past three years. In fact, Defendants have committed or aided and abetted in the commission of countless acts of racketeering activity, including the misrepresenting of Security Benefit Life's financial condition following Guggenheim's acquisition of the company for each year during the Class Period. Each racketeering act was related, had a similar purpose, involved the same or similar participants and method of commission, had similar results, and impacted similar victims, including the Plaintiff and other members of the Class.

125.    The multiple predicate acts of racketeering activity that Defendants committed and/or conspired to, or aided and abetted in the commission of, constitute a "pattern of racketeering activity," as defined in 18 U.S.C. § 1961(5) as they were related to each other and amount to and pose a threat of continued racketeering activity, and therefore constitute a "pattern of racketeering activity" as defined in 18 U.S.C. § 1961(5).

**Predicate Acts**

126.    Section 1961(1)(B) of RICO provides that "racketeering activity" includes any act indictable under 18 U.S.C. § 1341 (relating to mail fraud) and 18 U.S.C. § 1343 (relating to wire fraud). As set forth below, Defendants have engaged and continue to

engage in conduct violating each of these laws to effectuate their scheme.

127.   For the purpose of executing and/or attempting to execute the above-described scheme to sell the Security Benefit Life annuity products by concealing the company's financial instability, conflicts of interest and how the annuity was designed to minimize interest credits, which if disclosed, would reveal these annuity products to be inferior to alternative investments, Defendants, in violation of 18 U.S.C. § 1341, placed in post offices and/or in authorized repositories matter and things to be sent or delivered by the Postal Service, caused matter and things to be delivered by commercial interstate carriers, and received matter and things from the Postal Service and/or commercial interstate carriers, including, but not limited to, marketing brochures, annuity disclosure forms, performance illustrations, applications, contracts, training manuals, webinars, video tapes, correspondence, annuitant leads lists, annuity payments and commission payments, reports, data, summaries, statements and other materials relating to the marketing and sale of Security Benefit Life's annuity products.

128.   For the purpose of executing and/or attempting to execute the above-described scheme to defraud or obtain money by means of false pretenses, representations or promises, Defendants, also in violation of 18 U.S.C. § 1343, transmitted and received by wire, matter and things, which include, but are not limited to, marketing brochures, consumer brochures, annuity applications, annuity disclosure forms, field memos, correspondence, prospective lead lists, annuity payments, investment and management fee payments, commission payments, reports, data, summaries, account statements, faxes, other annuity marketing and sales materials, and wire transfers by and among affiliates for purposes of moving liabilities off the balance

sheet. In addition, pursuant to and as part of the scheme to defraud, Defendants intended to and did receive payments from Plaintiff and other Class members that were transmitted or cleared through the use of interstate wires in violation of 18 U.S.C. § 1343.

129.   In addition to the predicate acts identified above, the predicate acts committed by the RICO Enterprise included, but were not limited to the delivery and transmission of training and marketing materials from Security Benefit Life to the IMOs, including Creative Marketing, who in turn delivered and transmitted the training and marketing materials to individual producers, including the advisor who sold the Total Value Annuities to the Plaintiff. These transmissions occurred in the months preceding July 2012 when Plaintiff Ogles was sold his Total Value Annuity.  The predicate acts also included the transfer of funds in the form of a purchase payment of approximately $145,000 by or on behalf of Plaintiff Ogles in July 2012. At or around the time Plaintiff made his purchase payment, Security Benefit Life transferred or caused to be transferred funds in the form of commission payments to the advisor who sold the Plaintiff his Total Value Annuity, as well as to Creative One. On an on-going basis since July 2012, funds have been transferred by and between Security Benefit Life and Guggenheim Investments and Guggenheim in the form of deposits to Security Benefit Life's general account, and as funding for investments paid to other entities, including RBS, for fees and costs associated with the Annuity Linked TVI Index. Likewise, funds were transferred from Security Benefit Life to Guggenheim and Guggenheim Investments in the form of investment advisory fees and management fees.

130.   At a minimum, Defendants aided and abetted violations of the above laws, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343

offenses pursuant to 18 U.S.C. § 2.

131.   Many of the precise dates of Defendants' fraudulent uses of the U.S. Mail and wire facilities have been deliberately hidden and cannot be alleged without access to Defendants' books and records. Indeed, the success of Defendants' scheme depends upon concealment, and Defendants have withheld details of their scheme from Plaintiff and members of the proposed Class. Generally, however, Plaintiff can describe the occasions on which the predicate acts of mail and wire fraud would have occurred, and how those acts were in furtherance of a scheme. They include thousands of communications to perpetuate and maintain the scheme, including, among other things:

- transmitting and receiving promotional materials touting Security Benefit Life's purportedly positive surplus and stable financial condition;

- sharing information about prospective purchasers of Security Benefit Life's annuity products;

- processing applications for Security Benefit Life's annuity products;

- processing premium payments received from the annuity holders, including those of Plaintiff; and

- processing transfers of funds for the purported payment of investment of management fees.

132.   The materials sent or received by Defendants via the U.S. Mail, commercial carrier, wire, or other interstate electronic media, contained, inter alia, fraudulent material misrepresentations and omissions about the undisclosed conflicts of interest and risks of the Security Benefit Life's annuity products, including the risk of default given Security Benefit Life's financial instability, calculated to deceive persons of ordinary prudence and comprehension. Defendants used "dishonest methods or schemes" involving "the

deprivation of something of value by trick, deceit chicanery or overreaching." *McNally v. United States*, 483 U.S. 350, 358 (1987).

133.   Defendants' corporate headquarters have communicated by U.S. Mail, email, and by facsimile with each other and with various regional offices, subsidiaries, and affiliates in furtherance of their scheme.

134.   Defendants' omissions of material facts, acts of concealment and failures to disclose were knowing and intentional, and made for the purpose of deceiving Plaintiff and members of the proposed Class into purchasing the overpriced and underperforming Security Benefit Life annuity products.

135.   Defendants either knew or recklessly disregarded the fact that their omissions and misrepresentations were material and were relied upon by Plaintiff and the members of the proposed Class as shown by their payments for the Security Benefit Life annuity products.

136.   Although not necessary to make out a violation of the mail or wire fraud statutes, Plaintiff and the Class relied, to their detriment, on Defendants' fraudulent material omissions and misrepresentations of Security Benefit Life's true financial condition, the conflicts of interest at play, and the manner in which the Total Value Annuity was designed to benefit the Defendants to the detriment of the Plaintiff and members of the proposed Class, all of which were made by means of websites, mass mailings, newspaper advertisements, telephone calls, marketing materials, and virtually uniform representations or omissions. Reliance by at least some of the purchasers of the Security Benefit Life annuity products allowed the Defendants to charge an excessive price for the annuity products, injuring all those who purchased them during the Class Period.

137.    Defendants knew Plaintiff and members of the proposed Class relied on their misrepresentations and omissions concerning the true financial condition of Security Benefit Life, the conflicts of interest at play, and the manner in which the Total Value Annuity was designed to benefit the Defendants to the detriment of the Plaintiff and members of the proposed Class, and Defendants knew that purchasing annuitants would incur substantial loss as a result.

138.    Accordingly, Defendants have obtained money and property belonging to the Plaintiff and members of the proposed Class, and Plaintiff and the members of the Class have been injured in their business or property by Defendants' overt acts of mail and wire fraud, and by their aiding and abetting each other's acts of mail and wire fraud.

**The Plaintiff's Transaction**

**Plaintiff Albert Ogles**

139.    Plaintiff Albert Ogles in July 2012 purchased a Security Benefit Life Total Value Annuity with a purchase payment of approximately $145,000. 100% was allocated to the 5 Year Annuity Linked Index Account.

140.    Ogles' Total Value Annuity purchase was based on the express and implied representations of Security Benefit Life's financial condition and stability, and that the 5 Year Annuity Linked TVI Index Account Rider had been designed and was being managed in a manner beneficial to purchasers of the annuity, and in a manner to make it superior to other indexed annuities already in the marketplace.

141.    Security Benefit Life omitted from the uniform and standardized disclosures provided to Ogles, the following material facts:

a.  that the annuities purchased were worth significantly less than the purchase payments made to buy them;

b.  that significant conflicts of interest existed between Ogles and the advisor who sold him the Total Value Annuity, as well as between Ogles and Security Benefit Life and RBS and Guggenheim and Guggenheim Investments;

c.  that the 5 Year Annuity Linked TVI Index Account Rider had been created to operate to the detriment, rather than the benefit of Ogles;

d.  that Security Benefit Life had either failed to perform adequate due diligence to determine the suitability of the Annuity Linked TVI Index as an appropriate index to use as the basis of an index crediting option in an indexed annuity, or did the due diligence and then ignored the determination that the Annuity Linked TVI Index was not an appropriate index to use as the basis of an index crediting option in an indexed annuity;

e.  that the Annuity Linked TVI Index was not truly an external index, but instead was internally controlled by or on behalf of Security Benefit Life and Guggenheim Partners and RBS through undisclosed financial dealings between the entities; and

f.  that the volatility control overlay was not a feature of the Total Value Annuity designed to provide more upside potential, but instead was of little to no value to the Total Value Annuity purchasers, and unnecessarily increased the costs of the annuity.

142.   Ogles would not have purchased the Total Value Annuity had he known Security Benefit Life's true financial condition and had he received full disclosure of any of the omitted material facts set out in the preceding paragraph.  Ogles continued to own the Total Value Annuity and it has recently reached the five-year anniversary, at which time he learned that the Five Year Annuity Linked TVI Index Account Rider failed to produce any significant interest credits or to otherwise perform consistent with the uniform representations made by Security Benefit Life, RBS and Guggenheim.

143.    The Security Benefit Life annuity sold to Ogles was worth significantly less than represented. Indeed, undisclosed to Ogles was that the Security Benefit Life annuity was worth approximately 15% less than his purchase payments when he paid for them, and those losses were compounded in subsequent years' losses by the failure of Security Benefit Life, Guggenheim and Guggenheim Investments, and RBS to adequately manage the Five Year Annuity Linked TVI Index Account in a manner consistent with the stated objective of producing competitive interest credits for the annuity product. All of Ogles' losses were proximately caused by the Defendants' fraudulent scheme and failures to perform as promised.

**Class Allegations**

144.    Plaintiff brings this action on behalf of himself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class ("the Class") for violations of federal laws, breach of contract, unjust enrichment, conversion and declaratory judgment:

> a.    All persons in the United States who between January 1, 2012 and the date class notice is disseminated purchased a Total Value Annuity from Security Benefit Life and allocated purchase payments to the 5 Year Annuity Linked TVI Index Account. Excluded from the class are owners, officers, directors, employees, agents and/or representatives of Defendants and their parent entities, subsidiaries, affiliates, successors, and/or assigns, and the Court, Court personnel, and members of their immediate families.

145.    *Numerosity.* The members of the Class are so numerous that individual joinder of all members is impracticable. In 2012, Security Benefit Life received in excess of $4.1 billion in annuity payments and received in excess of $134 million in annuity

payments in Kansas alone. The identity and precise number of Class members, though unknown to Plaintiff, is reasonably ascertainable from the Security Benefit Life's records. The putative Class exceeds 100 members.

146.   *Commonality and Predominance*. This action involves common questions of law and fact, which predominate over any questions affecting individual Class members. These common legal and factual questions include, but are not limited to, the following subject matter:

a.  Whether each Class members' annuity was worth less than the amount the Class member paid for it;

b.  the manner in which the Total Value Annuity and the Annuity Linked TVI Index Account and the Annuity Linked TVI Index were designed;

c.  the Defendants' projected performance of the Annuity Linked TVI Index;

d.  the payment of investment and management fees by Security Benefit Life to Guggenheim, Guggenheim Investments and/or RBS;

e.  the nature and extent of Security Benefit Life's undisclosed affiliation with the other Guggenheim Insurers and related entities;

f.  the nature and extent of Security Benefit Life's and Guggenheim's undisclosed affiliation with RBS;

g.  the financial condition of Security Benefit Life;

h.  whether the Defendants breached the Total Value Annuity contracts;

i.  whether the Defendants breached the terms of the 5 Year Annuity Linked TVI Index Account Rider;

j.  whether Defendants were unjustly enriched;

k.  whether Defendants engaged in mail and/or wire fraud;

l.  whether Defendants engaged in a pattern of racketeering activity;

m.  whether the alleged RICO Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

n.  whether Defendants conducted or participated in the affairs of the RICO Enterprise through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(c);

o.  whether Plaintiff and the Class are entitled to appropriate equitable remedies, including declaratory and injunctive relief; and

p.  whether Plaintiff and the Class are entitled to monetary damages, including treble damages under federal RICO law.

147.  _Typicality._ Plaintiff's claims are typical of the claims of the members of each Class because, inter alia, all Class members were injured through the same alleged uniform misconduct described above.

148.  _Adequacy of Representation_. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex consumer class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

149.  _Superiority_. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory

judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

150.    *Propriety of Declaratory Relief.*  Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## COUNTS
### COUNT ONE: BREACH OF THE TOTAL VALUE ANNUITY CONTRACT

151.    Plaintiff repeats and realleges all preceding paragraphs 1 to 150.

152.    A Total Value Annuity contract exists between the Plaintiff and Security Benefit Life, and between each putative Class member and Security Benefit Life.

153.    Plaintiff and each putative Class member have substantially performed on these contracts.

154.    As set out in detail above, Security Benefit Life breached the Total Value Annuity contract and 5 Year Annuity Linked TVI Index Account Rider in all or any of the following ways:

  a.  By failing to base interest on the 5 Year Annuity Linked TVI Index Account upon the change in an external market index when the uniform policy language states that "interest on an Index Account Value is based upon the change in an external market index" and the Annuity Linked TVI Index is not in fact "external" but is created either directly or indirectly, controlled

and managed by and/or on behalf of Guggenheim and its related entities, including Security Benefit Life;

b. By Security Benefit Life having a direct and on-going relationship with RBS in contravention of the uniform terms of the 5 Year Annuity Linked TVI Index Account Rider which state that "RBS's only relationship to Security Benefit Life Insurance Company is as licensor of certain trademarks and trade names of RBS and of the Annuity Linked TVI Index." The direct and ongoing relationship includes, but is not limited to, RBS being a counterparty to call options and warrants purchased by Security Benefit Life for hedging purposes related to the Total Value Annuities and 5 Year Annuity Linked TVI Index Account Rider, as well as Security Benefit Life making substantial other payments of fees to RBS in relation to RBS's involvement with the Annuity Linked TVI Index which diminish the value and performance of the Plaintiff's and putative Class members' annuities and riders;

c. By paying excessive and unnecessary fees and charges to related entities and thereby depleting or reducing interest credits that would otherwise inure to the Plaintiff and putative Class members' benefit;

d. By breaching the covenant of good faith and fair dealing by unfairly interfering with the Plaintiff's and putative Class members' rights to receive the benefits of Total Value Annuity contract and 5 Year Annuity Linked TVI Index Account Rider;

e. By exercising (or by allowing others acting on its behalf to exercise) discretion in a manner that rendered the benefits of the Total Value Annuity contract and 5 Year Annuity Linked TVI Index Account Rider illusory or of diminished value, either in whole or in part; and/or

f. By issuing to the Plaintiff and each member of the putative Class a Total Value Annuity and 5 Year Annuity Linked TVI Index Account Rider that were less valuable than the purchase payments made for each.

155.   Security Benefit Life's breaches are ongoing and continue today.

156.   The Plaintiff and putative Class members have each been directly or proximately damaged by these breaches and have suffered financial losses as a result.

Plaintiff and the putative Class are therefore entitled to recover actual damages and all other relief to which they may be entitled.

## COUNT TWO: BREACH OF THE SECURITY BENEFIT LIFE and GUGGENHEIM INVESTMENTS CONTRACT

157.    Plaintiff repeat and reallege all preceding paragraphs 1 to 156.

158.    At all times relevant to the Class Period, a contract existed between Security Benefit Life and Guggenheim Investments for management of Security Benefit Life's general account. The Plaintiff and each putative Class member were intended beneficiaries of the contract as reflected in the standardized and uniform marketing materials created by Guggenheim and Security Benefit Life:

> Guggenheim Investments, a subsidiary of Guggenheim Partners, manages Security Benefit Life's general account assets of more than $10 billion. The firm's expertise helps us set competitive credited rates for our annuity products.

159.    Guggenheim Investments failed to adequately and appropriately manage Security Benefit Life's general account and/or certain subaccounts related to the Total Value Annuities for the benefit of the Plaintiff and members of the proposed Class and in doing so failed to provide the necessary basis for setting competitive credited rates for Security Benefit Life's annuity products. Indeed, the credited rates for the Total Value Annuity have been far lower than competitors and far lower than Security Benefit Life's stated expectations.

160.    Rather, Guggenheim Investments and/or its parent, Guggenheim, used Security Benefit Life as a profit source for itself by improperly extracting from Security Benefit Life dividends despite a lack of surplus and profits to support paying dividends,

exorbitant management fees and investment fees without providing corresponding value, and cash through improper loans and promissory notes.

161.    The Plaintiff and putative Class members have each been directly or proximately damaged by these breaches and have suffered financial losses as a result. Plaintiff and the putative Class are therefore entitled to recover actual damages and all other relief to which they may be entitled.

## COUNT THREE: UNJUST ENRICHMENT

162.    Plaintiff repeats and realleges all preceding paragraphs 1 to 161.

163.    To the extent necessary, Plaintiff brings this count for unjust enrichment in addition to or in the alternative to Plaintiff's breach of contract counts.

164.    The Plaintiff and members of the putative Class conferred benefits on Guggenheim and its related entities, and on RBS, by providing purchase payments to Security Benefit Life for each Total Value Annuity and 5 Year Annuity Linked TVI Index Account Rider.

165.    Guggenheim and its related entities, and RBS appreciated or knew of the benefits conferred on them by the Plaintiff and members of the putative Class.

166.    Guggenheim and its related entities, and RBS, retained the benefits under such circumstances as make the retention inequitable.  Specifically, Guggenheim and its related entities, and RBS, contributed to and fraudulently misrepresented and concealed the true financial condition of Security Benefit Life.  Guggenheim and its related entities, and RBS, depleted Security Benefit Life's reserves and surplus – including Plaintiff and putative Class members' annuity payments – for their own immediate financial gain.

167.   The Plaintiff and putative Class members have each been directly or proximately damaged by these breaches and have suffered financial losses as a result. Plaintiff and the putative Class are therefore entitled to recover actual damages and all other relief to which they may be entitled.

## COUNT FOUR:  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(c)

168.   Plaintiff repeats and realleges all preceding paragraphs 1 to 167.

169.   This claim arises under 18 U.S.C. § 1962(c), which provides in relevant part:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . .

170.   In violation of 18 U.S.C. § 1962(c), Defendants have conducted or participated, directly or indirectly, in the conduct of the affairs of the RICO Enterprise through a "pattern of racketeering activity," as defined by 18 U.S.C. § 1961(5). Therefore, Defendants have violated 18 U.S.C. § 1962(c).

171.   The injuries of Plaintiff and members of the proposed Class were directly and proximately caused by Defendants' racketeering activity. Reliance by at least some of the purchasers of the Security Benefit Life's annuity products allowed the Defendants to charge an excessive price for the annuity products, injuring all those who purchased them during the Class Period.

172.   As a result and by reason of the foregoing, the Plaintiff and Class members have been injured, suffered harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

## COUNT FIVE:  VIOLATION OF THE RACKETEER INFLUENCED AND CORRUPT ORGANIZATIONS ACT, 18 U.S.C. § 1962(d)

173.   Plaintiff repeats and realleges all preceding paragraphs 1 to 172.

174.   This claim arises under 18 U.S.C. § 1962(d), which provides in relevant part: "It shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section."

175.   In violation of 18 U.S.C. § 1962(d), Defendants conspired to defraud the Plaintiff and members of the proposed Class of their money and property through the sale of overpriced annuity products pursuant to the pattern of racketeering activity and the scheme described above. Defendants agreed to conduct or to participate in the affairs of the enterprise and agreed to commit at least two of the predicate acts identified above.

176.   The injuries of Plaintiff and the proposed Class were directly and proximately caused by Defendants' racketeering activity. Reliance by at least some of the purchasers of the Security Benefit Life's annuity products allowed the Defendants to charge an excessive price for the annuity products, injuring all those who purchased them during the Class Period.

177.   As a result and by reason of the foregoing, the Plaintiff and Class members have been injured, suffered harm and sustained damage to their business and property,

and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

178.   In addition, as set forth above, Defendants have violated 18 U.S.C. §§ 1962 (c), and (d), and will continue to do so in the future. Enjoining Defendants from committing these RICO violations in the future and/or declaring their invalidity is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to enjoin violations of 18 U.S.C. § 1962.

## PRAYER FOR RELIEF

179.   WHEREFORE, Plaintiff prays for a judgment:

   a. Certifying the Class as requested herein;

   b. Awarding Plaintiff and Class members compensatory damages, trebled, in an amount to be determined at trial;

   c. Awarding Plaintiff declaratory and injunctive relief;

   d. Awarding Plaintiff and Class members attorneys' fees and costs; and

   e. Affording Plaintiff and Class members with such further and other relief as deemed just and proper by the Court.

## JURY DEMAND

180.   Plaintiff demands a jury trial of all issues triable by right by jury.

## DESIGNATION OF PLACE FOR TRIAL

181.   Plaintiff designates Kansas City, Kansas as the place of trial of this action.

Respectfully submitted,

/s/ Eric D. Barton
Eric D. Barton (KS Bar No. 16503)
Tyler W. Hudson (KS Bar No. 20293)
Sarah Ruane (KS Bar No. 23015)
WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
phone: (816) 701-1100
facsimile: (816) 531-2372
ebarton@wcllp.com
thudson@wcllp.com
sruane@wcllp.com