## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS
## AT KANSAS CITY

| | |
|---|---|
| **ALBERT OGLES,** ) | |
| ) | |
| **Plaintiff, individually and on behalf of all others similarly situated,** ) ) ) | |
| ) | |
| **v.** ) | |
| ) | |
| **SECURITY BENEFIT LIFE INSURANCE COMPANY; SECURITY BENEFIT CORPORATION; ELDRIDGE INDUSTRIES, LLC; GUGGENHEIM PARTNERS, LLC; and GUGGENHEIM INVESTMENTS, a/k/a GUGGENHEIM PARTNERS INVESTMENT MANAGEMENT, LLC,** ) ) ) ) ) ) ) ) ) ) ) ) ) | **Case No. 2:18-cv-02265-HLT-KGG** |
| **Defendants.** | |

---

### SECOND AMENDED CLASS ACTION COMPLAINT

---

Plaintiff Albert Ogles, by and through his attorneys, brings this Second Amended Complaint against Defendants Security Benefit Life Insurance Company ("Security Benefit Life"), Security Benefit Corporation ("SBC"), Eldridge Industries, LLC ("Eldridge"), Guggenheim Partners, LLC and Guggenheim Investments (a/k/a Guggenheim Investment Management, LLC) ("Guggenheim"), (collectively, "Defendants"), on behalf of himself and all other similarly situated persons who purchased annuity products issued by Security Benefit Life, on or after July 2012. Plaintiff alleges the following upon personal knowledge as to himself and his own acts, and as to

all other matters upon information and belief, based upon the investigation made by and through his attorneys and expert consultants.

## <u>INTRODUCTION</u>

1.     This case involves a scheme in interstate commerce to mislead and defraud purchasers of indexed annuity products. Defendants devised and deployed this fraudulent scheme to enter and become the leader in the highly competitive fixed indexed annuities market.  In 2010, fixed indexed annuity sales totaled $30 billion. In 2011, Security Benefit Life Insurance Company ("Security Benefit Life") — what until then had been a quiet, conservative life insurance company based in Topeka, Kansas — entered this market and quickly became one of its leading players. Security Benefit Life did so by selling billions of dollars of fixed indexed annuities that purported to offer a novel and attractive twist to investors.  Security Benefit Life spiked its annuity product with a key feature that fueled its rapid rise and made Security Benefit Life a sudden leader in a market in which it had never before competed: a "Total Value Annuity" with a "5-Year Annuity Linked TVI Index Account."

2.     As this lawsuit alleges, Security Benefit Life's entry into the fixed indexed annuity market and its Total Value Annuity product introduced in 2012 was a sham.  This action seeks to hold Defendants accountable for the significant, direct losses suffered by the purchasers of this annuity. Purchasers of Security Benefit Life's Total Value Annuity with the 5-Year Annuity Linked TVI Index Account were defrauded through a pattern of racketeering by Defendants, in concert with other members of their illegal enterprise.  The RICO Act is the best vehicle available under the law to make all defrauded purchasers across the United States whole.

3.     Security Benefit Life's grand entrance into the national fixed index annuities market came only after Security Benefit Life was acquired and infiltrated by Guggenheim Partners,

LLC ("Guggenheim"), a notorious private equity firm. Security Benefit Life's market entry was part of a broader scheme hatched by Guggenheim's top two executives at the time, Todd L. Boehly ("Boehly") and Mark Walter ("Walter"). Boehly was the chief deal maker. Walter was CEO.  It was widely reported and known that Walter and Boehly had ambitions to become billionaires, and that one of Boehly's advisors was billionaire-felon Michael Milken. Guggenheim had amassed billions of dollars in assets under management by 2008.

4.     When the financial crisis hit, Boehly and Walter seized on the opportunity to scoop up conservative life insurance companies like Security Benefit Life which provided a perfect vehicle for their scheme. In 2010, Guggenheim bought Security Benefit Life for $210 million and by providing a $175 million loan to the company. Walter and Boehly joined the Security Benefit Life's Board of Directors, with Boehly becoming the Chairman.  Through this acquisition, Walter and Boehly were able to infiltrate and seize control of Security Benefit Life to carry out their scheme to leverage Security Benefit Life's solid reputation and assets into making themselves and their other Guggenheim businesses hundreds of millions of dollars.

5.     Overnight, Guggenheim transformed Security Benefit Life from a conservative life insurance company into a vehicle that could deliver new indexed annuity products to the market. The value of using Security Benefit Life was that it had been a trusted company with a safe, steady reputation. The new indexed annuity products appeared to be superior to existing indexed annuity products on the market.  In reality, they had been carefully, fraudulently crafted by Guggenheim (which was able to control every aspect of their development).

6.     Existing fixed indexed annuity products credited interest to the purchaser based on the financial performance of an outside market index, like the S&P 500 index, but the credited interest was capped at a maximum percentage, such as 3.25% per year.  This aspect of the annuity

limited the potential upside returns to the holder.  However, the cap also allowed the seller of the annuity to be able to predict the worst-case performance and protect its downside while hedging its risk.  Because the crediting option was linked to an independent market index that measured a portion of the market, the insurance company selling the annuity had no control over the performance of the index. The cap provided certainty for the life insurance company selling the annuity, regardless of the economic conditions or performance of the index.

7.      Guggenheim exploited this cap feature through deception and a scheme to defraud. Guggenheim and Security Benefit Life claimed to have created a revolutionary new fixed indexed annuity product *without a cap* on the return—an alleged uncapped return that could deliver investors far more in potential upside than the capped annuities that the market had previously offered for decades.  This new annuity product appeared to offer the purchaser unlimited potential returns depending on the performance of the index. This uncapped feature immediately differentiated this new product from existing annuities and supercharged the sales made by Security Benefit Life (and with Guggenheim at the helm, steering the ship the entire time).

8.      In reality, and as investors have now learned, this new annuity was not actually revolutionary.  It was a fraud. Security Benefit Life was not providing annuity holders with any actual ability to obtain uncapped or unlimited returns.  Instead, Guggenheim had engineered a way to deceptively control the performance of the annuity.  Guggenheim and Security Benefit Life had worked behind the scenes to develop an artificially created "index."  This was not an external market index.  It did not track and follow a portion of the market.  In fact, it was created to serve only one purpose:  to be used in this new annuity product. It existed only to serve Guggenheim's purposes.  It was intentionally designed to be incredibly complex, and it was impossible to evaluate how it actually functioned or to evaluate historical returns.  In fact, the index was developed to

ensure that its actual performance would be limited.  That way, Security Benefit Life could and did tout that its annuity did not have a cap, but Security Benefit Life faced no risk that market conditions would cause the index to unexpectedly rise in value – a risk that existed with all "real" external market indexes that measure the performance of a portion of the market.  In other words, this annuity did not need a cap. It was artificially created for this product, and it was designed to generate low or no returns for annuity purchasers and to reduce hedging costs for Security Benefit Life and therefore increase profits.  Purchasers of this annuity were literally sold a sham, and one that Guggenheim and Security Benefit Life knew was never going to perform for its purchasers.

9.      Of course, none of the annuity purchasers knew this and Security Benefit Life and Guggenheim took great measures to make sure they never could figure it out.  Guggenheim and Security Benefit Life took steps to actively conceal how this product was actually developed and they lulled investors into believing the returns were uncapped.  Guggenheim and Security Benefit Life represented that the index was developed by the Royal Bank of Scotland ("RBS")—a trusted name globally in the financial world.  By doing so, the index appeared to have been developed and operated by a separate, unaffiliated company that had no stake in the performance of the fixed index annuity product.  It gave the index the superficial appearance of being both legitimate and independent.  Here is one of Security Benefit Life's representations about the index:



**Who Runs the Annuity Linked TVI Index?**

The Annuity Linked TVI Index was developed and is owned by The Royal Bank of Scotland (RBS) as an innovative rules-based index designed to provide portfolio diversification.

The Annuity Linked TVI Index can be found on Bloomberg at http://www.bloomberg.com/quote/ALTVI:IND.

10.     In reality, Guggenheim and Security Benefit Life entered into transactions with The Royal Bank of Scotland (RBS) so that RBS could serve as the front for this index. RBS helped

Security Benefit Life hedge the risk of the new annuity product. The hedging costs for an uncapped fixed indexed annuity product that was linked to a real external market index that actually measured a portion of the market would have been extremely expensive.  In that situation, the insurance company would face the risk that the particular portion of the market performed exceedingly well, and the annuity purchaser would be entitled to rich returns without any cap.  By developing its own artificial index that had a controlled performance, Security Benefit Life offered an uncapped annuity but was able to hedge its risk at minimal cost.

11.     Armed with a new product that was deceptively designed to appear superior to existing annuity products, Guggenheim and Security Benefit Life began a systematic, deceptive marketing campaign that led to Security Benefit Life's quick rise to the top of this market. Guggenheim disseminated false information about the features of this product – touting the uncapped potential.  Security Benefit Life, or companies working with Security Benefit Life, also generated simulated historical performance charts that implied that the ALTVI index offered above market returns in prior years.  The simulated results (the blue line below) showed that the ALTVI index would have been up an average of 7.2% per year in up and down market conditions including the financial crisis, ahead of the S&P 500 index (orange line below).



12.     The newly designed annuity product became a smashing success as investors flocked to capitalize on the potential of obtaining these uncapped returns within an annuity. Hundreds of millions of dollars poured into these annuities.

13.     Once Security Benefit Life and Guggenheim had the investors' money in their hands, the truth started to unfold.  The product performed much differently than Defendants had promised it could.  As the chart above shows, the actual results in the real world starting in April 2012, were in stark contrast to the simulated results used to market the product. The index dropped in value and provided virtually no interest crediting to the annuity holder.  To make matters worse, the new annuity product had to be held for five years before any crediting occurred.  This meant that purchasers were trapped in this product for at least five years, while Security Benefit Life held billions in annuity deposits made by these purchasers.  At the end of five years, these purchasers received virtually no interest.  They had been duped. All the while, Guggenheim was able to freely use their money for all sorts of exploits and adventures, without any risk of having to repay it before the end of five years.

14.     The deposits that came flooding into Security Benefit Life were only a means to an end for Boehly and Walter.  The money did not stay at Security Benefit Life. Guggenheim directed Security Benefit Life to make dividend payments, to pay management and investment fees, and to make transfers of billions of dollars to Guggenheim or related companies controlled by Walter and Boehly. These transfers have allowed Walter and Boehly to buy companies and other assets, including the purchase of the Los Angeles Dodgers.  Many of these purchases used the ill-gotten gains from the annuity sales scheme.

15.     This action seeks to hold Guggenheim and Security Benefit Life accountable for this scheme that exploited thousands of annuity purchasers.  Guggenheim and Security Benefit Life created an annuity product that locked up thousands of annuity purchasers' life savings for years while Guggenheim used the fraudulently obtained premium deposits to make a fortune.  The purchasers are entitled to recoup their losses and disgorge the ill-gotten gains.

## II – PARTIES & RELATED ENTITIES

### Plaintiff:

16.     Plaintiff Albert Ogles is and was at all times pertinent a resident and citizen of the State of Alabama.

17.     In July 2012, Plaintiff purchased a Security Benefit Total Value Annuity. In doing so, Plaintiff became, like thousands of similarly situated purchasers across the United States, a victim of Defendants' fraudulent racketeering scheme that has enriched Defendants at Plaintiff's expense.

**<u>Defendants:</u>**

18.     Defendant Security Benefit Life Insurance Company is a Kansas corporation with its principal place of business in Topeka, Kansas.

19.     Many of Security Benefit Life's acts and omissions challenged in this action took place in this District from its home office in Topeka, Kansas.  Security Benefit Life is liable for its own acts and the acts and omissions of its related entities, producers, agents, employees, co-conspirators, and co-members of the RICO Enterprise described herein.

20.     Defendant Security Benefit Corporation is a Kansas corporation with its principal place of business in Topeka, Kansas.

21.      SBC, at all relevant times, was doing business in this District. SBC is Security Benefit Life's parent company and is controlled by Guggenheim. SBC is liable for its own acts and the acts and omissions of its related entities, affiliates, agents, employees, co-conspirators, and co-members of the RICO Enterprise described herein.

22.     Defendant Guggenheim Partners, LLC is a New York limited liability corporation, with its headquarters in Chicago, Illinois and New York, New York.

23.     From approximately February 26, 2010 through March 4, 2015, Guggenheim owned and controlled Guggenheim Investments, SBC and Security Benefit Life. Guggenheim is liable for its own acts and the acts and omissions of its related entities, affiliates, agents, employees, co-conspirators, and co-members of the RICO Enterprise described herein.

24.     Defendant Guggenheim Investments is also known as Guggenheim Partners Investment Management, LLC which is registered with the Security & Exchange Commission as an investment advisor and lists its principal place of business as 100 Wilshire Boulevard, Suite 500, Santa Monica, California, 90401, and maintains other offices at 227 West Monroe Street,

Suite 4900, Chicago, Illinois, 60606; and at 330 Madison Avenue, New York, New York, 10017; and at 500 Boylston Street, Suite 1300, Boston, Massachusetts, 02116.

25.     Guggenheim Investments notes on its form ADV that it does business in all United States jurisdictions with the exception of Guam and Wyoming. Guggenheim Investments is liable for its own acts and the acts and omissions of its related entities, affiliates, agents, employees, co-conspirators, and co-members of the RICO Enterprise described herein.

26.     Eldridge Industries, LLC is a Delaware corporation with its principal place of business at 600 Steamboat Road, Greenwich, CT 06830, and with offices in New York, London and Beverly Hills.  Eldridge's registered agent for service of process is Incorporating Services, LTD., 3500 South Dupont Highway, Dover DE 19901.

27.     Eldridge identifies itself as a private investment firm specializing in providing both equity and debt capital. Eldridge was formed in December 2014 by Todd Boehly when he left Guggenheim Partners.  On March 4, 2015, SBC and Security Benefit Life were acquired by New Eldridge, LLC which is owned and controlled by Eldridge Industries and Todd Boehly.  Boehly serves as the Chief Executive Officer and controlling member of Eldridge.  From March 4, 2015 through the present, Eldridge owned and controlled SBC and Security Benefit Life. Eldridge is liable for its own acts and the acts and omissions of its related entities, affiliates, agents, employees, co-conspirators, and co-members of the RICO Enterprise described herein.

**Defendants' Related Parties and Entities:**

28.     Advisors Excel, LLC ("Advisors Excel") is a Kansas corporation with its principal place of business in Topeka, Kansas. Advisors Excel is an "independent marketing organization" ("IMO") and is one of the four IMOs Security Benefit Life released its Total Value Annuity exclusively through. Advisors Excel helped orchestrate Security Benefit Life's entrance to the

fixed index annuity market, and participated in the development and design of the Total Value Annuity and the ALTVI Index.

29.     David Callahan, Co-Founder of Advisors Excel. Callahan helped orchestrate Security Benefit Life's entrance to the fixed index annuity market, and participated in the development and design of the Total Value Annuity and the ALTVI Index.

30.     Innovation Design Group, LLC is a Kansas corporation with its principal place of business in Topeka, Kansas. It is owned and controlled in part by Advisors Excel and/or David Callahan. Innovation Design Group helped orchestrate Security Benefit Life's entrance to the fixed index annuity market and participated in the development and design of the Total Value Annuity and the ALTVI Index.

31.     Jordan Canfield is the CEO of Innovation Design Group. Canfield helped orchestrate Security Benefit Life's entrance to the fixed index annuity market and participated in the development and design of the Total Value Annuity and the ALTVI Index.

32.     Alpha Artists, LLC is a Delaware company with its principal place of business in Atlanta, Georgia. It was formed in 2010 "for the purpose of capitalizing on opportunities in the insurance industry identified by the company's partners while they were involved in other specialty finance businesses."[1] The company's partners are J.P. Steele, Sean J. Coleman and Kyle M. Bollman. The Alpha Artists team helped orchestrate Security Benefit Life's entrance to the fixed

---

[1] http://www.indexmethodologies.com/aboutus.html

index annuity market and participated in the development and design of the Total Value Annuity and the ALTVI Index.

33.    Creative Marketing International Corporation is a Kansas corporation with its principal place of business in Leawood, Kansas. In 2014, Creative Marketing changed its name to "Creative One Marketing Corporation." ("Creative One") Creative One is an "independent marketing organization" ("IMO") and is one of the four IMOs Security Benefit Life released its Total Value Annuity exclusively through.

34.    The Impact Partnership, LLC ("Impact Partnership") is a Georgia corporation with its principal place of business in Kennesaw, Georgia. Impact Partnership is an "independent marketing organization" ("IMO") and is one of the four IMOs Security Benefit Life released its Total Value Annuity exclusively through.

35.    Gradient Financial Group, LLC and/or Gradient Annuity Brokerage and/or Gradient Insurance Brokerage, Inc. ("Gradient Financial") is a Minnesota corporation and/or a Kansas corporation with principal places of business in Topeka, Kansas. Gradient Financial is an "independent marketing organization" ("IMO") and is one of the four IMOs Security Benefit Life released its Total Value Annuity exclusively through.

36.    Robert "Bobby" Patton Jr. ("Patton") was at all relevant times a Guggenheim client and associate of Walter and Boehly. Patton is part of the group that formed Guggenheim Baseball Management, LLC with Walter and Boehly, the private partnership Guggenheim formed in 2011 to acquire the Los Angeles Dodgers.

37.    Mark Walter ("Walter") is Guggenheim's CEO and has been since its formation in 1999. After purchasing SBC and Security Benefit Life, Guggenheim installed Walter as a member

of SBC's Board of Directors. Walter was at relevant times also a trustee or director of several organizations including the parent holding companies for Security Benefit Life.

38.     Todd L. Boehly ("Boehly") was the Managing Partner in the Office of the Chief Executive Officer of Guggenheim. He was later named Guggenheim's President and in that capacity was reported to be its "chief deal maker." After purchasing SBC and Security Benefit Life, Guggenheim installed Boehly as the Chairman of the Board for SBC. In 2015, he left Guggenheim and co-founded Eldridge Industries, LLC. At that time ownership and control of SBC and Security Benefit Life was transferred from Guggenheim to Eldridge Industries. He is now CEO and controlling member of Eldridge Industries. In 2015, Boehly also became the ultimate controlling person of Security Benefit Life.

39.     Michael Milken, known as the "Junk Bond King," at relevant times was a client of Guggenheim and mentor to Boehly, and was an early investor in Boehly's hedge fund, and at one point was reported to have had nearly $800 million invested in various Guggenheim funds and deals.

40.     The Royal Bank of Scotland, plc ("RBS") is a United Kingdom-based banking and financial services company headquartered in Edinburgh, Scotland. Its filings with the Kansas Secretary of State notes that its principal office in the United States is at 600 Washington Boulevard, Stamford, Connecticut 06901. At all relevant times, RBS and its affiliates participated in the creation, sponsoring and administration of the "Annuity Linked TVI Index."

41.     Guggenheim Life and Annuity Company ("Guggenheim Life") is a Delaware company domiciled in Delaware, with its "Main Administrative Office" reportedly at 401 Pennsylvania Parkway, Suite 300, Indianapolis, Indiana. Guggenheim Life was first organized in 1985 as Kansas City Variable Life Company. Following a change in ownership, that company was

renamed Wellmark Community Insurance Inc., which Guggenheim through its subsidiaries acquired in the fall of 2009 and renamed Guggenheim Life. Walter and other employees of Guggenheim and Guggenheim's parent, Guggenheim Capital, LLC, were made members of Guggenheim Life's board of directors. In 2012, Security Benefit Life retro-ceded approximately $500,000,000 in liabilities to Guggenheim Life as part of a funds withheld reinsurance treaty.

42.     Heritage Life Insurance Company (AZ) ("Heritage") is an Arizona company domiciled in Arizona, with its "Main Administrative Office" reportedly at 401 Pennsylvania Parkway, Suite 300, Indianapolis, Indiana. Heritage is not a subsidiary of Guggenheim or Eldridge. Heritage sold no annuity products during the Class Period; it has instead purportedly assumed approximately $1.69 billion in current liabilities through reinsurance agreements with Security Benefit Life. As shown below, despite Heritage's separate ownership, Guggenheim is affiliated not only with Security Benefit Life and Guggenheim Life, but also with Heritage; by the same token, despite Heritage's separate ownership, Security Benefit Life and Guggenheim Life, are likewise affiliated with Guggenheim and Heritage.

43.     RX Life Insurance Company ("RX Life") is an Iowa company domiciled in Arizona, with its "Main Administrative Office" reportedly at 227 West Monroe Street, Suite 3775, Chicago, Illinois. RX Life is not a subsidiary of Guggenheim or Eldridge. RX Life sold no annuity products during the Class Period; it has instead purportedly assumed approximately $95.1 million in current liabilities through reinsurance agreements with Heritage Life.  Heritage Life served as the main reinsurer for Security Benefit Life. RX Life is a wholly owned subsidiary of Patton, who is affiliated with Guggenheim, Boehly, Walter and Guggenheim Baseball Management. Despite RX Life's separate ownership, Security Benefit Life is affiliated with Heritage and RX Life.

## III - JURISDICTION AND VENUE

44.     This Court has original jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c).

45.     This Court has personal jurisdiction over Defendants pursuant to 18 U.S.C. § 1965(a), (b) and (d). Security Benefit Life and SBC reside in, are found in, have agents and related entities in and transact their affairs in Kansas.

46.     Moreover, all Defendants are associates in and have participated in a fraudulent enterprise designed to develop, market, promote, distribute, sell, administer and manage Security Benefit Life's annuity products in and from Kansas during the Class Period, such that the "ends of justice" support the exercise of personal jurisdiction over them by this Court.

47.     Defendants' contacts with this District and the United States as a whole satisfy the "minimum contacts" test, such that the exercise of jurisdiction over them is consistent with constitutional due process protections.

48.     Venue is proper in this District pursuant to 18 U.S.C. § 1965(a) and (b), as Security Benefit Life and SBC reside in, are found in, have agents in and transact their affairs in Kansas.

49.     Venue in this District is alternatively appropriate under 28 U.S.C. § 1391, because Guggenheim, Security Benefit Life, and SBC, as corporations, are deemed to reside in any judicial district in which they are subject to personal jurisdiction, and because a substantial part of the events or omissions giving rise to the claims occurred in this District.

## IV - FACTUAL ALLEGATIONS

### Security Benefit Life and Guggenheim's Acquisition

50.     Security Benefit Life is one Kansas's oldest life insurance companies.  Its current

website boasts of its rich history:

> Eleven visionary men with $11 pooled their money in the middle of an ice cream
> table in an East Topeka drugstore to create the Knights and Ladies of Security,
> which was officially chartered on Feb. 22, 1892. Through wars and natural
> disasters, epidemics and economic upheavals, the company has distinguished itself
> through the decades as a nationally recognized pioneer in financial performance,
> product and program innovation, customer service and employment practices.
> From its inception when assets could have been easily contained in a child's bank,
> Security Benefit has evolved into a leader in the U.S. retirement market with assets
> under management reaching $37 billion. During its 125-year history, the company
> has changed its name, but its Topeka, Kansas, location and commitment to its
> clients across the country have remained constant.

51.     For decades, Security Benefit Life focused on variable annuity products that were

sold through traditional distribution outlets, including banks and broker/dealers where the person

selling the variable annuity products had a securities license and was subject to heightened

regulatory scrutiny and in-house compliance requirements. The money invested in variable

annuities was specifically allocated to separate accounts, rather than to the general account of the

insurance company.  The individual client account was then managed by a fund manager with all

costs, expenses and returns subject to full disclosure.

52.     That changed in 2010.  Although Security Benefit Life's website ignores this era,

it was not so long ago that the 2008 financial crisis left the company on the brink of insolvency.

The Kansas Insurance Commissioner made findings about Security Benefit Life's weak financial

position caused by investment losses and variable annuity losses.[2]  The company was downgraded by Standard & Poor's to BB from BBB+, due, in part, to its declining capital and surplus in 2008. Given its perilous financial condition, it no longer had the surplus or reserves to keep selling variable annuity products through traditional distribution outlets. In fact, Security Benefit Life needed a substantial cash infusion to avoid further downgrades.

53.     Guggenheim Partners was perfectly positioned to seize on the opportunity this weakened company presented.  Guggenheim is a private equity firm.  It is privately owned.  Mark Walter is its CEO.  Todd Boehly at the time was its chief deal maker.  Together, they aggressively drove Guggenheim to become a major asset manager with billions under management.  By 2009, Guggenheim acted as an asset manager for numerous insurance companies. It was the asset manager of Security Benefit Life's general account.  Managing assets, however, has only so much potential upside. Boehly and Walter had bigger plans. They wanted to acquire insurance companies and own their assets.  This would allow them to build a base of capital to use for new potential deals.

54.     Guggenheim bought Security Benefit Life for $210 million. It infused the company with $175 million of capital, and borrowed the rest to make the purchase.  Guggenheim immediately went to work to re-build the company with its own ends in mind.  Guggenheim demutualized the company so that it had total control and could direct how the assets of Security Benefit Life were allocated. Guggenheim installed Boehly as the Chairman of Security Benefit Life.  Walter joined the Board.  Guggenheim now had the ability to direct the company, and use its assets for Guggenheim's, Walter's and Boehly's purposes.

---

[2] Order, Before the Commissioner of Insurance of the State of Kansas, In the Matter of Security Benefit Mutual Holding Company, docket No. 4103-DM, (May 18, 2010).

55.     Guggenheim turned its focus to converting Security Benefit Life into a top performer in the fixed indexed annuity market.  Guggenheim immediately designed a plan to enter and dominate the fixed indexed annuity market.  Guggenheim had close relationships with the independent marketing organization that sold these products.  Integral to Guggenheim Partners' plan was the notion that Security Benefit Life would be touted as a "Guggenheim Partners Company." This was because Security Benefit Life's debilitated financial condition, even if seemingly rectified by capital infusions from its new owners, could only serve as an obstacle to successful entry into the fixed indexed annuity market where the market participants have to repeatedly remind their customers:

> "Guarantees provided by annuities are subject to the financial strength of the issuing insurance company."

As stated in the Total Value Annuity Base Product Brochure:

> Company. Approved form numbers vary by state. Product features, limitations and availability may vary by state. Guarantees provided by annuities are subject to the financial strength of the issuing insurance company. Annuities are not FDIC insured; are not obligations or deposits of, and are not guaranteed or underwritten by any bank, savings and loan or credit union or its affiliates; are unrelated to and not a condition of the provision or term of any banking service or activity.

56.     To assuage any concerns arising from Security Benefit Life's very recent brush with financial death, its new owners shifted the focus to Guggenheim Partners--- who, coincidentally, had weathered the financial crisis very well comparatively speaking and whose brand was historically associated with the wealth management industry.

57.     In all the indexed annuity product-related marketing materials, as well as on the annuity contracts, Security Benefit Life and Guggenheim prominently displayed this logo:



58.     In addition to rebranding the company logo, the companies repeatedly stated in standardized marketing materials that "since 1892, Security Benefit has been helping people prepare for the future" and explained that

> In July 2010, Security Benefit was purchased by an investor group led by Guggenheim Partners and is now privately owned. Our owners are committed to Security Benefit's financial strength and a strong capital position.

59.     Likewise, the marketing materials also explained that the "Guggenheim name represents a rich tradition of innovation and success in business, philanthropy, education and investments" and that

> Guggenheim Partners manages Security Benefit Life's general account assets of more than $5 billion. The firm's investment expertise helps us set competitive credited rates for our annuity products.

60.     These pronouncements were carefully designed to give the appearance that Guggenheim would be adding benefit to Security Benefit Life.   In a press release from Guggenheim Partners, Howard Fricke, who had been serving as interim President and CEO of

Security Benefit since Feb. 16, 2010, after serving as Security Benefit President and CEO from 1988 to 2000 and Chairman from 1996 to 2006, was quoted saying

> "The completion of this acquisition is a key milestone for our organization and our associates. … Our goal is to grow profitably, and today we move forward as a stronger company, with the financial backing and business opportunities Guggenheim Partners has to offer." [3]

61.     Guggenheim Partners, however, had every intention of putting Security Benefit's capital to work.  Not the other way around.  But first, it had to find a way to resurrect Security Benefit Life.  It did it with a new product, the Total Value Annuity.

**The Total Value Annuity and Security Benefit Life's Rise to the Top**

62.     The "Total Value Annity" is a "fixed indexed annuity" issued by Security Benefit Life.  It was launched in April 2012.  Within a year, the Total Value Annuity skyrocketed to the number one selling fixed indexed annuity product in the country, pulling in nearly $2 billion dollars in premiums in its first year alone. It was the leading fixed indexed annuity in terms of sales in four of the initial five quarters after its launch and has remained in the top five for over two years. Security Benefit Life has received $7 billion in premium dollars from this product alone.

63.     The Total Value Annuity, however, was not a product innovation.  It did not catapult Security Benefit Life to the top of the market through legitimate business practices or superior business acumen.  Instead, Guggenheim manufactured this rise.  It designed a product that appeared to be superior but this was engineered through deception.

---

[3] https://www.guggenheimpartners.com/firm/news/guggenheim-partners-led-acquisition-of-security-be

64.     In 2011, the fixed indexed annuity market was occupied by a number of life insurance companies who were all offering products that had a similar design. They all offered interest crediting options that were linked to an external equities-based index (e.g. the S&P 500) and the potential earnings rates were all "capped" at relatively low rates (i.e. 2-3%). As one marketing organization put it: "For indexed annuity agents and advisors, it has been a challenge to find indexed interest options with uncapped interest potential."[4]

65.     The Total Value Annuity was specifically designed to appear different. The product immediately gained a market advantage by purporting to offer an "uncapped" interest crediting option. When consumers looked at existing fixed indexed annuities they saw a 'best case scenario' of earning roughly 3% interest per year at best—and only if the market performed positively.  By contrast, when they looked at the Total Value Annuity they saw the potential for much greater up-side potential because there was no cap to limit the earnings and projections of performance showed substantial upside potential even when the market had failed to perform during the financial crisis.

66.     In the product's debut press release issued by Security Benefit Life, the company's president, Doug Wolff, said the Total Value Annuity "targets savers with an eye toward accumulation" and the company said the product "comes as close to fully addressing the retirement challenge as any product on the market."[5] Advisors Excel also published a press release that the Total Value Annuity is a "fixed index annuity that provides solutions where other retirement

---

[4] http://creativeedgemag.com/getting-real-about-a-real-alternative-index/

[5] April 2, 2012, Press Release from Security Benefit.

income strategies fall short…" and "…the opportunity for income growth even when the stock and bond markets decline simultaneously." [6]

67.     At the heart of the "uncapped" interest crediting option of the Total Value Annuity is the unique index crediting option called the "5 Year Annuity Linked TVI Index." Despite its misleading name, the Annuity Linked TVI Index ("ALTVI") was not a crediting option based on the TVI index or any other market index that previously existed independent of this new annuity product. The same press release from Security Benefit Life explained that the "ALTVI was built with a goal of providing positive returns through diversification, non-correlation and stabilized volatility…[and] [i]ts index provides the Total Value Annuity a unique alternative to the performance of traditional asset classes."

68.     The standardized marketing materials for the Total Value Annuity included a brochure titled "Annuity Linked TVI Index explained." In it, three key features of the ALTVI are identified:

- The Index aims to deliver positive returns while moderating volatility regardless of market direction.

- The Index goal is to be non-correlated to negatively-correlated when compared to traditional asset classes like stocks and bonds over extended periods, making it an efficient asset allocation diversification tool.

- The Index generally has a short recovery time from negative periods, due to the ability to buy short in an attempt to profit from falling prices.

The brochure also explains that the "Annuity Linked TVI Index shares the same components as the TVI Index with the addition of a volatility overlay. The overlay increases exposure to the TVI when the TVI volatility is low and decreases exposure when volatility is high. This volatility

---

[6] April 1, 2012, News Release from Advisors Excel.

overlay is expected to dampen the highs and lows of the asset classes in which the Index invests which should provide less volatility in the returns of the Annuity Linked TVI Index."

69.    The standardized Statement of Understanding issued with the Total Value Annuities explained:

> Because the TVI™ is based on the 24 futures contracts on commodities, global currencies and U.S. interest rates, the daily values of the TVI™ are likely to be independent from the price movement of equity and bond indices. In addition, unlike traditional equity and bond indices that increase and decrease when equities and bonds increase and decrease, the TVI™ can increase in value when the futures contract prices are decreasing. Because it is based on the TVI™, the 5 Year Annuity Linked TVI Index Account provides you with the opportunity to receive index interest credits in times when an index crediting option based on equity or bond markets would not.

70.    Concerning the Index, the standardized Total Value Annuity contract notes that interest to be credited to the product "is based upon the change in an external market index," and specifically concerning the ALTVI it notes that the Annuity Linked TVI Index, ALTVI, RBS, The Royal Bank of Scotland and the DAISY device logo are trademarks of the Royal Bank of Scotland Group, plc or one of its affiliates… Security Benefit Life Insurance Company annuities are not sponsored, endorsed, sold or promoted by the Royal Bank of Scotland group, plc."

71.    The "Annuity Linked TVI Index explained" brochure, under the heading "Who Runs the Annuity Linked TVI Index?" states that the "Annuity Linked TVI Index was developed and is owned by The Royal Bank of Scotland (RBS) as an innovative rules-based index designed to provide portfolio diversification."

72.    Creative One, one of the four IMOs given exclusive distribution rights for the Total Value Annuity, explained that

> In order to understand the Annuity Linked TVI Index, it's important to know how it was developed. The Annuity Linked TVI Index is derived from another index, the Trader Vic Index™ Excess Return (TVI™ Index). Developed by Victor Sperandeo and EAM Partners L.P., the goal of the TVI is to provide positive returns through diversification and a non-correlated approach to traditional asset classes. The TVI Index is constructed using 24 highly liquid futures contracts across physical commodities, global currencies and U.S. interest rates. The TVI Index

tracks the prices of futures contracts in these asset classes, which can be either long or short in an attempt to take advantage of both rising and falling market trends.

73.    In an interview given to promote the launch of the Total Value Annuity, Security Benefit Life's president, Doug Wolff, explained: "This product gives clients access to a non-correlating index that, **when you look at historical performance, produces a very nice risk/return profile**, especially when it's mixed with exposure to the S&P 500 Index…It can go long or short on the futures contracts. It uses a momentum-based formula [for buying and selling futures]; it's not subjective, it's all quantitative."[7]

74.    Creative One, who was selected by Security Benefit Life and was authorized to promote the TVA's release, also noted in its marketing to producers that

> For indexed annuity agents and advisors, it has been a challenge to find indexed interest options with uncapped interest potential. There are not many such options today. Because the ALTVI index is internally diversified and also features a dynamic allocation process, the cost of hedging the index is better. The ALTVI Index is a 5-year, point-to-point, uncapped crediting option.  The ALTVI itself, with the volatility allocation and the 5-year interest calculation term, make it possible to have this option with no cap on the 5-year interest credit.  **Examining the past 20 years and simulating ALTVI performance shows the possibility of achieving a very competitive interest return**….
>
> Other than fixed interest option, index annuity interest formulas today are almost all linked to indices that are equities-oriented. This means that when equity indices are negative, zero index interest is credited. The only significant diversification previously available has been the fixed interest rate option, and that worked better when fixed rates were higher. There is not much diversification benefit from the fixed interest rate strategy today given declared rates hovering between 1% and 2%. Our challenge is to find a way to increase the likelihood of earning more interest – **without taking more risk**. Diversification is the technique of blending different asset types within a portfolio. A more diversified portfolio may produce higher returns on average for the same or less risk. Diversification is achieved when the various types of financial products in the portfolio are *not correlated*. The ALTVI

---

[7] https://retirementincomejournal.com/article/the-stacking-strategy/

is not an equity index and it is designed to not be correlated with equity indices, so diversification is possible. **For example, in 2008 when the S&P 500 decreased 38.49%, the ALTVI instead would have seen a 10.40% increase, based on simulated performance**.

75.     Here is the "historical performance, [that] produces a very nice risk/return profile," referenced by Mr. Wolff, and the examination of "the past 20 years and simulating ALTVI performance" that created the "possibility of achieving a very competitive return" as referenced by Creative One:



76.     Similar projections of simulated ALTVI performance were incorporated into the standardized marketing materials provided to customers. The illustration below shows a Total Value Annuity's simulated performance with the ALTVI as an interest crediting option:

The information in this table is based on:
- Initial Purchase Price: $100,000
- Initial Bonus: $10,000
- Initial Benefit Base: $110,000
- State: Generic
- Age: 50
- Status: Single
- Initial Allocation:
  50% S&P 500® Annual Point to Point Index Account, 3% Cap
  50% 5 Year Annuity Linked TVI Index Account, no Cap

| Start of year | Age | Lifetime Withdrawal Rate | Guaranteed 0% Index Interest Rates | | Recent Based on Index Values (2001-2011) | | Least S&P 500® Index (1998-2008) ALTVI Index (2001-2011) | | Median S&P 500® Index (1996-2005) ALTVI Index (1995-2005) | | Best S&P 500® Index (1991-2001) ALTVI Index (1993-2003) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Income Benefit Base if LAI taken at start of year | Lifetime Annual Income | Income Benefit Base if LAI taken at start of year | Lifetime Annual Income | Income Benefit Base if LAI taken at start of year | Lifetime Annual Income | Income Benefit Base if LAI taken at start of year | Lifetime Annual Income | Income Benefit Base if LAI taken at start of year | Lifetime Annual Income |
| 1 | 50 | 4.00% | $110,000 | $4,400 | $110,000 | $4,400 | $110,000 | $4,400 | $110,000 | $4,400 | $110,000 | $4,400 |
| 2 | 51 | 4.10% | $114,400 | $4,690 | $115,908 | $4,752 | $117,557 | $4,820 | $118,015 | $4,839 | $117,091 | $4,801 |
| 3 | 52 | 4.20% | $118,976 | $4,997 | $125,779 | $5,283 | $125,796 | $5,283 | $126,413 | $5,309 | $128,648 | $5,403 |
| 4 | 53 | 4.30% | $123,735 | $5,321 | $138,967 | $5,976 | $132,191 | $5,839 | $137,516 | $5,590 | $145,395 | $6,248 |
| 5 | 54 | 4.40% | $128,684 | $5,662 | $153,440 | $6,751 | $149,703 | $6,587 | $149,928 | $6,597 | $159,092 | $7,000 |
| 6 | 55 | 4.50% | $133,832 | $6,022 | $171,006 | $7,695 | $167,014 | $7,516 | $176,711 | $7,952 | $178,097 | $8,014 |
| 7 | 56 | 4.60% | $139,185 | $6,403 | $181,577 | $8,353 | $177,304 | $8,156 | $183,840 | $8,457 | $188,476 | $8,670 |
| 8 | 57 | 4.70% | $144,753 | $6,803 | $195,573 | $9,192 | $183,220 | $8,611 | $199,647 | $9,383 | $209,636 | $9,853 |
| 9 | 58 | 4.80% | $150,543 | $7,226 | $212,480 | $10,199 | $200,964 | $10,079 | $219,396 | $10,531 | $227,431 | $10,916 |
| 10 | 59 | 4.90% | $156,564 | $7,672 | $232,456 | $11,391 | $229,778 | $11,259 | $240,591 | $12,083 | $261,545 | $12,816 |
| 11 | 60 | 5.00% | $162,827 | $8,141 | $233,096 | $11,655 | $230,295 | $11,515 | $272,766 | $13,638 | $295,133 | $14,757 |
| After 10 years, annual effective rate of Stacking Roll-up increase to Income Benefit Base | | | 4% | | 7.80% | | 7.67% | | 9.51% | | 10.37% | |

For the S&P 500® Index, the Least, Median and Best index increase 10-year periods were based on historical index values as reported by Standard & Poor's®. For the Annuity Linked TVI™ Index, the Least, Median and Best index increases were based on simulated index values as reported by Bloomberg. The Least, Median and Best index increase periods were determined for each index separately. The Median period is the next best index increase out of the 11 10-year periods from 1991 to 2011. It is not the average of the Best and Least income periods. To determine the Least, Median and Best index increase 10-year periods, we only calculated the Income Benefit Base for the S&P 500® Annual Point to Point Account, and no spread or participation rate or vesting percentage, which may apply in determining the Index Interest Rate for the 5 Year ALTVI Index Account, were taken into account.

This table does not show what the Lifetime Annual Income or the Income Benefit Base will be under any Total Value Annuity with Income Rider because the past performance of the S&P 500® Index and the simulated past performance of the ALTVI™ Index does not reflect what will happen in the future. In addition, the actual caps, spreads and participation rates may be different than what is assumed for this table. Caps, spreads and participation rates are set at our discretion at the beginning of each Index Term based upon factors we consider relevant, including market conditions.

77.      In light of these representations, the original design of the Total Value Annuity made the "5-Year Annuity Linked TVI Index Account" the most, if not the only, attractive interest crediting option available in the product because the only other options were the fixed account interest crediting option that provided only a 1.00% guarantee, and the "S&P Annual Point to Point" account option that was capped at 2.75 - 3.00% (depending on when the annuity was purchased). When presented with these options, most purchasers of the Total Value Annuity opted to allocate most of their purchase payment dollars to the "5-Year Annuity Linked TVI Index Account" and its promise of greater ("uncapped") upside potential.  Thus, the ALTVI was designed to appear superior to the other, existing crediting options for the Total Value Annuity.

78.      Once an allocation was made to the "5-Year Annuity Linked TVI Index Account", then no re-allocation could be made for a period of five years. And, any interest credits would only be determined at the five-year mark, meaning that the annuity purchaser would not know how much interest they would receive until five years after the initial investment because the interest was calculated based on the difference between the ALTVI Index as it was reported at the time of the initial investment and then as it was reported on the fifth anniversary from the initial

investment. An attempt to re-allocate or withdraw from "5-Year Annuity Linked TVI Index Account" carried substantial penalties. This effectively locked up the funds allocated to this crediting option for five years. This meant that collectively Guggenheim now had access to more than a billion dollars knowing that repayments would not begin for years.

79.     The 5-Year Annuity Linked TVI Index Account was the only interest crediting option other than the fixed interest account (1.25%) and the S&P 500 Annual Point to Point Index Account (capped at 2.75 – 3.00%) from the launch of the Total Value Annuity in April 2012 until a year later when Security Benefit Life added another crediting option. However, producers continued to focus their sales efforts on the 5-Year Annuity Linked TVI Index Account, and more importantly, anyone who had selected it during the first year the Total Value Annuity was offered could not re-allocate their funds to any newly offered index accounts until after the five-year period had passed.

**The Total Value Annuity and its ALTVI Are a Sham Product.**

80.     Purchasers of the annuity had rude awakening. Purchasers who allocated their life savings to the account have seen little if any interest credited to their account by virtue of the ALTVI's poor performance.

81.     More recently, industry experts have evaluated Security Benefit Life's backtesting. In March 2015, Olivier Sarfati of Citigroup gave a presentation at the CBOE 2015 Risk Management Conference titled "Backtesting: A Practitioner's Guide to Assessing Strategies and Avoiding Pitfalls." It starts with an observation:

> "Too many investment strategies do not live up to expectations: they perform well in-sample, but fail to do so when implemented."

82.     Concerning the ALTVI, the presentation shows an illustration depicting backtesting using "in sample" data. It appears to be the same simulated performance of the ALTVI referenced

by Mr. Wolff, Creative One, and incorporated into the Total Value Annuity sales and marketing

materials:



83.     The next slide in the presentation provides an illustration incorporating the "out of

sample" data (i.e. the actual results of the ALTVI since it went live in 2010):



84.    As Mr. Sarfati's presentation shows, when creating the ALTVI and incorporating it into the Total Value Annuity, the simulated historical performance illustrations chosen by the Defendants bear no resemblance to the real world performance. Through backtest overfitting, Security Benefit Life, Guggenheim Partners and the others involved in bringing the product to market systematically and uniformly misrepresented the product's potential and captured billions of dollars of life savings in the process.

85.    Several leading academics wrote a paper in 2013 entitled "Pseudo-Mathematics and Financial Charlatanism: The Effects of Backtest Overfitting on Out-of-Sample Performance." In this paper, the authors explain how backtest overfitting often amounts to fraud. Ironically, one of the authors of this paper is Marcos Lopez de Prado, a mathematician who was a professor at

Cornell before leaving to work at Guggenheim from 2014 until several months ago, when he left to start his own company.

86.    Guggenheim also cannot contend that it had no idea the simulated performance was misleading.  Guggenheim Partners, the asset manager whose investment prowess was placed at the forefront of rebranding Security Benefit Life, actually projected poor performance in many of the sectors included in the TVI Index and actually took positions in its investments that were contrary to, or at least inconsistent, with the ALTVI. These facts were not disclosed to purchasers of the Total Value and the ALTVI and instead were intentionally and fraudulently concealed.

87.    In addition to the fraudulent representations about the potential returns, the ALTVI was also misrepresented to be an "external market index."  Security Benefit Life and Guggenheim Partners' actively concealed how the product was actually developed.  Security Benefit Life and Guggenheim Partners represented that the index was developed by the Royal Bank of Scotland ("RBS") — a recognized name globally in the financial world and seemingly unrelated to Security Benefit Life or Guggenheim.  By doing so, the index appeared to have been developed and operated by a separate, unaffiliated company that had no stake in the performance of the fixed index annuity product.  It gave the index the superficial appearance of being both legitimate and independent.  Here is one of the representations about the index that was included in the uniform marketing materials distributed with the product:

## Who Runs the Annuity Linked TVI Index?

The Annuity Linked TVI Index was developed and is owned by The Royal Bank of Scotland (RBS) as an innovative rules-based index designed to provide portfolio diversification.

The Annuity Linked TVI Index can be found on Bloomberg at http://www.bloomberg.com/quote/ALTVI:IND.

88.     In reality, however, the ALTVI was developed by Advisors Excel, Innovative Design Group and Alpha Artists, all who were contracted with Security Benefit Life and Guggenheim Partners for the intended purpose of propelling Security Benefit Life to the top of the fixed indexed annuity market, and in the course of doing so, earning millions of dollars on commissions on the sales of the product. The team, in fact, boasted about their accomplishments.

89.     Advisors Excel reports the following on its website:

When capital constraints became an issue for our industry a few years ago, we grabbed the reins and actively sought opportunities to help our producers not only survive but thrive in an increasingly challenging environment. We formed a strategic partnership with Innovation Design Group to design innovative, exclusive products that would provide greater value to your clients.

We partnered with IDG because of their success in bringing cutting-edge products to the industry, and our first venture with them, the Secure Income Annuity (SIA), was among those successes. Together, we worked with Security Benefit Life Insurance Company to introduce SIA in March 2011 and it quickly became the No. 1 selling fixed index annuity in the industry[1] gathering more than $7 billion in premium for AE producers since its release. **Through the same partnership, we introduced the Total Value Annuity in 2012, garnering both premium and media attention by ousting the SIA to grab the No. 1 selling FIA spot in the third quarter of 2012 and generating nearly $3 billion in premium for AE producers since then.**[8]

90.     Innovation Design Group reports the following on its website:

We introduce another solutions-based product. **This product, featuring the first of our alternative, proprietary indexes, was distributed through only the top FMOs in the industry.** This product offered clients the choice of an Accumulation focus without a fee, or the option to add a rider that provided Income or a Death Benefit. By providing the same product chassis, but in three different variations, we were able to focus on the benefit that was most important to each client's situation. **And with the uncapped index interest crediting option available in addition to minimum guaranteed growth, this product rocketed to #1 in the FIA space in a few short months.** Not the type to rest on our laurels, we made this product even more compelling by introducing our second proprietary index in the

---

[8] https://www.advisorsexcel.com/for-financial-professionals/planning/proprietary-product-development.php

Summer of 2013.  Giving clients more options for growing their retirement, giving our limited distribution an unprecedented competitive advantage, and delivering on our promises to our carrier partner.[9]

91.     Alpha Artists, LLC reports on its website that

The company performed early product development work on a groundbreaking fixed index annuity concept and worked with skilled distribution and an innovative U.S. life insurer to bring the concept to market. Alpha Artists licensed the first custom proprietary investment index to be embedded into a fixed index annuity in the U.S. life insurance industry. Fixed annuity policyholders were able to earn investment credits linked to the index which were uncapped by design in their potential - a feature never before accomplished. Product development began in 2009 and the annuity was launched nationwide in April 2012 and now exceeds $7 billion in inception sales. It was the leading fixed index annuity in terms of sales in four of the initial five quarters since its launch. Alpha Artists helped revolutionize the fixed index annuity industry with its licensing of this initial custom alternate index.[10]

92.     Guggenheim and/or Security Benefit Life were directly involved in the development of the ALTVI index.  It was not "external."  This was concealed, however. RBS served as the front for the index. RBS and Security Benefit have direct and ongoing relationships, including, but not limited to, RBS being a direct counterparty to call options and warrants purchased by Security Benefit Life and Guggenheim Partners  for hedging purposes related to the Total Value Annuities and "5 Year Annuity Linked TVI Index Account Rider," as well as Security Benefit Life making substantial other payments of fees and costs to RBS in relation to RBS's management and computation of the Annuity Linked TVI Index.

93.     The index also is not a "market index." An external market index is used to measure the performance of a particular segment of a market – often a stock market or commodities market.

---

[9] http://www.innovationdesigngroup.com/idg-proven-success.php

[10] http://www.indexmethodologies.com/aboutus.html

These are markets that fluctuate in value depending on the performance of this part of the economy. By contrast, the artificially created ALTVI index was structured exclusively to be inserted into a fixed indexed annuity product. It is impossible for a consumer to understand how the product functions, and how the volatility override operates or impacts the performance.

94.   The ALTVI was designed to underperform any external market index. Security Benefit Life has acknowledged that the hedging costs for an uncapped fixed indexed annuity product that was linked to an actual external market index, like the Trader Vic index, that actually measures the performance of a portion of a market would have been way too expensive. In that situation, Security Benefit Life would face the risk that the particular portion of the market tied to the index performed exceedingly well, and the annuity purchaser would be entitled to rich uncapped returns. By developing its own artificial index that had a controlled performance, Security Benefit Life and Guggenheim Partners could market its product as an uncapped annuity, but in function it was designed to have a limited performance. While it is impossible to control an actual, external market index, Security Benefit Life and Guggenheim were able to carry out their fraudulent marketing scheme by creating an index that could produce controlled results.

95.   Also, through the licensing arrangements between the parties, changes could be made at Security Benefit Life's discretion to the calculation methodologies allowing them to further undercut the index's performance and reduce their exposure.

96.   The Total Value Annuity and its ALTVI had other problems that were not disclosed to purchasers of the annuity. Although Security Benefit Life, SBC, and Guggenheim Partners represented that the "5 Year Annuity Linked TVI Index Account" provides the annuity owner with "the opportunity to receive index credits in times when an index crediting option based on equity or bond markets would not," the Defendants did not disclose that by being locked into the five-

year point-to-point method, the annuity owner had increased odds of being affected by bad times. Since the launch of the Total Value Annuity, the "Annuity Linked TVI Index" has declined in value and being locked into the "5 Year Annuity Linked TVI Index Account" has amplified the negative effect of these bad times experienced by the Plaintiff and members of the proposed Class. Of course, nondisclosure of amplified negative effects in down times is all the more concerning in light of the fraudulent simulations of historical performance, which show virtually no down times and certainly none that would have evidenced the amplified effect.

97.     Similarly, Security Benefit Life, SBC, Guggenheim and/or RBS added a volatility control overlay feature to the Total Value Annuity and falsely represented that with it, Security Benefit Life and purchasers of the Total Value Annuity could obtain more upside potential. Creative One, one of the four IMOs tapped to distribute the Total Value Annuity, parroted what the Defendants told it and explained to its producers that "[t]his volatility feature, or 'dynamic allocation' is expected to dampen the daily volatility in the returns of the Annuity Linked  TVI Index . . . [a]nd [b]y adding this dynamic allocation, Security Benefit can obtain more upside potential from its option budget and offer clients the more compelling values of no interest cap, 100% index participation and no annual spread." Contrary to the stated expectations, the volatility overlay has proven to be of little to no value to the annuity purchasers. This is because either the feature was designed to minimize interest credits, was faulty by design, or is being improperly managed by Security Benefit Life, SBC, Guggenheim Partners or RBS. The Defendants have fraudulently concealed these facts from the Plaintiff and members of the proposed Class.

98.     The price of hedging also strongly infers that Security Benefit and Guggenheim knew the ALTVI was designed to underperform.  Security Benefit Life's cost of purchasing option contracts as a hedge of the risk on the ALTVI was substantially cheaper than the cost of purchasing

option contracts for other TVA crediting options (i.e. S&P 500 Capped).  First, the actual cost of the option contracts was cheaper because any risk was mitigated by the product design and use of the ALTVI.  For example, Security Benefit Life purchased 5,126,346 ALTVI option contracts during 2013.  The cost of purchasing these option contracts was $138,971,836 or $27.10 per contract.  During the same year, Security Benefit Life purchased 1,467,598 S&P 500 capped option contracts.  The cost of purchasing these option contracts was $40,096,299 or $27.32 per contract. This makes no sense if the S&P contracts are a capped risk, while the ALTVI contracts are uncapped risk.

99.     Second, Security Benefit Life only needed to purchase one (1) five-year option contract for the ALTVI while it needed to purchase five (5) one-year option contracts for the S&P 500 capped contracts to cover the same five year period.  This means that the total hedging costs for the TVA linked to the ALTVI are a fraction of the cost of other annuities. This strategy saved Security Benefit Life over $560 million in 2013 and likely more than $1 billion during the class period.  Again, this makes no sense if the S&P contracts have a capped risk, while the ALTVI contracts have uncapped risk.  It only makes sense if the ALTVI was designed to underperform.

100.     Guggenheim also inflated the management fees paid by Security Benefit Life to Guggenheim for managing the general account.  Guggenheim Partners, Security Benefit Life and SBC misrepresented and/or concealed this fact from purchasers.  In fact, Security Benefit Life stated in its standardized marketing materials that the asset management expertise of Guggenheim (and its subsidiary, Guggenheim Investments) "helps us set competitive credited rates for our annuity products." This was misleading, and implied that Guggenheim's investing expertise would allow the TVA to obtain outsized returns compared to existing products.  Had annuity purchasers

understood the true dynamics between the companies and the actual management fees being transferred, they would not have purchased the TVA with the ALTVI crediting option.

**Outside, Third-Party Marketing Entities Furthered the Scheme**

101. Security Benefit also led annuity purchasers to believe that it had highly ethical and merit-based channels of distribution. In the same press release announcing the launch of the Total Value Annuity, Security Benefit Life explained that its parent company, SBC, "is a leading provider of savings and income solutions for America's pre- and post-retirees . . . [and] targets multiple wealth segments and channels of distribution through an independent, merit-based distribution structure."

102. Security Benefit Life's "independent, merit-based distribution structure" is a watered-down description of its marketing and sales scheme that is built largely on a compensation system that includes exorbitant commissions and other perks offered to agents and IMOs in exchange for pushing the company's equity-indexed annuities. Indeed, a significant reason Security Benefit Life went from being unranked to number four in the industry in only a year is that it incentivized its sales force by offering higher commissions and more attractive sales perks than its competitors were offering.

103. Another key component to Security Benefit Life's and SBC's "independent, merit-based distribution structure" is the fact that it "focuses on the retirement savings market" and looks to "broker/dealers, IMOs and other financial services providers" to market and sell its equity-indexed annuities. In other words, inherent to Security Benefit Life's marketing and sales scheme is the fact that the products are not being sold as life insurance products (as they are technically categorized), but instead as investments and retirement plans by "financial services providers" who hold themselves out as investment advisors and retirement planning experts. Thus, by design,

Security Benefit Life's and SBC's "independent, merit-based distribution structure" for its equity-indexed annuities is built on advisory relationships created by a sales force operating as investment advisors and retirement planning experts (rather than merely life insurance sales agents) and who are promoting investments in exchange for exorbitant undisclosed commissions and other compensation.

104.     On the one hand, those who were selling the fixed index annuities were doing so in the context of an advisory relationship that requires the advisors to act in the customer's best interest. But on the other hand, the advisors were overly incentivized by the exorbitant commissions and perks to sell SBC and Security Benefit Life's annuities and to do so to the exclusion of other more suitable investments, and to the detriment of the customer.

105.     On a uniform and consistent basis, the full extent of these conflicts of interests and the Defendants' compensation system and its detrimental impact on the Plaintiff's and proposed Class members' investments were not disclosed and were fraudulently concealed.

106.     Consistent with the uniform training, Plaintiff's advisor either never mentioned the compensation he was to receive or created the impression and belief that the compensation he received came from Security Benefit Life and not from the Plaintiff's funds. Likewise, Security Benefit Life's sales and marketing materials distributed in connection with the sale of Total Value Annuities, under the heading "Charges" on a page titled "Important Information About Security Benefit Total Value Annuity," states that "[w]hen you purchase your Total Value Annuity contract, no product-related expenses are deducted from your Purchase Payments at the time the application is received at Security Benefit . . . ." This is a deceptive half-truth. The commissions and perks paid to every producer who sold a Total Value Annuity were funded, directly or indirectly, by the Plaintiff's and proposed Class members' investments. The amount of this compensation factors

directly into the amount of earnings the Plaintiff and proposed Class members are to receive because, while Security Benefit Life initially bears the cost of the compensation, it ultimately recoups the cost by reducing the amount of earnings that would otherwise inure to the benefit of the Plaintiff and proposed Class members. This was not disclosed to the Plaintiff and proposed Class members, but should have been because it would have revealed the conflicts of interest and would have also allowed the Plaintiff and Class members the opportunity to make informed investment decisions.

107.    The Defendants owed a duty to make these disclosures, in part, because they voluntarily offered some information about other factors that could affect the performance of the Plaintiff's and proposed Class members' investments, but failed to tell the whole story of how the annuity was designed and how the agent compensation undercut the value and performance of the Plaintiff's and proposed Class members' investments.

108.    As noted above, the Defendants' marketing and sales scheme of the Total Value Annuity was to be carried out through "four elite independent marketing organizations (IMOs) . . . building on the success of our recent efforts to put unique and competitive products into the hands of respected national distribution organization." The advisor who sold the Plaintiff his annuities was contracted with Creative One, one of the "four elite independent marketing organizations" referred to above.

109.    The primary role of the IMO is to serve as a conduit between companies who issue annuities and the field agents who sell them. As a marketing organization, Creative One, like the other three IMOs, was actively involved and provided direct support to the advisor who sold the Total Value Annuity to the Plaintiff. That support came in the form of funding for sales events such as seminars and ad campaigns, as well as agent training and supervision. As was the case for

every Total Value Annuity sold, the IMO with whom the selling producer was contracted also received compensation from Security Benefit Life.

110.    On this point, the United States Department of Labor ("DOL") explained that fixed indexed annuities are "often quite complex and subject to significant conflicts of interest at the point of sale" and, thus, as the DOL determined, should be sold under more stringent conditions designed to protect customers. *See Mkt. Synergy Grp.,* 2016 WL 6948061, at *7 (citing Amendment to and Partial Revocation of Prohibited Transaction Exemption (PTE) 84-24 for Certain Transactions Involving Insurance Agents and Brokers, Pension Consultants, Insurance Companies, and Investment Company Principal Underwriters, 81 Fed. Reg. 21, 147-01. at 21,152-53 (Apr. 8, 2016)). Neither Security Benefit Life, Guggenheim Partners, nor any of the four elite IMOs distributing the Total Value Annuity made adequate efforts to educate or supervise the sales force, or to disclose the extreme conflicts of interest at play.

### Guggenheim's Transfers from Security Benefit

111.    The fraudulent intent behind the scheme, as well as the true effects on the insurance companies involved, are evidenced in many transactions. In a suspicious end-of-year transaction on December 31, 2012, Security Benefit Life loaned $960,219,687 to unknown, but affiliated, "IDF entities" and presumably received shares in an Insurance Dedicated Fund ("IDF").  An IDF is a hedge fund linked to a variable annuity or life insurance policy.  In exchange for supplying almost $1 billion in loans to these unknown and undisclosed affiliated entities, Security Benefit Life received shares in IDF-V Series B, IDF-V Series C and IDF-V Series D.  If any value of these IDF-V series shares were assigned, they were assigned by an affiliated entity of Security Benefit Life and were fraudulent.  There is no public market for these IDF products and these were highly illiquid investments by Security Benefit Life.

112.    In exchange for supplying $35,000,000 in cash, Security Benefit Life also received shares valued at $35,000,000 in a Guggenheim created fund named "Sec-Ben GBM Investco, LLC."  Presumably, GBM is an acronym for Guggenheim Baseball Management.  In essence, Security Benefit Life exchanged $995,219,667 in liquid cash for $995,219,687 in illiquid IDFs and an investment fund created and valued exclusively by Guggenheim.  Curiously, other insurance companies owned by Guggenheim engaged in similar transactions on April 26, 2012.  The total value of cash involved in all of these transactions (including Security Benefit Life's contribution) was $1,950,152,087 or roughly the $2 billion necessary to purchase the Los Angeles Dodgers.

113.    However, the suspicious transactions didn't stop in 2012.  Security Benefit Life also placed a substantial amount of reinsurance with affiliated entities.  From 2010 through 2017, Security Benefit Life paid reinsurance premiums of $1,982,256,207 to affiliated entities.  On December 31, 2012, Security Benefit Life appeared to transfer the risk of $1,645,324,285 to an affiliated company known as Heritage Life Insurance Company ("Heritage Life").[11]  Heritage Life is a small insurance company.  In 2011, it reported capital and surplus of $8,237,947.  Despite this fact, Heritage Life agreed to reinsure over $1.6 billion of Security Benefit Life's business.

114.    Instead of transferring the premium dollars necessary to support the reinsurance transaction to Heritage Life, Security Benefit Life decided to classify the transaction as a funds withheld reinsurance treaty.  Funds withheld reinsurance involves a reinsurance cession in which the ceding company does not actually remit premium to the reinsurer, but retains the premium in

---

[11] While Security Benefit Life contends that Heritage Life is not an affiliated company, Heritage Life is owned by Robert L. Patton, Jr.  Mr. Patton is a member of the board of Security Benefit and is a partner in Guggenheim Baseball Management, along with Mr. Boehly and Mr. Walter.

a separate account from which claims will be paid.  The primary purpose of structuring reinsurance on a funds withheld basis is to reduce or eliminate the need for an unauthorized reinsurer to post collateral.  However, Heritage Life is purportedly an authorized reinsurer.  Here, the effect of the reinsurance transaction was to allow Security Benefit Life to maintain control over $1.6 billion in cash but to remove those associated liabilities from its balance sheet.

115.    Similar suspicious reinsurance transactions occurred on October 1, 2017 when Heritage Life ceded approximately $95.1 million to a small insurance company, RX Life Insurance Company ("RX Life"), that it purchased on that same day.  RX Life's capital and surplus at the end of 2016 was $9 million, yet it assumed $95.1 million in reinsurance obligations from Heritage Life.

116.    In addition to purchasing the Dodgers, the cash stripped from Security Benefit Life has been used to make loans to or investments in a number of affiliated LLC's that own assets which are controlled and maintained by Boehly, Walter, Eldridge and Guggenheim for their exclusive use or personal profit.  These affiliated LLC's include Cain Hoy Enterprises LLC ("Cain Hoy"), Delaware Life Insurance Company ("Delaware Life"), Media Rights Capital II LP ("MRC"), Essential Properties Realty Trust, Inc.[12] and Four Six Four Aircraft, LLC.

117.    From the years 2010 through 2017, $7,158,094,203 of assets were cashed out by Security Benefit Life and "invested" in affiliated companies.  By 2017, 378% of Security Benefit Life's surplus was "invested" in affiliated companies.

---

[12] The manager of EPRT Holdings, LLC is Anthony D. Minella, President of Eldridge, former Chief Investment Officer for Security Benefit Life and co-head of the Corporate Credit Group at Guggenheim Investments.

118.   In addition to investing a substantial portion of Security Benefit Life's surplus in affiliated entities, Security Benefit Life also paid exorbitant management fees to affiliated entities from 2010-2017.  By 2016, management fees to affiliated entities had ballooned to $196,302,940. From the years 2010 through 2017, Security Benefit Life paid $831,527,633 to affiliates.

119.   Finally, Security Benefit Life paid dividends to its shareholders in the amount of $363,870,970 from 2010 through 2017.  These dividends were paid in spite of the fact that Security Benefit Life's public filings from 2010 through 2017 reveal unassigned surplus far below this amount -- even $0 unassigned surplus in some year.

120.   Between assets invested in affiliated entities, management fees paid to affiliated entities, reinsurance placed with affiliated entities and dividends to shareholder, Security Benefit Life transferred $10 billion of assets to affiliated entities during the time it was owned by Guggenheim Partners.

121.   While Guggenheim contends that it has contributed capital to Security Benefit Life over the years to bolster Security Benefit Life's surplus, these purported contributions of capital are sham transactions.  Prior to making a capital contribution in Security Benefit Life, Guggenheim Partners required Security Benefit Life to purchase an "investment" in the form of an uncollateralized note from an affiliated entity.  Once Security Benefit Life purchased this "investment" from Guggenheim Partners, then Guggenheim Life would deliver a portion of the money back to Security Benefit Life in the form of a capital contribution.  However, the affiliated note and accompanying capital contribution were worth substantially less than the cash spent by Security Benefit Life.  Importantly, the affiliated note is not a liquid investment.

122.   On August 1, 2013, Guggenheim acquired yet another vulnerable insurance company, purchasing the domestic U.S. annuity business and certain life insurance businesses of

Sun Life Financial Inc. ("Sun Life") and placing it in Delaware Life Holdings, LLC, a subsidiary formed by Guggenheim in December 2012 and controlled at the time by Boehly and Walter.  On September 30, 2013, Security Benefit Life loaned $221,094,350 of its surplus to Delaware Life. Within a few months of receiving this loan, Delaware Life paid a $185 million dividend to Delaware Life Holdings LLC.  Despite the common ownership of Security Benefit Life and Delaware Life, this transaction was reported as an "unaffiliated" transaction by Security Benefit Life in its Annual Statements.

123.    On July 30, 2015, Security Benefit Life loaned $266,548,377 and $633,096,755 to Cain Hoy – a private equity firm founded in September 2014 by Boehly and two former executives of Guggenheim Partners.  Cain Hoy was also launched with an investment from Guggenheim Capital.  Despite Boehly serving as Chairman of Security Benefit Life and owning a stake in Cain Hoy, this loan was reported as an "unaffiliated" transaction by Security Benefit Life in its Annual Statements.

124.    Security Benefit Life purchased $20,000,000 of stock in MRC.  MRC was an independent film and television studio that was launched with an investment from Guggenheim Partners and is now completely owned by Security Benefit Life's parent, Eldridge Industries. Despite Guggenheim Partners' investment in MRC and Eldridge's ownership of MRC, this purchase was reported as an "unaffiliated" transaction by Security Benefit Life in its 2015 Annual Statement.

125.    Plaintiff and the other members of the proposed Class suffered concrete damages when they purchased their annuities from Security Benefit Life. As a direct result of the unlawful practices alleged herein, Plaintiff and the members of the proposed Class purchased one or more annuities that were worth far less than the premiums paid; each of them incurred an immediate,

albeit fraudulently concealed, measurable financial loss on the purchase date equal to the difference between the premiums paid and the diminished value attributable to the fraudulent design of the Total Value Annuity and its ALTVI Account as a result of the operation of the RICO Enterprise described more fully below.

126. Plaintiff and members of the proposed Class also suffered concrete damages when, on the five-year anniversary of their annuity purchase, the 5 Year Annuity Linked TVI Index Account realized little or no interest credits. In addition, to the extent that Plaintiff and other members of the proposed Class surrender their annuities before expiration of the pertinent surrender charge period, they have sustained additional concrete damages in the form of surrender charges.

127. Defendants have thus, through a scheme that began as early as January 1, 2012, and continues through the present day ("the Class Period"), fraudulently duped Plaintiff and members of the proposed Class into buying annuity products based on false assurances of safety and financial strength, and through the fraudulent concealment of the truth about the design of the Total Value Annuity and the 5 Year Annuity Linked TVI Index Account. Plaintiff and the members of the proposed Class would not have purchased their annuities had they known the true financial condition of Security Benefit Life and that the Total Value Annuity was designed to provide profit to the Defendants at the expense of and to the detriment of the annuity purchasers, and that they were purchasing annuity products that are far riskier and thus worth far less than comparable products issued by financially sound issuers.

128. Defendants' fraudulent scheme constitutes a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1962(c) and (d). Plaintiff and the Class have been damaged by Defendants' pattern of racketeering activity because they were misled into

purchasing annuities based on material misrepresentations of the financial strength of the issuing companies, and omissions of the fact the Total Value Annuity and its 5 Year Annuity Linked TVI Index Account were designed and managed to minimize interest credits to the annuity products that no reasonable person would purchase if not deceived. This suit is necessary to remedy the injury caused by Defendants' racketeering activity.

### Plaintiff's Transaction

129.  Plaintiff Albert Ogles in July 2012 purchased a Security Benefit Life Total Value Annuity with a purchase payment of approximately $145,000. 100% was allocated to the 5 Year Annuity Linked Index Account.  Like all other purchasers of the Total Value Annuity with the ALTVI crediting option, Ogles was defrauded by the fraudulent marketing scheme devised by Defendants.

130.  Ogles was never told that the ALTVI index was not an external market index that existed independent of the annuity product.  Ogles was never told that the ALTVI index was created exclusively for the Total Value Annuity product.  Ogles was never told that Security Benefit Life and/or Guggenheim were involved with the design of the ALTVI index.  Ogles was never told that the historical performance of the annuity was based on simulated backtesting using in-sample data to create a positive appearance of performance.  Ogles was never told that Security Benefit Life and RBS entered into hedging transactions and had a financial relationship.  Ogles was never told that Security Benefit Life was able to hedge its risk on the ALTVI crediting option at a fraction of the cost of the other crediting options.

131.  Ogles would not have purchased the Total Value Annuity had he known the truth about the product's design and had he received full disclosure of all of the material facts set forth herein.  Ogles continued to own the Total Value Annuity and it recently reached the five-year

anniversary, at which time he learned that the Five Year Annuity Linked TVI Index Account Rider failed to produce any interest credits or to otherwise perform consistent with the uniform representations made by Security Benefit Life, Guggenheim Partners, and the four IMOs who were given the exclusive rights for the product.

132.     Ogles has been injured in his property by virtue of the drastic underperformance of the Total Value Annuity, as have all other purchasers of the Total Value Annuity who chose the fraudulent ALTVI crediting option.   All of Ogles' losses were proximately caused by the Defendants' fraudulent scheme.   He has suffered injury to his property and is a victim of the fraudulent scheme.

### **Class Allegations**

133.     Plaintiff brings this action on behalf of himself and all other similarly situated Class members pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure and seeks certification of the following Class ("the Class") for violations of federal laws, unjust enrichment, and declaratory judgment:

> All persons in the United States who between January 1, 2012 and the date class notice is disseminated purchased a Total Value Annuity from Security Benefit Life and allocated purchase payments to the 5 Year Annuity Linked TVI Index Account. Excluded from the class are owners, officers, directors, employees, agents and/or representatives of Defendants and their parent entities, subsidiaries, affiliates, successors, and/or assigns, and the Court, Court personnel, and members of their immediate families.

134.     <u>Numerosity</u>. The members of the Class are so numerous that individual joinder of all members is impracticable. In 2012, Security Benefit Life received in excess of $4.1 billion in annuity payments and received in excess of $134 million in annuity payments in Kansas alone, a substantial portion of which is directly attributable to sales of the Total Value Annuity and its ALTVI Account. The identity and precise number of Class members, though unknown to Plaintiff,

is reasonably ascertainable from the Security Benefit Life's records.  The putative Class exceeds

100 members.

135.   <u>Commonality and Predominance</u>. This action involves common questions of law

and fact, which predominate over any questions affecting individual Class members. These

common legal and factual questions include, but are not limited to, the following subject matter:

a.   the manner in which the Total Value Annuity and the Annuity Linked TVI Index Account and the Annuity Linked TVI Index were designed;

b.   the Defendants' projected performance of the Annuity Linked TVI Index;

c.   the payment of investment and management fees by Security Benefit Life to Guggenheim, Guggenheim Investments and/or RBS;

d.   the nature and extent of Security Benefit Life's undisclosed affiliation with the other Guggenheim Insurers and related entities;

e.   the nature and extent of Security Benefit Life's and Guggenheim's undisclosed affiliation with RBS;

f.   whether Defendants were unjustly enriched;

g.   whether Defendants engaged in a pattern of racketeering activity (mail and/or wire fraud);

h.   whether the alleged RICO Enterprise is an "enterprise" within the meaning of 18 U.S.C. § 1961(4);

i.   whether each of the Defendants conducted or participated in the affairs, directly or indirectly, of the RICO Enterprise;

j.   whether the pattern of racketeering alleged caused the injury to property and investment losses alleged;

k.   whether Plaintiff and the Class are entitled to appropriate equitable remedies, including declaratory, injunctive relief and/or disgorgement; and

l.   whether Plaintiff and the Class are entitled to monetary damages, including treble damages under RICO law.

136.   <u>Typicality</u>. Plaintiff's claims are typical of the claims of the members of each Class because, inter alia, all Class members were injured through the same alleged uniform misconduct described above.

137.   <u>Adequacy of Representation</u>. Plaintiff will fairly and adequately protect the interests of the members of the Class. Plaintiff has retained counsel experienced in complex class action litigation, and Plaintiff intends to prosecute this action vigorously. Plaintiff has no interests adverse or antagonistic to those of the Class.

138.   <u>Superiority</u>. A class action is superior to all other available means for the fair and efficient adjudication of this controversy. The damages or other financial detriment suffered by individual Class members is relatively small compared to the burden and expense that would be entailed by individual litigation of their claims against Defendants. It would thus be virtually impossible for Plaintiff and Class members, on an individual basis, to obtain effective redress for the wrongs done to them. Furthermore, even if Class members could afford such individualized litigation, the court system could not. Individualized litigation would create the danger of inconsistent or contradictory judgments arising from the same set of facts. Individualized litigation would also increase the delay and expense to all parties and the court system from the issues raised by this action. By contrast, the class action device provides the benefits of adjudication of these issues in a single proceeding, economies of scale, and comprehensive supervision by a single court, and presents no unusual management difficulties under the circumstances here.

139.   <u>Propriety of Declaratory Relief</u>.  Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

## CAUSES OF ACTION

## COUNT ONE

## VIOLATION OF THE RICO ACT, 18 U.S.C. § 1962(c) & (d)

140.    Plaintiff repeats and re-alleges all preceding paragraphs 1 to 139.

141.    Plaintiff, each member of the Class, and Defendants are "persons" as that term is defined throughout RICO (*i.e.*, 18 U.S.C. §§ 1961(3) and 1962(c)).

142.    18 U.S.C. § 1962(c) provides that it "shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity[.]" In violation of 18 U.S.C. § 1962(c), each Defendant has conducted or participated, directly or indirectly, in the conduct of the affairs of the Fraudulent Annuity Enterprise (defined below) through a pattern of racketeering activity involving the design, creation, sale, and marketing of fraudulent annuity products. These acts constituted mail fraud and wire fraud, as explained below and above.

143.    18 U.S.C. § 1962(d) provides that it "shall be unlawful for any person to conspire to violate any of the provisions of subsection . . . (c) of this section." In violation of 18 U.S.C. § 1962(d), each Defendant conspired or agreed to join a scheme to defraud Plaintiff and members of the proposed Class.

### The Fraudulent Annuity Enterprise

144.    The Fraudulent Annuity Enterprise alleged in this case is an association in fact enterprise consisting of Guggenheim, Guggenheim's individual principals in their individual capacities (Boehly and Walter), Security Benefit Life, RBS, Advisors Excel, Creative One, Gradient Financial, Impact Partnership, Innovation Design Group, Alpha Artists, Heritage Life,

EquiTrust Life, and Rx Life. This association-in-fact is referred to for purposes of this claim as the "Fraudulent Annuity Enterprise."

145.   Although they are not formally included in the Fraudulent Annuity Enterprise, thousands of advisors/producers who contracted with the IMOs mentioned above were also participants in the scheme.

146.   As set forth herein, the Fraudulent Annuity Enterprise has an ascertainable structure that is separate and distinct from the persons and entities that constitute it, and the Fraudulent Annuity Enterprise is separate and apart from the pattern of racketeering activity alleged herein.

147.   Together, the participants in the Fraudulent Annuity Enterprise infiltrated Security Benefit Life and used it (and its associated entities) as a vessel to defraud investors by fraudulently designing, creating, selling, and marketing Total Value Annuities, for the purpose of raising fast cash in order to fund exorbitant, unrelated purchases for the primary benefit of a few of Guggenheim's principals.

148.   The Fraudulent Annuity Enterprise is separate and distinct from each Defendant because it existed only through the combined actions and directions from its participants, each of whom are separate and distinct persons

149.   The Fraudulent Annuity Enterprise is also separate and distinct because for decades the ordinary, normal course of business for SBL was selling life insurance—not selling exotic annuities with an allegedly uncapped index. Defendants targeted and infiltrated SBL because it was a sleepy, conservative life insurance company that would not be suspected of becoming infected with a fraudulent scheme that would be used to secretly fund the acquisition of the Los Angeles Dodgers baseball club.

150.    The Fraudulent Annuity Enterprise meets the three factors required under the *Boyle* test: (1) the participants share a common purpose (to defraud investors and use the proceeds to capture billions of dollars in sales that would have gone to other, legitimate annuity companies that were not using a rigged "uncapped" index to dupe investors); (2) the relationships among the players are clear (the participants worked together to further the goals of the enterprise, provide cover and false legitimacy, and to create the illusion of independence so that investors would not realize that they were buying a sham product with a rigged index), and (3) there is and was a longevity sufficient to achieve its purpose (the scheme began several years ago and remains ongoing).

151.    The Fraudulent Annuity Enterprise functions through its deception of prospective annuity purchasers, in part, by deceiving prospective annuity purchasers regarding the value of Security Benefit Life's annuity products sold to them during the Class Period, as well as the true manner in which the 5 Year Annuity Linked Index Account Rider had been designed and managed to provide profit to the Fraudulent Annuity Enterprise at the expense of and to the detriment of the Plaintiff and members of the proposed Class. If truly objective and disinterested, and if not used as a ruse to promote and effectuate the sale of these annuity products, many of these services and products could be legitimate and non-fraudulent. However, Defendants have, through the Fraudulent Annuity Enterprise, engaged in a pattern of racketeering activity that involves a fraudulent scheme to increase revenues for Guggenheim and Eldridge through the sale of Security Benefit Life's deceptively designed and marketed annuities, and the looting of Security Benefit Life's annuity premiums through camouflaged transfers and sham transactions to provide profit to the Fraudulent Annuity Enterprise at the expense of and to the detriment of the Plaintiff and members of the proposed Class.

152.     Each member of the Fraudulent Annuity Enterprise has an existence separate and distinct from its participation in the racketeering activities of the Fraudulent Annuity Enterprise. Guggenheim, Security Benefit Life, EquiTrust Life, Guggenheim Life, Heritage Life, Rx Life, Creative One, Advisors Excel, Gradient Financial and Impact Partners are all organized as separate companies, with separate boards, separate books and records, separate accounts and separate existences for legal and regulatory purposes. Security Benefit Life, EquiTrust Life and Guggenheim Life facilitated and knowingly participated in the fraudulent scheme orchestrated by Guggenheim. So too did Heritage, which is separately indirectly owned by Patton and was corrupted as part of the scheme.

153.     The Fraudulent Annuity Enterprise also has an existence and structure that is separate and distinct from other affairs of its members. Members of the Fraudulent Annuity Enterprise engage in business operations separate and apart from their activities on behalf of the Fraudulent Annuity Enterprise. Guggenheim, for example, is a privately held global financial services firm with more than $295 billion in assets under management. Guggenheim provides asset management, investment banking and capital markets services, insurance services, institutional finance and investment advisory solutions to institutions, governments and agencies, corporations, investment advisors, family offices, and individuals.

154.     Defendants nevertheless became associated with the Fraudulent Annuity Enterprise and conducted or participated in the affairs of the Fraudulent Annuity Enterprise in addition to their own affairs. The activities engaged in by the associates of the Fraudulent Annuity Enterprise facilitating the racketeering activities are not, however, ordinary legitimate business activities and, in fact, were unlawful.

155.   Each member of the Fraudulent Annuity Enterprise has a clearly defined role and relationship in the conduct of the affairs of the Fraudulent Annuity Enterprise, and as alleged above all of the associates took some part in directing the Fraudulent Annuity Enterprise's affairs:

- Guggenheim, Walter, Boehly, and Eldridge engaged in the siphoning of funds from Security Benefit Life.

- Guggenheim, Walter, Boehly and Patton coordinated the transfer of current liabilities off the books of Security Benefit Life at the expense of and to the detriment of the Plaintiff and members of the proposed Class, and created the false impression of positive surplus and financial stability to permit the illicit siphoning of cash from Security Benefit Life.

- Guggenheim and/or Guggenheim Investments took control of Security Benefit Life's general account and, in addition to siphoning cash through investments, loans and fraudulent reinsurance transactions, also charged Security Benefit Life excessive management and investment fees.

- Walter, Boehly and Patton used a substantial amount of the siphoned funds for personal purposes or purposes not in the interests of Security Benefit Life, including for the speculative Dodgers purchase.

- Security Benefit Life designed and sold annuity products promising to perform obligations for which it had no intention to perform.

- Heritage served as a corrupt and purportedly unaffiliated entity that accepted ceded liabilities from Security Benefit Life to allow it to falsely represent its financial condition.

- Rx Life served as a corrupt and affiliated entity that accepted ceded liabilities from Security Benefit Life so that Security Benefit Life could falsely represent its financial condition.

- Officials from each company involved themselves in the affairs of the others. For example, as more particularly alleged above, as the primary conductors and beneficiaries of the fraudulent scheme, Guggenheim's Walter and Boehly assumed positions of control within Security Benefit Life and Patton acquired control over Heritage. As an additional example, on December 31, 2012, major officer and director positions of Heritage were held by people who worked at Guggenheim and the Guggenheim Insurers.

- Guggenheim, Security Benefit Life, Advisors Excel, Innovative Design Group, Alpha Artists and RBS together designed and developed the Total Value Annuity and 5 Year Annuity Linked TVI Index Account and Annuity Linked TVI Index.

- RBS and Security Benefit Life entered into side transactions where RBS served as and profited from being the counterparty to call options purchased by Security Benefit Life related to the Total Value Annuity and 5 Year Annuity Linked TVI Index Account.

- Security Benefit Life, Creative One, Advisors Excel, Impact Partnership and Gradient Financial developed the distribution system for the Total Value Annuity that was rife with conflicts of interest detrimental to the annuity purchasers.

156. In these ways and others, each of the Defendants participated or conducted, directly or indirectly, the unlawful activities comprising the Fraudulent Annuity Enterprises' affairs.

157. The cooperation exhibited by the members of the Fraudulent Annuity Enterprise fell outside the bounds of the parties' normal commercial relationships and was undertaken to advance the corrupt purposes of the Fraudulent Annuity Enterprise.

158. Guggenheim and Eldridge have taken over and manipulated Security Benefit Life. Their acquisition and use of Security Benefit Life made it easier to commit and conceal the fraud, allowing circular, non-economic reinsurance transactions among Security Benefit Life and the other Guggenheim-controlled entities, as well as transactions with Guggenheim Investments, RBS, Eldridge, Advisors Excel, Innovative Design Group and Alpha Artists in which Security Benefit Life paid excessive fees and costs.

159. Guggenheim Partners and Patton also infiltrated and manipulated Heritage, which agreed to and did falsely report itself as not affiliated with Security Benefit Life. Guggenheim and Patton thus involved themselves in the affairs of Heritage for an illicit purpose, arranging for it to assume billions of dollars in liabilities so as to generate phony reserve credits for Security Benefit

Life while hundreds of millions of dollars have been siphoned off to members of the Fraudulent Annuity Enterprise.

160.     The Fraudulent Annuity Enterprise's decision to operate through Security Benefit Life and the other Guggenheim Insurers, and Rx Life and Heritage thus facilitated its unlawful activity. Defendants consciously used the separate corporate forms of Security Benefit Life and the other Guggenheim Insurers and Rx Life in order to make the fraudulent scheme harder to detect and to better conceal the nature and extent of their misrepresentations and wrongdoing. Indeed, the success of the Fraudulent Annuity Enterprise depended upon the appearance of distinctness between Guggenheim, Security Benefit Life and the other the Guggenheim Insurers, Rx Life and Heritage.

161.     Moreover, Security Benefit Life took actions harmful to its own self interest (and its annuity holders), such as transferring billions of dollars of their funds to Guggenheim affiliates and to highly illiquid, speculative ventures like the Dodgers that would otherwise be available to make payments to its annuity holders.

162.     The Fraudulent Annuity Enterprise has had an ongoing and continuous existence before and during the Class Period sufficient to permit the Defendants to pursue the Fraudulent Annuity Enterprise's purpose. Throughout the Class Period, the members of the Fraudulent Annuity Enterprise associated in fact to market and sell Security Benefit Life's annuity products while concealing the severe conflicts of interest at play and the true nature of the design of the Total Value Annuity and its 5 Year Annuity Linked TVI Index Account, on an ongoing rather than *ad hoc* basis. None of the Defendants acted independently or in competition with one another, or otherwise in a manner contrary to the Fraudulent Annuity Enterprise's purpose.

163.     There was also coordination in the reinsurance transactions that helped effectuate

the purpose of the Fraudulent Annuity Enterprise.  The fundamental circularity of the non-economic reinsurance transactions could only have been accomplished with the coordination and cooperation of each member of the Fraudulent Annuity Enterprise, including in particular, the allegedly non-affiliated Heritage. No associate of the Fraudulent Annuity Enterprise could have accomplished the goals of the cash-raising and liability-dumping scheme on its own initiative. Likewise, the distribution of the Total Value Annuity in the marketplace could not have been accomplished without the concerted effort of the Fraudulent Annuity Enterprise to conceal the conflicts of interest that were detrimental to the annuity purchasers.

164.   The Fraudulent Annuity Enterprise has displayed a continuity of membership during the Class Period exceeding two years, during which time Defendants acted continuously in their respective roles in the Fraudulent Annuity Enterprise. And, there is a very real threat of continued misconduct.

165.   During the Class Period, each associate in the Fraudulent Annuity Enterprise was aware of the scheme to conceal the substantial conflicts of interest inherent to the sale of the annuities, and to conceal the true manner in which the 5 Year Annuity Linked Index Account Rider had been designed and managed to provide profit to the Fraudulent Annuity Enterprise at the expense and to the detriment of the Plaintiff and putative Class, and thus, was a knowing and willing participant in that scheme.

166.   The Fraudulent Annuity Enterprise engages in and affects interstate commerce because it involves activities across state boundaries, such as the fraudulent marketing, promotion advertisement, and sale of Security Benefit Life's annuity products, the receipt of inflated annuity payments from such fraudulent sales, and the payment of excessive fees and charges within the Fraudulent Annuity Enterprise.

167.     As described above and below, Defendant Guggenheim Partners, Eldridge, and their principals infiltrated Security Benefit Life to form the Fraudulent Annuity Enterprise and used it to engage in a scheme to defraud the purchasers of Security Benefit Life's Total Value Annuities.

168.     At all relevant times, the Fraudulent Annuity Enterprise was engaged in, and its activities affected, interstate commerce. Defendants used the interstate, national scheme to avoid detection by state regulators. Thus, RICO is especially important to deter and punish the Defendants' interstate scheme to defraud thousands of consumers across the United States.

**The Pattern of Racketeering Activity**

169.     In violation of 18 U.S.C. §1962(c), the Defendants used the Fraudulent Annuity Enterprise as a vessel to commit a pattern of racketeering activity. In particular, Defendants have engaged in countless acts of mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343) within the past three years. Defendants used the interstate mails and wires in furtherance of a scheme to defraud to investors.

170.     The focal point of mail fraud and wire fraud is a scheme to defraud. The fraud in this case included affirmative misrepresentations as well as fraud by concealment, half-statement, or omission. Defendants engaged in a scheme to defraud by fraudulently concealing (1) the true value of Security Benefit Life's annuity products, including the fraudulent simulations of historical performance of the ALTVI, (2) the conflicts of interest created by the sales and marketing scheme of the Total Value Annuities, (3) the siphoning of Security Benefit Life's cash for the use and benefit of individual enterprise members, and (4) the fraudulent portrayal of SBC and Security Benefit Life as "Guggenheim Partners Companies."

171.     Defendants acted with specific intent to defraud investors. Direct evidence of

specific intent is rare, and Plaintiff and the members of the Class will demonstrate the willful, specific intent to defraud through circumstantial evidence.

172.    Because of this fraudulent scheme, Defendants were able to and did charge Plaintiff and members of the proposed Class excessive prices for Security Benefit Life's annuity products and deprived them of interest credits on their annuities. Defendants locked the annuity holders into products they never would have purchased had they known the manner in which the 5 Year Annuity Linked Index Account Rider had been designed and created.

173.    As alleged above, Defendants have consistently and fraudulently concealed the conflicts of interest inherent in the sale of the annuities, fraudulently misrepresented and concealed the true design of the Total Value Annuity and the ALTVI index, and misrepresented RBS's status as unaffiliated and external to the operation of the Five Year Annuity Linked TVI Index Account.

174.    Each act of mail fraud or wire fraud alleged herein was related (similar purpose, similar participants, similar method of commission, similar result, and similar victims, including the Plaintiff and other members of the Class) and continuous (the scheme to defraud occurred over several years and it continues to occur as Defendants continue to conceal their fraud and reap the windfall of their deceptive annuity products).

175.    In furtherance of their scheme to defraud, in violation of 18 U.S.C. § 1341, Defendants used the interstate mails (including commercial carriers and the U.S. Post Office) to send, among other things, marketing brochures, simulations of historical returns for the ALTVI and TVI, annuity disclosure forms, performance illustrations, applications, contracts, training manuals, webinars, video tapes, correspondence, annuitant leads lists, annuity payments and commission payments, reports, data, summaries, statements and other materials relating to the marketing and sale of Security Benefit Life's annuity products. Defendants used the interstate

mails to transmit fraudulent account statements to members of the Class.

176.   In furtherance of their scheme to defraud, in violation of 18 U.S.C. § 1343, Defendants transmitted and received by interstate wire, among other things, marketing brochures, simulations of historical returns for the ALTVI and TVI, consumer brochures, annuity applications, annuity disclosure forms, field memos, correspondence, prospective lead lists, annuity payments, investment and management fee payments, commission payments, reports, data, summaries, account statements, faxes, other annuity marketing and sales materials, and wire transfers by and among affiliates for purposes of moving liabilities off the balance sheet. Defendants also received payments from Plaintiff and other Class members that were transmitted or cleared through the use of interstate wires in violation of 18 U.S.C. § 1343. Defendants also wired to one another the fruits of their scheme to defraud.

177.   In addition, Defendants used the interstate mails and wires to cause the delivery and transmission of fraudulent simulations of historical returns for the ALTVI and TVI, training and marketing materials from Security Benefit Life to the IMOs, including Creative One, who in turn delivered and transmitted the training and marketing materials to individual producers, including the advisor who sold the Total Value Annuities to the Plaintiff. These transmissions occurred in the months preceding July 2012 when Plaintiff Ogles was sold his Total Value Annuity.

178.   The predicate acts also included the transfer of funds in the form of a purchase payment of approximately $145,000 by or on behalf of Plaintiff Ogles in July 2012. At or around the time Plaintiff made his purchase payment, Security Benefit Life transferred or caused to be transferred funds in the form of commission payments to the advisor who sold the Plaintiff his Total Value Annuity, as well as to Creative One.

179.    On an on-going basis since July 2012, funds have been transferred by and between Security Benefit Life and Guggenheim Investments and Guggenheim and Eldridge in the form of deposits to Security Benefit Life's general account, and as funding for investments paid to other entities, including RBS, for fees and costs associated with the Annuity Linked TVI Index. Likewise, funds were transferred from Security Benefit Life to Guggenheim and Guggenheim Investments and Eldridge in the form of investment advisory fees and management fees.

180.    At a minimum, Defendants aided and abetted the mail fraud and wire fraud violations described herein, thereby rendering them indictable as principals in the 18 U.S.C. §§ 1341 and 1343 offenses pursuant to 18 U.S.C. § 2.

181.    Many of the precise dates of Defendants' uses of the interstate mail and wires in furtherance of their scheme to defraud have been deliberately hidden and cannot be alleged without access to Defendants' books and records, which requires discovery. Indeed, the very success of Defendants' scheme depended upon its concealment, and Defendants have withheld details of their scheme from Plaintiff and members of the proposed Class.

182.    Even so, Plaintiff can describe the occasions on which the predicate acts of mail and wire fraud would have occurred, and how the interstate mail and wires were in furtherance of a scheme. They include thousands of communications to perpetuate and maintain the scheme, including, among other things:

- transmitting and receiving promotional materials touting the "innovative" design and unique characteristics of the TVA, including the simulated historical performance of the ALTVI and its "uncapped" earning potential;

- sharing information about prospective purchasers of Security Benefit Life's annuity products;

- processing applications for Security Benefit Life's annuity products;

- processing premium payments received from the annuity holders, including those of Plaintiff;

- processing transfers of funds for the purported payment of investment of management fees;

- sham transactions and improper transfers between Security Benefit Life and affiliated entities;

183.    The materials sent or received by Defendants via the interstate mail and wires contained, *inter alia*, materially false misrepresentations and omissions about the undisclosed conflicts of interest and risks of the Security Benefit Life's annuity products, including the risk of default given Security Benefit Life's financial instability, calculated to deceive persons of ordinary prudence and comprehension.

184.    Defendants' corporate headquarters have communicated by interstate mail and wire (including email and facsimile) with each other and with various regional offices, subsidiaries, and affiliates in furtherance of their scheme.

185.    Defendants' omissions of material facts, acts of concealment, and failure to disclose material facts were knowing and intentional, and were made for the purpose of deceiving Plaintiff and members of the proposed Class into purchasing the overpriced and underperforming Security Benefit Life annuity products.

186.    To be clear, Defendants engaged in both affirmatively false statements and fraud by omission, which are both actionable as mail and wire fraud.

187.    Defendants either knew or recklessly disregarded the fact that their omissions and misrepresentations were material to Plaintiff and the members of the proposed Class, as shown by the substantial payments for the Security Benefit Life annuity products. Purchase of the annuity product proves the success of the scheme in persuading Plaintiff and the rest of the class members to purchase the fraudulent annuities.

188.     Without Defendants' fraudulent and materially misleading communications involving virtually uniform, deceptive representations or omissions, made by means of websites, mass mailings, newspaper advertisements, telephone calls, and marketing materials, Defendants never would have sold the fraudulent annuities or obtained the premium payments from Plaintiff and members of the proposed Class.

189.     Accordingly, Defendants have obtained property (money) belonging to the Plaintiff and members of the proposed Class, and Plaintiff and the members of the Class have been injured in their business or property by Defendants' overt acts of mail and wire fraud, and by their aiding and abetting each other's acts of mail and wire fraud.

**Causation and Injury to Plaintiff and the Class**

190.     Plaintiff and each member of the putative Class have sustained injury to his or her property by reason of the acts and conduct of Defendants alleged in this Complaint, including their loss of money due to their overpayment at the time of sale for the annuity products and/or losses realized after reaching the five-year anniversary of the annuity sold to them during the Class Period by Security Benefit Life.

191.     Plaintiff and members of the proposed Class were the direct and indeed only targets of the RICO scheme to defraud. They purchased annuities issued by Security Benefit Life based on false express and implied representations of how the Total Value Annuities with the ALTVI index option were created, operated, and managed.

192.     Plaintiff and members of the proposed Class would not have purchased the annuities had they known the truth about how the ALTVI index was created, operated, and managed.

193.    But for the conduct of Defendants alleged in this Complaint, Plaintiff and the putative Class would not have been injured.  The injury suffered by Plaintiff and each member of the Class herein was a foreseeable and natural consequence of the scheme to defraud.

194.    Other than Plaintiff and the putative Class, there are no victims more directly injured by Defendants' scheme and enterprise who can be counted on to seek remedies under RICO.

195.    The injuries of Plaintiff and members of the proposed Class were directly and proximately caused by Defendants' racketeering activity that defrauded annuity purchasers, and which allowed the Defendants to charge an excessive price for the annuity products compared to their true value, injuring all those who purchased them during the Class Period.

196.    As a result and by reason of the foregoing, the Plaintiff and Class members have been injured, suffered harm and sustained damage to their business and property, and are therefore entitled to recover actual and treble damages, and their costs of suit, including reasonable attorney fees, pursuant to 18 U.S.C. § 1964(c).

197.    In addition, as set forth above, Defendants have violated 18 U.S.C. §§ 1962 (c), and (d), and will continue to do so in the future.

198.    Enjoining Defendants from committing these RICO violations in the future and/or declaring their invalidity and disgorging ill-gotten gains is appropriate pursuant to 18 U.S.C. § 1964(a), which authorizes the district courts to issue appropriate orders to provide equitable relief to civil RICO plaintiffs and enjoin violations of 18 U.S.C. § 1962.

199.    Plaintiffs seek compensatory damages, disgorgement, equitable relief, injunctive relief, treble damages, and attorneys' fees.

## COUNT TWO
## UNJUST ENRICHMENT

200.    Plaintiff repeats and re-alleges all preceding paragraphs 1 to 198.

201.    The Plaintiff and members of the putative Class conferred benefits on Guggenheim, Eldridge and their related entities by providing purchase payments to Security Benefit Life for each Total Value Annuity and 5 Year Annuity Linked TVI Index Account Rider. Guggenheim and its principals, as well as Eldridge and its principals, in turn, caused Security Benefit Life to transfer the cash infused into Security Benefit Life from these annuity purchases in order to make exorbitant and high-risk purchases and investments for itself, its affiliates, and its principals.

202.    Guggenheim, Eldridge and their related entities appreciated or knew of the benefits conferred on them by the Plaintiff and members of the putative Class.

203.    Guggenheim, Eldridge and their related entities retained the benefits under such circumstances as make the retention inequitable.  Specifically, Guggenheim, Eldridge and their related entities contributed to and fraudulently misrepresented the truth about the nature and characteristics of the Total Value Annuity and the 5 Year Annuity Linked TVI Index Account Rider, in order to induce Plaintiffs to purchase the Total Value Annuity with the 5 Year Annuity Linked TVI Index option.

204.    Defendants Guggenheim and its principals have been unjustly enriched as a result of their ability to use hundreds of millions of dollars gained from Plaintiff's purchases of fraudulently designed and sold annuities for purposes of enriching the individual principals, and for purposes that would not have been possible but for the fraudulent and inequitable conduct of Defendants.  The Plaintiff and putative Class have been harmed by Defendants' unjust enrichment and are entitled to a proper restitutionary remedy and all other relief to which they may be entitled.

## PRAYER FOR RELIEF

205.    WHEREFORE, Plaintiff prays for a judgment:

      a.      Certifying the Class as requested herein;

      b.      Awarding Plaintiff and Class members compensatory damages, trebled, in an amount to be determined at trial;

      c.      Ordering all appropriate equitable remedies, including but not limited to declaratory and injunctive relief;

      d.      Awarding Plaintiff and Class members attorneys' fees and costs; and

      e.      Affording Plaintiff and Class members with such further and other relief as deemed just and proper by the Court.

**JURY DEMAND**

206.    Plaintiff demands a jury trial of all issues triable by right by jury.

**DESIGNATION OF PLACE FOR TRIAL**

207.    Plaintiff designates Kansas City, Kansas as the place of trial of this action.

Respectfully submitted,

/s/ Eric D. Barton
Eric D. Barton (KS Bar No. 16503)
Tyler W. Hudson (KS Bar No. 20293)
Sarah Ruane (KS Bar No. 23015)
WAGSTAFF & CARTMELL LLP
4740 Grand Avenue, Suite 300
Kansas City, MO 64112
phone: (816) 701-1100
facsimile: (816) 531-2372
ebarton@wcllp.com
thudson@wcllp.com
sruane@wcllp.com

James M. Terrell (*pro hac vice*)
P. Michael Yancey (*pro hac vice*)
Robert G. Methvin, Jr. (*pro hac vice*)
Courtney Cooper Gipson (*pro hac vice*)
**METHVIN, TERRELL, YANCEY, STEPHENS
& MILLER, P.C.**
2201 Arlington Ave. South
Birmingham, AL 35205
Phone: (205) 939-0199
Fax: (205) 939-0399
jterrell@mmlaw.net
myancey@mmlaw.net
rgm@mmlaw.net
cgipson@mmlaw.net

*Attorneys for Plaintiff Albert Ogles*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on the 1st day of November, 2018, I filed the foregoing using the Court's CM/ECF system that will send notice of electronic filing to all counsel of record registered through the Court's ECF system.

/s/ <i>Eric D. Barton</i>
Counsel for Plaintiff Albert Ogles
