# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF KANSAS

| | |
|---|---|
| **ALBERT OGLES,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 18-CV-02265-HLT-KGG** |
| **SECURITY BENEFIT LIFE INSURANCE COMPANY, ET AL.,** | |
| **Defendants.** | |

## MEMORANDUM AND ORDER

Plaintiff Albert Ogles filed this civil action alleging violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §§ 1961-1968, and a state-law claim for unjust enrichment. Defendants Security Benefit Life Insurance Company, Security Benefit Corporation (collectively "Security Benefit"), Guggenheim Partners, LLC, and Guggenheim Investments (collectively "Guggenheim") have filed motions to dismiss the operative second amended complaint. Docs. 67, 69.[1] Both Security Benefit and Guggenheim argue that Ogles's RICO claim is reverse-preempted under the McCarran-Ferguson Act, 15 U.S.C. § 1012, and that Ogles has failed to state a claim under either RICO or for unjust enrichment. The Court heard oral argument on May 16, 2019.[2]

For the reasons discussed below, the Court grants both motions to dismiss. Specifically, the Court holds that Ogles's RICO theory involving the financial strength of Security Benefit is reverse-preempted under the McCarran-Ferguson Act. Ogles's RICO theory alleging the

---

[1]   The Royal Bank of Scotland and Eldridge Industries were also named as Defendants, but Ogles voluntarily dismissed both parties. Docs. 57, 72.

[2]   The transcript of the hearing is available at Doc. 82. Citations to relevant portions will be referenced as "Tr. at __."

fraudulent design of the annuity at issue is dismissed for failure to state a claim under Rule 12(b)(6). The Court declines to exercise supplemental jurisdiction over Ogles's claim for unjust enrichment, and that claim is therefore dismissed without prejudice.

## I.    BACKGROUND

The following facts are taken from the well-pleaded allegations of the second amended complaint, Doc. 61, and, consistent with the standards for evaluating motions to dismiss under Rule 12(b)(6), the Court assumes the truth of these facts for purposes of analyzing the motions to dismiss.

Security Benefit is an insurance company based in Topeka, Kansas. Doc. 61 at 19. Guggenheim bought Security Benefit in 2010 and went to work making Security Benefit into a competitive player in the fixed-index annuity market. *Id.* at 17-18. This dispute stems from Ogles's purchase of an annuity from Security Benefit in July 2012—in particular his purchase of a Total Value Annuity ("TVA"), which is a type of fixed-index annuity. *Id.* at 8. The TVA has been very profitable for Security Benefit. *Id.* at 20.

A fixed-index annuity is something of a hybrid. It combines the generally low-risk features of a traditional fixed annuity, which provides principal security but a typically modest rate of return, with the ability to link interest growth to a particular financial index. Doc. 66-5 at 3.[3] The return on investment for a fixed-index annuity—called the crediting option—is often linked to an

---

[3]    Before filing its motion to dismiss, Security Benefit filed a motion asking the Court to take judicial notice of certain documents. Doc. 65. Specifically, Security Benefit sought judicial notice of Ogles's annuity contract (Doc. 66-1); Security Benefit's Statement of Understanding for the TVA (Doc. 66-2); Security Benefit's 2013 annual statement (Doc. 66-3); the Kansas Insurance Commissioner's Report of Examination of Security Benefit as of December 31, 2013 (Doc. 66-4); and a Security Benefit brochure explaining the ALTVI (Doc. 66-5). Security Benefit sought judicial notice of these documents because they were referenced or quoted in Ogles's second amended complaint or are otherwise publicly available and relevant to the issues before the Court. Ogles did not oppose Security Benefit's motion and his counsel stated at oral argument that he did not oppose the Court taking judicial notice of these documents. Tr. at 5:23-6:11. Accordingly, the Court grants Doc. 65 and takes judicial notice of the attached documents. *See Ice Corp. v. Hamilton Sundstrand Inc.*, 444 F. Supp. 2d 1165, 1169 n.8 (D. Kan. 2006).

equity-based index like the S&P 500, Dow Jones, or Nasdaq. Doc. 61 at 21. Many fixed-index annuities are capped in terms of how much they can earn. But the TVA was uncapped, meaning it had, theoretically, unlimited potential. *Id.* The crediting option for the TVA was the Annuity Linked TVI Index ("ALTVI"). *Id.* at 22.

The ALTVI combines the Trader Vic Index with a proprietary volatility overlay. *Id.* at 22-24; Doc. 66-5 at 4. The Trader Vic Index is based on commodities, currencies, and interest rates and was developed and is managed by the Royal Bank of Scotland. The Trader Vic Index is generally thought to perform inversely to equities-based indices, like the Dow Jones. Doc. 61 at 22-24; Doc. 66-5 at 4. The selling point of the TVA, then, with its ALTVI crediting option, was that it might perform favorably when annuities linked to indices based on stocks might not, and its potential was uncapped. *Id.*; *see also* Doc. 66-5 at 2-4.

A brochure explaining the ALTVI stated that it was "developed and is owned" by the Royal Bank of Scotland. Doc. 66-5 at 5. The TVA contract Ogles signed also noted that the ALTVI is trademarked by the Royal Bank of Scotland, but that Security Benefit's annuity products "are not sponsored, endorsed, sold or promoted by The Royal Bank of Scotland," and that the "Royal Bank of Scotland . . . make[s] no representation and offer[s] no advice with regard to purchasing any Security Benefit annuity." Doc. 61 at 23; Doc. 66-1 at 7. Ogles claims that the Royal Bank of Scotland was just a "front" and that, in reality, the ALTVI was developed by third-party companies partnered with Security Benefit and Guggenheim, and thus it was not "external" as advertised. Doc. 61 at 32-33. Ogles also alleges that historical simulations of the ALTVI's performance— needed because the ALTVI was a recent creation—were misleading. Specifically, historical performance simulations showed an upward trend in past years—a trend that did not hold up after Ogles purchased his annuity. The historical simulations were used in marketing materials to tout

the potential of the ALTVI, though those materials stated that this simulated past performance "does not reflect what will happen in the future." *Id*. at 25-26.

Ogles purchased the TVA in Alabama in July 2012 for approximately $145,000 and allocated 100% of his funds to the ALTVI, which was one of the available crediting options. *Id*. at 45. Under the terms of the TVA, the annuity would be held for five years before any crediting occurred, presuming the index's performance warranted crediting. *Id*. at 7. But at the end of that period, Ogles "learned that the Five Year Annuity Linked TVI Index Account Rider failed to produce any interest credits or to otherwise perform consistent with the uniform representations made . . . ." *Id*. at 46. The failure to produce interest credits is the source of Ogles's alleged damages. There are no allegations that Ogles's initial investment of $145,000 was depleted. The claims center on whether the TVA had an inherently diminished value due to an allegedly fraudulent design, and thus was not worth the $145,000 investment. Tr. at 96:8-18. Ogles also received a 10% bonus allocation on his principal, though at oral argument Ogles counsel stated that the bonus would be forfeited if the annuity funds were withdrawn within the first ten years.[4] Doc. 66-1 at 5; Tr. at 100:21-101:2.

Ogles has now sued under RICO alleging that the true nature, development, and potential of the TVA and ALTVI were misrepresented, as was Security Benefit's true financial condition, and therefore he was damaged in that the annuity he purchased was worth less than the premium he paid for it. Doc. 61 at 43-44.[5]

---

[4]  The annuity contract reflects a 10.00% bonus ($14,530.60), along with a "Bonus Recapture Rate" table. Doc. 66-1 at 5. The amount of "bonus recapture" depends on the amount of the bonus and the contract year. *Id*. at 5, 18-19. In years 1 through 6, the rate of recapture is 100%, with the rate decreasing by 20% each year thereafter. *Id*. at 5.

[5]  Ogles also asserts claims on behalf of a class, but no class has been certified. *See* Doc. 61 at 46-48. The propriety of this case as a class action is not relevant to deciding the motions to dismiss.

## II.  STANDARD

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is plausible if it is accompanied by sufficient factual content to allow a court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* The plausibility standard requires "more than a sheer possibility that a defendant has acted unlawfully," but it "is not akin to a 'probability requirement.'" *Id.* "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557) (internal quotations omitted).

In undertaking this analysis, the Court accepts as true all well-pleaded allegations in the second amended complaint, though it need not accept legal conclusions. *Id.* Likewise, conclusory statements are not entitled to the presumption of truth. *Id.* at 678-79. Additionally, where a plaintiff asserts a RICO claim, certain heightened pleading standards apply. Specifically, predicate acts of mail or wire fraud must be pleaded with particularity under Federal Rule of Civil Procedures 9(b). *George v. Urban Settlement Servs.*, 833 F.3d 1242, 1254 (10th Cir. 2016). This means that "plaintiffs must 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *Id.* (quoting *Koch v. Koch Indus.*, 203 F.3d 1202, 1236 (10th Cir. 2000)).

## III.  ANALYSIS

Ogles's second amended complaint asserts RICO claims against all Defendants, alleging violations of 18 U.S.C. § 1962(c) and (d). Doc. 61 at 49-63. Ogles also asserts of claim of unjust enrichment against Guggenheim. *Id.* at 64. Each claim is discussed in turn.

**A. Ogles asserts two theories of relief under RICO.**

Because of the complex subject matter and the lengthy complaint—and because the precise nature of the claim bears on the analysis—a somewhat detailed description of Ogles's claims is necessary. Specifically, Ogles alleges that Defendants "fraudulently duped Plaintiff and members of the proposed Class into buying annuity products based on false assurances of safety and financial strength, and through the fraudulent concealment of the truth about the design of the Total Value Annuity and the 5 Year Annuity Linked TVI Index Account." Doc. 61 at 44 (¶ 127). Based on this, it appears Ogles's RICO claim has two theories of relief. Tr. at 56:5-57:2.

The first theory—regarding the financial strength of Security Benefit—is that certain financial transactions involving Guggenheim, Security Benefit, and other related entities misled Ogles regarding Security Benefit's true financial condition, and that he would not have purchased the annuity had he known that Security Benefit's financial picture was far more tenuous than it appeared to be.[6] The Court refers to this as the "financial strength" theory. Ogles alleges that these transactions made the purchase of the annuity "far riskier . . . than comparable products issued by financially sound issuers." Doc. 61 at 44. Ogles details the transactions he contends are suspicious or improper in the second amended complaint. *Id*. at 39-43 (¶¶ 111-124). Notably, many of these transfers all occurred after Ogles bought his annuity in July 2012, though he does not explain how those post-purchase transactions could have plausibly impacted his decision or misled him into purchasing his annuity. *See id.*

The second theory is that the annuity product itself (the TVA) and the index it was linked to (the ALTVI) were fraudulently designed, marketed, and sold. This will be referred to as the

---

[6] As noted above, the Court refers to both Security Benefit Corporation and Security Benefit Life—two separate entities—collectively as "Security Benefit." Although the annuity was sold by Security Benefit Life, for purposes of this analysis and the arguments raised in the motions to dismiss, the distinction between the two is not relevant. Likewise, the distinction between the two Guggenheim entities is also not relevant for purposes of this order.

"fraudulent design" theory. Ogles alleges that Guggenheim and Security Benefit "rigged" the TVA to underperform. *See* Doc. 75 at 44; Doc. 61 at 43-44 (¶ 125, asserting that Ogles was damaged when he purchased the annuity that was worth less than the premiums paid "attributable to the fraudulent design of the Total Value Annuity and its ALTVI Account . . ."). At oral argument, Ogles's counsel conceded that the precise way in which the TVA and ALTVI was "rigged" was not yet known—he described it as a "black box" at this stage, presumably meaning it was something of a mystery. Tr. at 116:19-21.

Both Guggenheim and Security Benefit have moved to dismiss Ogles's RICO claim on grounds that it is reverse-preempted under the McCarran-Ferguson Act, 15 U.S.C. § 1012(b). This argument is focused on Ogles's financial-strength RICO theory. Defendants also argue that Ogles's RICO claim has not been pleaded with the requisite particularity under Rule 9(b). The Court will apply that argument to Ogles's fraudulent-design theory.

### 1. Ogles's financial-strength RICO theory is reverse-preempted under the McCarran-Ferguson Act.

The McCarran-Ferguson Act states that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance . . . unless such Act specifically relates to the business of insurance." 15 U.S.C. § 1012(b). It bars application of a federal statute if three conditions are met: first, the federal statute relied on must not relate to the business of insurance; second, a state statute regulates the business of insurance; and third, "the federal statute would invalidate, impair, or supersede the state statute." *BancOklahoma Mortg. Corp. v. Capital Title Co.*, 194 F.3d 1089, 1098 (10th Cir. 1999). When the McCarran-Ferguson Act applies, the federal claim is said to be reverse-preempted, meaning it is preempted in favor of state regulation.

The parties all agree that RICO—the federal statute Ogles seeks to proceed under—does not specifically relate to the business of insurance. *See Humana Inc. v. Forsyth*, 525 U.S. 299, 307 (1999). The parties also agree that Kansas and Alabama have enacted laws to regulate insurance. *See* K.S.A. § 40-102; K.S.A. § 40-103; *see also Steele v. First Deposit Nat'l Bank*, 732 So. 2d 301, 303 (Ala. Civ. App. 1999) ("It is undisputed that Alabama's insurance code . . . [was] enacted for the purpose of regulating the business of insurance.").[7] There is likewise no argument that RICO is in direct conflict with state law or any argument that RICO would <u>invalidate</u> or <u>supersede</u> state law. *See Humana*, 525 U.S. at 307 (defining invalidate to mean "render ineffective" and supersede to mean "displace (and thus render ineffective) while providing a substitute rule" (internal citations omitted)). Where the parties diverge is whether RICO would <u>impair</u> state insurance laws in this context.

In *Humana, Inc. v. Forsyth*, the Supreme Court considered what the McCarran-Ferguson Act meant by "impair." The Supreme Court rejected the extremes, concluding that Congress did not intend to "cede the field of insurance regulation to the States" completely, nor did it "intend[] a green light for federal regulation whenever the federal law does not collide head on with state regulation." *Id.* at 308-09. Instead, the Supreme Court turned to the dictionary definition of "impair" and held that "[w]hen federal law does not directly conflict with state regulation, and when application of the federal law would not frustrate any declared state policy or interfere with a State's administrative regime, the McCarran-Ferguson Act does not preclude its application." *Id.* at 310.

---

[7] Security Benefit and Guggenheim discuss both Kansas and Alabama law in the context of this analysis, Kansas being where Security Benefit is based, and Alabama being where Ogles bought his annuity. Ogles states that only Kansas law is relevant in this analysis. Doc. 75 at 38 n.6. Regardless, neither party claims any material difference between Kansas and Alabama law. Thus, to the extent Ogles's RICO claim impairs the administrative regime of one state, it likewise does the other.

Security Benefit and Guggenheim argue that *Ludwick v. Harbinger Group, Inc.* is directly on point and controls whether Ogles's financial-strength RICO theory is reverse-preempted by the McCarran-Ferguson Act. In *Ludwick*, the plaintiff brought a RICO claim against an insurance company alleging that it misled her into paying too much for an annuity "by disseminating reports and marketing materials that did not properly reflect sham transactions [that the insurance company] undertook to hide its true financial state." *Ludwick v. Harbinger Group, Inc.*, 854 F.3d 400, 402 (8th Cir. 2017). This is very similar to Ogles's allegations. Doc. 61 at 44 (¶ 127: "Defendants . . . fraudulently duped Plaintiff and members of the proposed Class into buying annuity products based on false assurances of safety and financial strength . . ."); *id.* at 53 (¶ 155, stating that defendants "created the false impression of positive surplus and financial stability . . ."); *id.* at 39-43 (¶¶ 111-124, detailing the supposedly "many transactions" evidencing the "fraudulent intent behind the scheme").[8]

The Eighth Circuit in *Ludwick* noted that "[q]uestions about insurance companies' solvency are, no surprise, squarely within the regulatory oversight by state insurance departments." *Ludwick*, 854 F.3d at 404 (citing applicable state law). Accordingly, deciding the RICO claim based on an insurance company's financial strength and solvency "would mean asking the same questions as state insurance regulators . . . and effectively double-checking their work." *Id.* at 405. The court held that such "intrusion and interference" with state regulators was precisely the conduct forbidden by the McCarran-Ferguson Act. *Id.* The Eighth Circuit thus affirmed the district court's dismissal under Rule 12(b)(6), finding the RICO claim was reverse-preempted. *Id.* at 407; *see also Hudson v. Athene Annuity & Life Co.*, 2017 WL 3477745, at *1-*3 (S.D. Iowa May 11,

---

[8]  In their respective reply briefs, Defendants draw other parallels between Ogles's second amended complaint and the complaint in *Ludwick*. Doc. 76 at 12-13; Doc. 77 at 12-14.

2017) (citing *Ludwick* and finding RICO claim reverse-preempted where the plaintiff similarly alleged "a fraudulent scheme to mislead consumers into purchasing annuities based on material misrepresentations regarding [the defendant's] financial strength").

The Court finds the reasoning of *Ludwick* persuasive and applicable to Ogles's financial-strength RICO theory. As explained above, Ogles's allegations are starkly similar to those in *Ludwick* to the extent he alleges that certain financial transactions decreased or limited Security Benefit's financial strength and solvency and thus devalued his annuity. And like in *Ludwick*, these transactions are very much the concern of state insurance regulators in Kansas and Alabama. As Security Benefit explains in great detail in its motion, Doc. 68 at 20-22, many of the transactions that Ogles highlights are heavily regulated by both Kansas and Alabama insurance law. *See* K.S.A. §§ 40-2c01 through 40-2c29 (setting reporting requirements and authorizing corrective action by the Kansas Insurance Department regarding insurance companies' risk-based capital); K.S.A. § 40-222b (stating that upon a finding that "a condition such that the continued operation of the company might be hazardous to the insuring public," the Kansas Insurance Commissioner is authorized "to take such action as may be reasonably necessary to rectify the existing condition"); K.S.A. §§ 40-2b01 through 40-2b29 (regulating investments by insurance companies); K.S.A. § 40-409 (regulating reserve requirements); K.S.A. § 40-222 (authorizing the Kansas Insurance Commissioner to make "a financial examination of any insurance company" doing business in Kansas); K.S.A. §§ 40-3602 through 40-3659 (regulating impaired or insolvent insurers); *see also* Ala. Code § 27-3-7 (setting minimum surplus requirements for foreign insurance companies doing business in Alabama); Ala. Code § 27-3-4 (setting reserve requirements for foreign insurance companies).

Given these state regulations, asking the Court to decide whether Defendants defrauded annuity purchasers based on the cited transactions—which by all accounts have never been questioned by state regulators—"would mean asking the same questions as state insurance regulators . . . and effectively double-checking their work." *Ludwick*, 854 F.3d at 405. And double-checking the work of state regulators would impair state insurance regulation because it would "interfere with a State's administrative regime." *Humana*, 525 U.S. at 310. Accordingly, the Court concludes that Ogles's RICO theory regarding the financial strength of Security Benefit is reverse-preempted.

Notably, although Ogles disputes that *Ludwick* should apply, he does not explain how his financial-strength RICO theory—premised on a claim that various reinsurance transactions between Security Benefit and related entities were improper—could be evaluated without interfering with, or at least second-guessing, the decisions of state insurance regulators, who have already signed off on those transactions. Instead, he claims that the Court "could absolutely determine that Mr. Ogles and other class members were defrauded based on false representations that induced them into purchasing the fixed index annuities at issue without passing any judgment on the Kansas insurance regulators." Doc. 75 at 44 (citing *Secs. & Exch. Comm'n v. Nat'l Secs., Inc.*, 393 U.S. 453 (1969)). The Court first notes that Ogles's argument on this point consists of one case cite and no elaboration. Second, the court in *Ludwick* rejected a similar argument. *Ludwick*, 854 F.3d at 405.

In *National Securities*, the sole case cited by Ogles on this point, the SEC sought to unwind a fraudulent merger of insurance companies that had been approved by state insurance regulators. *Nat'l Secs.*, 393 U.S. at 455-56. The Supreme Court rejected an argument that the SEC's claims were reverse-preempted by the McCarran-Ferguson Act because the state law at issue was

primarily focused on protecting shareholders, not policyholders, and thus was not regulating "the business of insurance." *Id.* at 460-61. Although state law did require consideration of the effects of the merger on policyholders, the focus of the case was on the misrepresentations to shareholders, not how the merger affected policyholders. *Id.* at 462-63.

Here, by contrast, the allegations are about financial reinsurance transactions and hedging options that go directly to the question of Security Benefit's strength and its ability to make good on the insurance contracts it was making with policyholders—or in this case, annuity holders. Kansas and Alabama regulate these transactions to ensure solvency and security for the benefit of policyholders, and thus the subject matter here clearly is the regulation of the "business of insurance." *See id.* at 459-60 (explaining that "[t]he relationship between insurer and insured, the type of policy which could be issued, it's reliability . . . these were the core of the 'business of insurance'" that the McCarran-Ferguson Act was aimed at).

Ogles also argues that there is a significant split between the Tenth Circuit and the Eighth Circuit regarding reverse-preemption under the McCarran-Ferguson Act, and therefore *Ludwick* should not control. Doc. 75 at 39-43; s*ee also Negrete v. Allianz Life Ins. Co. of N.A.*, 927 F. Supp. 2d 870, 876-77 (C.D. Cal. 2013). This split is centered on the impact of the existence of a state cause of action that would target the conduct at issue. At least one Eighth Circuit case has found that where state law permitted only administrative recourse, then a RICO claim would be reverse-preempted (in other words, not allowed to proceed) because it would frustrate or supplant the state's "carefully developed scheme of regulation"—in other words, the state's decision to not allow private suits. *LaBarre v. Credit Acceptance Corp.*, 175 F.3d 640, 643 (8th Cir. 1999) (quoting *Doe v. Norwest Bank Minn., N.A.*, 107 F.3d 1297, 1308 (8th Cir. 1997)). But the Tenth Circuit has allowed federal claims to go forward even where there was no specific statutory cause

of action under state insurance laws, where other state laws could nonetheless provide a vehicle for an alternative cause of action. *BancOklahoma*, 194 F.3d at 1099-1100; *see also Negrete*, 927 F. Supp. 2d at 877 ("Whereas some courts have found the lack of a private right of action to be dispositive, others have held that where as a federal right of action does not frustrate a state's interests or unduly interfere with its administrative scheme, the federal claim is not barred by the McCarran-Ferguson Act."). The Third Circuit has stated that the existence of a private cause of action is just one of several non-exclusive factors to consider, citing the Supreme Court's decision in *Humana*. *See Weiss v. First Unum Life Ins. Co.*, 482 F.3d 254, 261 (3d Cir. 2007).

This dispute between the circuits seems overstated in light of the Supreme Court's controlling holding in *Humana*, and particularly so in its relevance to this case. In *Ludwick*, the Eighth Circuit actually appeared to narrow the split by stating that the existence of a state common-law cause of action (but no state statutory cause of action) would lead to "the same inference as if the cause of action were written into the insurance code, namely that the state had not found its regulatory efforts frustrated by the availability of private litigation." *Ludwick*, 854 F.3d at 406. This seems to fall in line with the Tenth Circuit's statement in *BancOklahoma* that the absence of a private cause of action specified under a state's insurance law was not dispositive on the question of impairment where alternative grounds for suit existed. *BancOklahoma*, 194 F.3d at 1099-1100.

But more compelling on this point is *Ludwick*'s conclusion that any distinctions between statutory and common-law causes of actions were largely academic because "Ludwick has failed to establish that the specific sort of misconduct she alleges—an insurer lying about its financial condition and accounting—would be actionable under the common law of each implicated jurisdiction." *Ludwick*, 854 F.3d at 406. The Eighth Circuit noted that the fact that general fraud claims could be brought under state law "sheds little light on the disruptive effects of Ludwick's

particular theory of liability." *Id.* In other words, no state cause of action existed in any form that would let Ludwick bring the type of claim being pursued, and so the question had no bearing on impairment under the McCarran-Ferguson Act.

Ogles concedes that there is no statutory cause of action under Kansas insurance laws but that there are other valid causes of action under common law that can be used to target insurance fraud generally. Doc. 75 at 42.[9] But, like in *Ludwick*, Ogles does not point to any valid state cause of action—under the common law or otherwise—that would permit him to make the precise sort of challenge he seeks to assert under his financial-strength RICO theory, namely to target "an insurer lying about its financial condition and accounting." *Ludwick*, 854 F.3d at 406.

Also unpersuasive is Ogles's reliance on *Negrete v. Allianz Life Insurance Co.*, at least as it applies to his financial-strength RICO theory. Ogles is correct that the court in *Negrete* concluded that the RICO claims in that case would not impair various states' insurance laws, including Kansas and Alabama, because those states have an interest in combatting fraudulent insurance sales, and a RICO claim challenging the same fraudulent conduct would not impair that interest. *Negrete*, 927 F. Supp. 2d at 884-87. But *Negrete* also underscored that determining whether a RICO claim is reverse-preempted requires an examination of a plaintiff's precise claims and the theories of liability asserted, because the analysis is a fact-intensive one. *Id*. at 878 (citing *Saunders v. Farmers Ins. Exch.*, 537 F.3d 961, 967 (8th Cir. 2008)).

The claim in *Negrete* was distinct from Ogles's financial-strength RICO theory. In *Negrete*, the plaintiffs alleged that the sale of an annuity was fraudulent because purchasers were led to believe that the annuity product had features it did not actually have. *Id*. at 873. By contrast,

---

[9]    The parties again agree that there are no material differences between Kansas and Alabama law on the availability of state causes of action. Doc. 68 at 22 n.4

Ogles's financial-strength theory is that improper transactions involving Security Benefit's financial condition caused him to buy an annuity he would not otherwise have purchased.[10] This puts Ogles's case squarely on par with *Ludwick*, not *Negrete*.

Accordingly, the Court finds the McCarran-Ferguson Act reverse-preempts Ogles's RICO claim as to his financial-strength theory, and it is dismissed.

### 2. Ogles remaining RICO theory fails to state a claim.

Both Defendants have also moved for dismissal of Ogles's RICO claim for failure to state a claim.[11] As explained above, the Court has discerned two RICO theories. Because Ogles's financial-strength theory is reverse-preempted under the McCarran-Ferguson Act, the Court will evaluate his remaining theory—fraudulent design of the TVA and ALTVI—under the requisite pleading standards.[12]

RICO makes it "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity." 18 U.S.C. § 1962(c). The elements of a RICO claim are (1) conduct, (2) of an enterprise, (3) through a pattern, (4) of racketeering activity. *George*, 833 F.3d at 1248.

---

[10] In his response brief, Ogles suggests that his RICO claim is focused only on the fraudulent-design theory and that "the case is not about the financial condition of Security Benefit Life or any other defendant." Doc. 75 at 44. But as discussed above in section III.A., that is not how the second amended complaint reads. Although *Negrete* may be more on point as to Ogles's alternative fraudulent-design RICO theory, Defendants only argue reverse-preemption as to his financial-strength theory.

[11] Security Benefit joined in that argument, stating that Ogles's complaint should be dismissed "for the reasons set forth . . . in the motions to dismiss filed by the other defendants." Doc. 68 at 8.

[12] The Court notes that Ogles's counsel stated at oral argument that it would be willing "to abandon the allegation that Mr. Ogles purchased the product based on assurances of financial strength of Security Benefit" if the McCarran-Ferguson Act applied to that claim. Tr. at 54:24-55:9. But he also argued that the financial transactions would still be relevant to a broader RICO scheme to defraud. *Id.* at 57:4-24. The Court addresses that below.

A pattern of racketeering activity means that a defendant is alleged to have committed certain predicate acts, which are certain specified state or federal offenses. *In re: EpiPen (Epinephrine Injection, USP) Mktg., Sales Practices & Antitrust Litig.*, 336 F. Supp. 3d 1256, 1322 (D. Kan. 2018). Mail fraud and wire fraud are predicate acts under RICO, *id.*, and these are the two predicate acts Ogles asserts.

To plausibly assert mail fraud, Ogles must allege "(1) the existence of a scheme or artifice to defraud or obtain money or property by false pretenses, representations or promises, and (2) use of the United States mails for the purpose of executing the scheme." *BancOklahoma*, 194 F.3d at 1102 (quoting *Bacchus Indus., Inc. v. Arvin Indus., Inc.*, 939 F.2d 887, 892 (10th Cir. 1991)); *see also Tal v. Hogan*, 453 F.3d 1244, 1263 (10th Cir. 2006). The elements of wire fraud are the same, but alleging use of interstate wires to execute the scheme instead of mail. *In re: EpiPen*, 336 F. Supp. 3d at 1322 (citing *George*, 833 F.3d at 1254).

A heightened pleading standard is required for allegations of mail and wire fraud. *George*, 833 F.3d at 1254; *see also Robbins v. Wilkie*, 300 F.3d 1208, 1211 (10th Cir. 2002) (noting that while some RICO elements are only subject to general pleading standards, predicate acts must be pleaded in accordance with Rule 9(b)); *In re: EpiPen*, 336 F. Supp. 3d at 1322. This means that "plaintiffs must 'set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *George*, 833 F.3d at 1254 (quoting *Koch*, 203 F.3d at 1236). Accordingly, although Ogles may plead most elements of a RICO claim generally, the predicate acts of mail and wire fraud—required to meet the element of racketeering—must be pleaded with particularity.

Defendants argue that Ogles has failed to state a RICO claim because his allegations of mail and wire fraud do not satisfy the particularity standards of Rule 9(b), and thus he cannot

establish a pattern of racketeering activity sufficient to state a RICO claim. Doc. 70 at 24-27. Ogles concedes that the heightened pleading standard of Rule 9(b) applies to allegations of mail and wire fraud. Doc. 75 at 18.[13] But he argues that standard should be relaxed in this case and that he only needs to plead a "scheme to defraud" instead of specific misrepresentations. *Id.* at 19, 22-27.

### a. **Rule 9(b) is not relaxed in this case**.

As a preliminary matter, Ogles asserts that Rule 9(b) should be relaxed in this case because "the alleged fraud unfolded over several years," and because he is not able to obtain information exclusively in Defendants' control. Doc. 75 at 19. Ogles claims that "[m]any of the precise dates of Defendants' uses of the interstate mail and wires in furtherance of their scheme to defraud have been deliberately hidden and cannot be alleged without access to Defendants' books and records, which requires discovery." Doc. 61 at 60 (¶ 181).

In support of this assertion, Ogles cites *George v. Urban Settlement Services*. There, the Tenth Circuit stated that, "in determining whether a plaintiff has satisfied Rule 9(b), courts may consider whether any pleading deficiencies resulted from the plaintiff's inability to obtain information in the defendant's exclusive control." *George*, 833 F.3d at 1255. But in *George*, the issue was only that "not all" of the allegations were particularized. *Id.* In many instances, plaintiffs were able to "identify [bank] employees by name, specify the dates when those employees made allegedly false statements, identify the actions the plaintiffs took in reliance on those misrepresentations, detail the injuries they suffered as a result, and explain how those misrepresentations furthered the enterprise's ultimate goal of denying [loan modification]

---

[13] Ogles's brief dedicates considerable space to discussing other elements of his RICO claim. *See* Doc. 75 at 21-30. But other than challenging whether Ogles suffered an injury caused by Guggenheim's conduct—required to show RICO standing under 18 U.S.C. § 1964(c), Defendants have not challenged the adequacy of Ogles's pleading except as to whether he has alleged mail and wire fraud with particularity. Accordingly, the Court does not consider whether Ogles has adequately pleaded the other elements of a RICO claim.

applications." *Id.* at 1256. As for the less precise allegations, the court was willing to lessen the particularity requirement as to the other defendant, Urban, a bank contractor. This was because the plaintiffs in *George* had specifically alleged that Urban employees had intentionally misrepresented themselves as Bank of America employees on the phone, and thus the plaintiffs could not always identify when they were actually speaking to Urban's employees. *Id.* at 1256-57.

Ogles has not alleged any similar deceit or misconduct that makes him unable to identify specific instances of mail or wire fraud in this case. Although he states that "[m]any of the precise dates" are hidden, the Court notes that Ogles has not alleged <u>any</u> precise dates, let alone how others have been deliberately hidden.[14] The Court does not "require omniscience," *George*, 833 F.3d at 1256 (quoting *Williams v. Duke Energy Int'l, Inc.*, 681 F.3d 788, 803 (6th Cir. 2012)), nor does it expect that Ogles could identify <u>every</u> communication or wire transfer. But Ogles has not explained why he cannot at least identify <u>some</u> particularized examples, not the least of which would be those involving his own annuity purchase.[15] His conclusory statements that he simply cannot obtain any examples because Defendants have concealed them is not enough to relax the particularly requirement for his claims of mail or wire fraud.

        **b.**    **Ogles has not pleaded mail or wire fraud with the requisite particularity.**

As explained above, racketeering activity is an element of a RICO claim, and mail and wire fraud are predicate acts that can meet that element. But mail and wire fraud must be pleaded with

---

[14] Ogles also cites to *VNA Plus, Inc. v. Apria Healthcare Group* to suggest that the Rule 9(b) standard should be relaxed. But in that case, the Court noted that the "complaint includes six pages identifying 18 different categories of alleged misrepresentations Apria made through interstate mail or wire transmissions between January 1995 and August 11, 1997." *VNA Plus, Inc. v. Apria Healthcare Grp., Inc.*, 29 F. Supp. 2d 1253, 1263 (D. Kan. 1998). The Court has not found such sufficient allegations in Ogles's second amended complaint.

[15] Ogles only asserts that funds for his annuity were transferred "[a]t or around" July 2012, and that marking materials were transmitted "in the months preceding July 2012." Doc. 61 at 59 (¶¶ 177-178). These are not particularized allegations. Even if they were, two generalized examples do not adequately plead the broad scheme to defraud Ogles alleges.

particularity under Rule 9(b), meaning that "plaintiffs must set forth the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof." *George*, 833 F.3d at 1254 (internal citations and quotations omitted).

Ogles argues that the focus of the Court's inquiry should be on the existence of a "scheme to defraud" instead of false statements or misrepresentations.[16] Doc. 75 at 23-24. In support, Ogles cites to three criminal cases to suggest that he is not required to show any affirmative misrepresentation. *Id.* (citing *United States v. Kennedy*, 64 F.3d 1465 (10th Cir. 1995); *United States v. Capra*, 652 F. App'x 632 (10th Cir. 2016); and *United States v. Gallant*, 537 F.3d 1202 (10th Cir. 2008)). The Court notes that each of these cases involved post-conviction appeals challenging the sufficiency of the evidence underlying jury convictions. None addressed this question in the context of federal civil pleading standards, or specifically, the particularized pleading standards under Rule 9(b). Additionally, other cases have rejected the notion that a plaintiff "need not plead a fraudulent misrepresentation of fact to support the requirement of a predicate act of mail or wire fraud." *Tronsgard v. FBL Fin. Grp., Inc.*, 312 F. Supp. 3d 982, 992 (D. Kan. 2018).

Nor can Ogles's argument be squared with his response to the motions to dismiss, which states that "as part of the scheme, [Defendants] made specific misrepresentations and deceptive omissions" using the mail and wires, Doc. 75 at 25, or the second amended complaint, which states that "[t]he fraud in this case included affirmative misrepresentations as well as fraud by concealment, half-statement, or omission," Doc. 61 at 57 (¶ 170). As the Tenth Circuit noted in

---

[16] Ogles also argues that there is no requirement that he show he relied on any false statement. Doc. 75 at 23-24 (citing *Bridge v. Phoenix Bond & Indem. Co.*, 553 U.S. 639 (2008)). The Court notes that it does not appear that either Defendant has argued as much. Guggenheim does point out that Ogles has not alleged with specificity about any materials he received regarding the annuity he purchased. But this is in the context of pointing out that Ogles should be able to identify at least some specific instances of mail or wire use, not as an argument that Ogles was required to plead personal reliance. *See* Doc. 70 at 25.

*Kennedy*, where allegations of mail fraud are based on false pretenses or representations, then false pretenses or representations are "an essential element of the scheme itself." *Kennedy*, 64 F.3d at 1476.[17] Accordingly, Ogles is not relieved of identifying "the time, place and contents of the false representation, the identity of the party making the false statements and the consequences thereof.'" *George*, 833 F.3d at 1254.

But the second amended complaint is short on these details. Although the second amended complaint asserts that a wide variety of materials related to Security Benefit's annuity products were sent through the mail and interstate wires, the only allegation tied to a particular time is that funds were transferred to and between Defendants "[o]n an on-going basis since July 2012." Doc. 61 at 60 (¶ 179). As to Ogles's own annuity purchase, he alleges that "training and marketing materials" were transmitted "in the months preceding July 2012" when he bought his annuity, and that "[a]t or around July 2012," Ogles's initial investment of $145,000 was transferred. Doc. 61 at 59 (¶¶ 177-178). But these allegations only put Defendants on notice of allegedly fraudulent conduct before, during, and after July 2012. That is the antithesis of particularized allegations.

Otherwise, Ogles only notes the general "occasions"—in the form of categorical events such as "transmitting and receiving promotional materials" and "processing applications" for annuity products—of when he suspects mail and wire fraud would have occurred. Doc. 61 at 60-61 (¶ 182). But it is not sufficient to simply plead "a litany of diverse and vague alleged acts ('emails, faxes, correspondence, and/or meetings, and the like') with zero details or concrete examples." *Burnett v. Mortg. Elec. Registration Sys., Inc.*, 706 F.3d 1231, 1240 (10th Cir. 2013)

---

[17] At oral argument, counsel for Ogles stated that, if the focus of the case is on misrepresentations, then there would likely be no claim against Security Benefit or Guggenheim. Claims based on misrepresentations would have to be brought against the independent marketing organizations and individuals who sold the annuities. Tr. at 111:14-112:9. As discussed further below, the Court has not discerned any well-pleaded misrepresentations at all, let alone a plausible scheme to defraud.

(discussing pleading standards for allegations of false representations in the context of a Fair Debt Collection Practices Act). But that is largely what Ogles has done. *See* Doc. 61 at 58-59 (¶¶ 175-176). This falls short of particularized pleading.

Moving beyond the lack of specific instances of mail and wire fraud, the Court is hard-pressed to find any plausible allegations of fraud at all in the second amended complaint. The second amended complaint states that the mail and wire fraud in this case consisted of

> affirmative misrepresentations as well as fraud by concealment, half-statement, or omission. Defendants engaged in a scheme to defraud by fraudulently concealing (1) the true value of Security Benefit Life's annuity products, including the fraudulent simulations of historical performance of the ALTVI, (2) the conflicts of interest created by the sales and marketing scheme of the Total Value Annuities, (3) the siphoning of Security Benefit Life's cash for the use and benefit of individual enterprise members, and (4) the fraudulent portrayal of SBC and Security Benefit Life as "Guggenheim Partners Companies."

*Id.* at 57 (¶ 170).[18] Ogles also alleges fraud relating to the way in which the Royal Bank of Scotland's role in the ALTVI was represented. *Id.* at 58 (¶ 173). To survive a motion to dismiss, these conclusions must be supported by facts from which an inference of fraud can be drawn. *See Iqbal*, 556 U.S. at 678. But this is where the second amended complaint falls short.

---

[18] Instead of explaining the precise basis of his mail and wire fraud claims, Ogles's response brief simply directs the Court to 88 paragraphs of the second amended complaint that he maintains evidence "a scheme to fraudulently design, market, and sell fixed index annuities," Doc. 75 at 23 (citing to second amended complaint paragraphs 1-9, 11, 14, 55-61, 63, 65-79, 87, 89-91, 94, 96, 101-110, 151-155, 158-161, 167, and 169-189), or which "identify[] and describ[e] six different categories of information and numerous examples of information conveyed . . . that fraudulently represented the TVA Annuity with ALTVI crediting option and its true characteristics," Doc. 75 at 25 (citing to second amended complaint paragraphs 84-87, 92-94, 96-97, 100, 106-107, 130, 170, 175-177, and 182). The Court has carefully reviewed the second amended complaint and discusses the allegations further below. But the Court notes that many of these paragraphs contain conclusory allegations. For example, paragraphs 1 through 9 contain nothing but conclusory statements that "Defendants devised and deployed this fraudulent scheme" to make billions, that the TVA "was a sham" and a fraud designed to generate low or no returns, that it was engineered to only serve Defendants' "illegal enterprise," that Guggenheim acquired Security Benefit as "part of a broader scheme" to become billionaires, and that Guggenheim's executives associated with felons. The Court recognizes that some of these allegations are part of the second amended complaint's introductory section, but such conclusory allegations pervade the second amended complaint. Obviously, in evaluating motions to dismiss for failure to state a claim, the Court need not—and does not—accept such conclusory statements at true. *See Iqbal*, 556 U.S. at 678.

**Fraud surrounding the ALTVI.** Regarding the "fraudulent simulations" of the ALTVI, the second amended complaint contains <u>no</u> allegations that the historical simulations of the ALTVI were themselves somehow inherently fraudulent.[19] *See Am. Dental Ass'n v. Cigna Corp.*, 605 F.3d 1283, 1292 (11th Cir. 2010) (finding no plausibility or particularity where, in part, "there are no allegations anywhere that the quoted language of the advertisements is false"). Rather, Ogles only alleges that the historical simulations simply did not perform as well in the real world. Doc. 61 at 27-29 (¶¶ 80-86). But the fact that actual, real-world performance of the ALTVI has trended significantly downward compared to the simulated historical data does not lead to a fair inference of fraud. There are any number of reasons why past performance—real or simulated—would not match future performance, the most obvious being a change in the economy. But that does not equate to misrepresentation. *See Iqbal*, 556 U.S. at 679 (determining whether a complaint states a plausible claim for relief "requires the reviewing court to draw on its judicial experience and common sense").

Ogles also alleges that the simulated historical performance was fraudulently used in marketing to misrepresent the potential of the TVA (when linked to the ALTVI). Doc. 61 at 26 (¶ 77); *id*. at 29 (¶ 84, stating that Security Benefit and Guggenheim used simulated historical performance data to "systematically and uniformly misrepresent[] the product's potential"). But Ogles's assertion that the TVA's potential was misrepresented is just a conclusory statement—it is not backed by any factual contentions. Indeed, this claim is actually undercut by another paragraph of the second amended complaint, which contains an excerpt from some marketing material that states, albeit in fine print, that "simulated past performance of the ALTVI[TM] Index

---

[19] There is reference to a 2013 academic paper that the second amend compliant summarizes as "explain[ing] backtest overfitting [or simulated historical data] often amounts to fraud." Doc. 61 at 29 (¶ 85). But that is the extent of the allegation; it includes nothing to suggest that the simulated historical performance of the ALTVI was actually fraudulent.

does not reflect what will happen in the future." *Id*. at 25-26 (¶¶ 75-76). The Court will not infer fraudulent misrepresentation where other allegations show no misrepresentation at all.

Related to this are Ogles's allegations that Defendants misrepresented the relationship of the Royal Bank of Scotland to the ALTVI. Specifically, Ogles claims that the ALTVI was marketed as being developed and owned by the Royal Bank of Scotland, when in reality the Royal Bank of Scotland was allegedly just a "front." But the TVA contract Ogles signed—of which the Court has taken judicial notice and which is quoted in the second amended complaint—stated specifically that the Royal Bank of Scotland did not endorse the TVA and that the "Royal Bank of Scotland plc and The Royal Bank of Scotland Group plc make no representation and offer no advice with regard to purchasing any Security Benefit annuity." Doc. 61 at 23 (¶ 70); Doc. 66-1 at 7.[20] Again, Ogles's claim of fraud is undercut by his own complaint.

Ogles also states that the ALTVI was described as being an "external" index, when in reality it was developed by third-party companies partnered with Security Benefit and Guggenheim. Doc. 61 at 30-33 (¶¶ 87-92). Importantly, the ALTVI was tied to the Trader Vic Index, which by all accounts is an external index managed by the Royal Bank of Scotland. But beyond that, the fact that Security Benefit and related entities had a hand in developing the ALTVI as part of the annuity product it was selling does not suggest fraud, let alone that the annuity itself was "rigged" to underperform.

---

[20] The second amended complaint also includes an allegation that Security Benefit and the Royal Bank of Scotland "have direct and ongoing relationships, including, but not limited to, RBS being a direct counterparty to call options and warrants purchased by Security Benefit Life and Guggenheim Partners for hedging purposes related to the Total Value Annuities and '5 Year Annuity Linked TVI Index Account Rider,' as well as Security Benefit Life making substantial other payments of fees and costs to RBS in relation to RBS's management and computation of the Annuity Linked TVI Index." Doc. 61 at 32 (¶ 92). Ogles never expounds on the significance of this allegation, however, and it seems to cut against the claim that the Royal Bank of Scotland was merely a "front" for the ALTVI.

**Conflicts of interest.** Regarding "the conflicts of interest created by the sales and marketing scheme," this allegation seems to be addressed in paragraphs 101 through 110 of the second amended complaint. *Id.* at 36-39. Included in these paragraphs are allegations that Security Benefit offered "exorbitant commission and other perks" to agents (presumably sales agents) and marketing companies, *see, e.g.*, *id.* at 36 (¶ 102), that annuities were sold as investment and retirement-planning tools by "'financial services providers' who hold themselves out as investment advisors and retirement planning experts,'" *id.* at 36 (¶ 103), and that these "conflicts" (meaning those acting in an advisory relationship while being overly incentivized) were not disclosed to purchasers, *id.* at 37 (¶¶ 104-105). This is the extent of the allegations of any "conflicts of interest"—essentially just conclusory statements that there were conflicts of interest. Ogles offers no factual backing that elevates these conclusions to plausible allegations, let alone particularized ones. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). For example, other than concluding that the commissions were "exorbitant," Ogles pleads no facts as to what the commissions were or what makes them "exorbitant." Nor does he identify a single instance of a sales agents "operating as investment advisors and retirement planning experts (rather than merely life insurance sales agents)."

The only somewhat specific allegation is that Ogles's "advisor" "either never mentioned the compensation he was to receive or created the impression and belief that the compensation he received came from Security Benefit Life and not from the Plaintiff's funds." *See* Doc. 61 at 37-38 (¶ 106). Ogles calls this a "deceptive half-truth" because, "while Security Benefit Life initially bears the cost of compensation, it ultimately recoups the costs by reducing the amount of earnings that would otherwise inure to the benefit of the Plaintiff and proposed Class members." *Id.* In other

words, Security Benefit did pay its agents directly, but it allegedly recouped those costs on the backs of the likes of Ogles through the alleged scheme to defraud. But this is simply speculation. And importantly, nowhere in the second amended complaint are there any allegations that Ogles's earnings were improperly reduced or not paid to him—to the contrary, the basis for his case is that the ALTVI (which was the crediting option for Ogles's annuity) did not <u>earn</u> any interest.

**Security Benefit's financial strength.** Regarding the "siphoning" of Security Benefit's cash, the Court has already addressed how this theory is reverse-preempted as an independent basis for RICO liability. *See supra* section III.A.1. But even considering these allegations in the context of Ogles's fraudulent-design RICO theory, the fact that Defendants engaged in financial transactions after Security Benefit began selling the TVA in no way suggests a scheme to defraud, let alone that the TVA was fraudulently designed.

**Security Benefit's portrayal as a "Guggenheim Partners Company."** Finally, regarding the "fraudulent portrayal" of Security Benefit as a "Guggenheim Partners Company," the Court notes that there are no allegations in the second amended complaint that Security Benefit was <u>not</u> actually a Guggenheim company. The entire premise of the case is that Guggenheim acquired Security Benefit and then pushed Security Benefit into the fixed-index annuity market. *See* Doc. 61 at 2-3 (¶¶ 2-5); *id.* at 18-20 (¶¶ 56-61). Although Ogles may believe Guggenheim had ulterior motives in acquiring Security Benefit, and that it used Security Benefit to perpetrate the alleged scheme to defraud, there is nothing fraudulent about how this relationship was portrayed because it appears undisputed that Security Benefit was, in fact, a Guggenheim company.

In sum, the Court has carefully reviewed Ogles's second amended complaint. His claim that the TVA was fraudulently designed or "rigged" is simply not supported by any well-pleaded factual allegations. *See Iqbal*, 556 U.S. at 678 ("A claim has facial plausibility when the plaintiff

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."). Even if the Court accepted Ogles's premise that he only needs to plead the existence of a scheme to defraud to show mail and wire fraud, the Court would not conclude that he had done so. At most, the allegations are "merely consistent with a defendant's liability" but "stop[] short of the line between possibility and plausibility of entitlement to relief." *Id.* (quoting *Twombly*, 550 U.S. at 557). Even if Ogles could muster plausibility, the allegations of mail and wire fraud would still fall far short of particularity. *See George*, 833 F.3d at 1254. Indeed, the Court has been hard-pressed to find any misrepresentations, let alone the particularized time, place, and content allegations that could support a claim of mail or wire fraud. Without that, there is no plausible RICO claim alleged under 18 U.S.C. § 1962(c).

This likewise dooms Ogles's RICO conspiracy claim under 18 U.S.C. § 1962(d). "If a plaintiff has no viable claim under § 1962(a), (b), or (c), then its subsection (d) conspiracy claim fails as a matter of law." *Tal*, 453 F.3d at 1270. The Court therefore grants both Defendants' motions to dismiss as to Ogles's RICO claims.[21]

### B. Ogles has not adequately pleaded diversity jurisdiction as to his state-law unjust-enrichment claim, and the Court declines to exercise supplemental jurisdiction.

As noted above, both parties have moved for dismissal of Ogles's unjust-enrichment claim. Ogles has clarified that the unjust-enrichment claim is only asserted against the Guggenheim Defendants. Doc. 75 at 48.

The second amended complaint asserts jurisdiction under 28 U.S.C. § 1331 (federal question) and 18 U.S.C. § 1964(c) (RICO). The second amended complaint does not state a

---

[21] Because the Court concludes that Ogles has not pleaded mail and wire fraud with sufficient particularity to state a valid RICO claim, the Court does not reach Defendants' other arguments that Ogles cannot show RICO standing under 18 U.S.C. § 1964(c).

separate jurisdictional basis for Ogles's unjust-enrichment claim, which arises under state law. At oral argument, counsel for Ogles stated that, should the Court decline to exercise supplemental jurisdiction, the alternative basis for jurisdiction over that claim would be diversity jurisdiction under 28 U.S.C. § 1332. Tr. at 148:10-18.

However, the second amended complaint does not establish a basis for diversity jurisdiction against the Guggenheim Defendants. The burden is on Ogles to establish that diversity jurisdiction exists. *Siloam Springs Hotel, L.L.C. v. Century Sur. Co.*, 781 F.3d 1233, 1236 (10th Cir. 2015) (citing *Full Life Hospice, LLC v. Sebelius*, 709 F.3d 1012, 1016 (10th Cir. 2013)). The second amended complaint states that both Guggenheim Defendants are L.L.C.s—limited liability companies.[22] Although each entity's principal place of business is listed, Ogles has not alleged the citizenship of each company's members. Determining the citizenship of an L.L.C. or other unincorporated association for purposes of diversity depends on the citizenship of all of its members. *Id*. at 1237-38. But the second amended complaint does not include any allegations about the citizenship of each of the Guggenheim companies' members. Given this, there is no proper basis for the Court to assume diversity jurisdiction over Ogles's unjust-enrichment claim.

A district court has supplemental jurisdiction "over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy." 28 U.S.C. § 1367(a). But a district court may decline to exercise supplemental jurisdiction where the state-law claim raises a novel or complex question or predominates over the federal question, where "the district court has dismissed all claims over which it has original jurisdiction," or where exceptional circumstances provide compelling reasons to decline

---

[22] The second amended complaint actually states that Guggenheim Partners, LLC is "a New York limited liability corporation." Doc. 61 at 9 (¶ 27). But New York state law refers to "limited liability companies." *See* N.Y. Ltd. Liab. Co. Law § 101 ("This chapter shall be known as the 'New York Limited Liability Company Law.'"); *see also* N.Y. Ltd. Liab. Co. Law § 102(m) (defining "limited liability company" as "an unincorporated organization").

jurisdiction. *Id.* at § 1367(c); *see also Exum v. U.S. Olympic Comm.*, 389 F.3d 1130, 1138-39 (10th Cir. 2004). In deciding whether to exercise supplemental jurisdiction over a state-law claim, the district court should consider whether the values of judicial economy, convenience, and fairness would be served by retaining jurisdiction. *Wittner v. Banner Health*, 720 F.3d 770, 781 (10th Cir. 2013).

Here, the Court has dismissed Ogles's federal RICO claim in its entirety. Guggenheim's motion to dismiss raises arguments in favor of dismissal of Ogles's unjust-enrichment claim, including that Ogles's claim is time-barred under Kansas law and that Kansas law does not permit an unjust-enrichment claim to be based on conferral of an indirect benefit. Doc. 70 at 32-37. These arguments raise questions of purely state law. Given these considerations, and given the early stage of this litigation, the Court declines to exercise supplemental jurisdiction over Ogles's state-law unjust-enrichment claim. It is accordingly dismissed without prejudice for lack of jurisdiction. *See Tal*, 453 F.3d at 1271.

## IV.    CONCLUSION

THE COURT THEREFORE ORDERS that both Defendants Motions to Dismiss (Docs. 67 and 69) are GRANTED. Specifically, Count One of the second amended complaint under RICO is dismissed for failure to state a claim. Count Two of the second amended complaint for unjust enrichment is dismissed without prejudice for lack of subject-matter jurisdiction.

IT IS SO ORDERED.

Dated: July 12, 2019                           /s/ *Holly L. Teeter*
                                                HOLLY L. TEETER
                                                UNITED STATES DISTRICT JUDGE